## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

HEMOSTEMIX INC.,

                Plaintiff,                    Case No.

v.

KYLE MAKOFKA, an individual, JED M.
WOOD, an individual, BLAKE WOOD, an
individual, RANDI WOOD, an individual,        **JURY TRIAL**
ALAN JACOBS, MD, an individual,        **DEMANDED**
REGINALD COOPER, an individual,
KINGSMAN SCIENTIFIC MANAGEMENT
INC., an Alberta, Canada corporation, ASPIRE
HEALTH SCIENCE, LLC, a Florida limited
liability company, and AJIA GLOBAL
SERVICES, LLC, a Delaware limited liability
company,

                Defendants.

_____/

## COMPLAINT

Plaintiff HEMOSTEMIX INC. ("**Hemostemix**" or "**the Company**"), hereby

files this Complaint for damages and injunctive relief against Defendants KYLE

MAKOFKA, an individual ("**Makofka**"), JED M. WOOD, an individual ("**Jed**

**Wood**"), BLAKE WOOD, an individual ("**Blake Wood**"), RANDI WOOD, an

individual ("**Randi Wood**"),  ALAN JACOBS, MD., an individual ("**Jacobs**"),

REGINALD COOPER, an individual ("**Cooper**"), KINGSMAN SCIENTIFIC

MANAGEMENT INC., an Alberta, Canada corporation ("**KSM**"), ASPIRE

1

HEALTH SCIENCE, LLC, a Florida limited liability company ("**Aspire**"), and

AJIA GLOBAL SERVICES, LLC, a Delaware limited liability company ("**AJIA**")

(collectively, "**Defendants**") and, in support of same, Hemostemix alleges as

follows:

## INTRODUCTION

Hemostemix, a biotechnology company, seeks redress for injuries and harm

sustained as a direct and proximate result of Makofka and Jed Wood attempting,

repeatedly and continuously, to gain control and ownership of Hemostemix and its

proprietary therapy and data. Makofka and Jed Wood executed a long-term, broad-

ranging scheme and conspiracy to steal Hemostemix's valuable intellectual property.

As set forth herein, Makofka and Jed Wood had a long-standing business

relationship that constituted a Racketeer Influenced and Corrupt Organizations

Enterprise (a "RICO Enterprise") by which they agreed to and did conduct and

participate in a pattern of racketeering activity for the unlawful common and similar

purpose of impairing Hemostemix financially, stealing Hemostemix's valuable

intellectual property (as defined below) and other assets, and ultimately taking

control of Hemostemix and its operations through: (a) fraud; (b) predatory and

commercially unreasonable loans and other funding arrangements; (c) self-dealing

and related transactions; (d) wire fraud; (e) extortion; (f) theft and misappropriation

of assets; and (g) tortiously and unlawfully interfering with and misappropriating

contractual relationships.  Makofka and Jed Wood employed this pattern of racketeering activity to acquire and maintain interests in and control over Hemostemix.  Makofka and Jed Wood further formed a RICO conspiracy with each other and Blake Wood, Randi Wood, Cooper and Jacobs, all of whom became integral to successful execution of the conspiracy by carrying out acts, including the pattern of racketeering activity, in furtherance of the RICO conspiracy in order to fulfill the unlawful common and similar purpose of impairing Hemostemix financially, stealing Hemostemix's valuable IP and other assets, and ultimately taking control of Hemostemix and its operations.  As a result of the malfeasance of all defendants, Hemostemix has sustained substantial monetary, reputational and other harm for which Hemostemix seeks relief.

Since Fall 2016, when they first hatched the scheme to take ownership and control of Hemostemix, Makofka and Jed Wood have used repressive and exploitive financial pressure, abusive litigation, and self-dealing to ultimately weaken Hemostemix and benefit Makofka, Jed Wood and Aspire.  Makofka misused and abused his positions of trust and confidence with Hemostemix to gain access to Hemostemix's operations, financial and accounting information, finances, network and servers, valuable IP and other assets which he and Jed Wood eventually misappropriated, and misused.  Makofka and Jed Wood carried out the scheme principally by impairing Hemostemix financially, impeding its ability to obtain

outside financing on commercially reasonable terms, and then providing secured financing through related entities they own and control, including KSM, J.M. Wood Investments, Ltd, and Aspire, with the intent of acquiring the rights to Hemostemix's IP related to ACP-01, a promising clinical stage cell-based, blood derived therapy Hemostemix developed for thirteen (13) years prior to the involvement of Makofka and Jed Wood.  The scheme and conspiracy, including all acts in furtherance thereof, were directed at and designed to benefit Makofka, Jed Wood and Aspire's interests in Florida.

After obtaining possession and control over Hemostemix's intellectual property (including critical clinical trial data), Makofka and Jed Wood have held it hostage and extorted Hemostemix by threats to indefinitely withhold the data unless Hemostemix pays an exorbitant ransom.  Hemostemix is entitled the return of its IP and other assets, actual damages, treble damages, injunctive relief, and attorneys' fees and costs to make itself whole after being victimized by Makofka, Jed Wood and the other individual and corporate defendants who targeted Hemostemix.

## **THE PARTIES**

## I.   **PLAINTIFF HEMOSTEMIX INC.**

1.     Plaintiff **Hemostemix Inc.** is a Canadian clinical-stage biotechnology company formed under the Business Corporations Act (Alberta).  At all times during

the period covered by this Complaint, Hemostemix has conducted business from its headquarters and principal place of business in Alberta, Canada.

2.     Hemostemix was targeted for takeover by Makofka and Jed Wood, was subjected to repressive and exploitive financing arrangements, was defrauded, had its assets and other property misappropriated by Defendants, had its contracts breached and stolen, and its business relationships tortiously interfered with by Defendants, all to ultimately benefit Makofka, Jed Wood and their business interests in Aspire.

## II.   DEFENDANTS

### A. <u>Kyle Makofka</u>

3.     Defendant **Kyle Makofka** is an individual residing in Blackfalds, Alberta, Canada.

4.     Makofka founded and wholly owns and controls Defendant KSM, which provided contracted-for management services to Hemostemix during the period covered by this Complaint.

5.     Makofka served first as Chief Restructuring Officer ("CRO"), then as President, and Chief Executive Officer ("CEO") of Hemostemix during the period covered by this Complaint.  He failed in every position.  Makofka also engaged in self-dealing transactions in violation of his fiduciary and other duties to Hemostemix.

6.     Makofka served as President and CEO of Aspire during the same time period that he served as President and CEO of Hemostemix.  Makofka continues to serve as President and CEO of Aspire.  Makofka has held, and continues to hold, himself out as a representative of Defendants KSM and Aspire for all purposes including, but not limited to, litigation in Florida.

7.     During the period covered by this Complaint, Makofka was involved in or orchestrated business ventures in Florida, executed or directed the execution of contract obligations for Aspire in Florida, and committed or directed the commission of tortious and illegal acts against Hemostemix in Florida.  Along with and at the direction of Jed Wood, Makofka was the ringleader of the vast conspiracy to impair Hemostemix financially, steal Hemostemix's IP and other assets, and ultimately take control of Hemostemix and its operations.

**B. <u>Jed Wood</u>**

8.     Defendant **Jed Wood** is an individual who, upon information and belief, resided during at least part of the period covered by this Complaint in Alberta, Canada.  Upon information and belief, Jed Wood is currently hiding out in a gated compound in Los Cabos, Mexico.

9.     During the period covered by this Complaint, Jed Wood was a minority shareholder of Hemostemix.

10.    Jed Wood formed Defendant Aspire and owns, controls, and/or operates with significant influence over Aspire through one or more of his corporate holdings under a family syndicate of affiliated entities which Jed Wood and other members of his family control ("Wood Group Family Office").  Jed Wood has held, and continues to hold, himself out as a corporate representative of Aspire in litigation and other matters in Florida.  Since Aspire's formation, Jed Wood has provided substantial funding and other material support and assistance to Aspire and its operations in Florida as part of the overall conspiracy set forth herein.

11.    During the period covered by this Complaint, Jed Wood was involved in or orchestrated business ventures in Florida, executed or directed the execution of contract obligations for Aspire in Florida, and committed or directed the commission of tortious and illegal acts against Hemostemix in Florida and elsewhere.  Along with Makofka, Jed Wood was the ringleader of the vast conspiracy to impair Hemostemix financially, steal Hemostemix's IP and other assets, and ultimately take control of Hemostemix and its operations.

**C. Blake Wood**

12.    Defendant **Blake Wood** is an individual who is the adult son of Defendant Jed Wood.  During the period covered by this Complaint, Blake Wood resided in, and continues to reside in Calgary, Alberta, Canada and Bridgetown, St. Michael, Barbados.

7

13.     Upon information and believe, Blake Wood is the principal of Wood Capital Ltd., a Barbados-based private equity investment firm for which Blake Wood is the titular owner but, upon information and belief, is ultimately owned and controlled by his father Jed Wood through the Wood Group Family Office syndicate, of which Blake Wood is a member.

14.     During the period covered by this Complaint, Blake Wood was involved in or orchestrated, committed or directed the commission of tortious and illegal acts against Hemostemix in Florida and elsewhere, all or a substantial part of which were in furtherance of a vast conspiracy with Makofka, Jed Wood and others to impair Hemostemix financially, steal Hemostemix's IP and other assets, and ultimately take control of Hemostemix and its operations.

**D. Randi Wood**

15.     Defendant **Randi Wood** is an individual who is the adult daughter of Defendant Jed Wood.  During the period covered by this Complaint, Randi Wood resided in, and continues to reside in, Beverly Hills, California and Palm Desert, California.

16.     Upon information and belief, Randi Wood is the titular owner and managing member of R.E.J. Investment Group, LLC ("**REJ**"), a California limited liability company, a company which is ultimately owned and controlled by her father Jed Wood through the Wood Group Family Office syndicate, of which Randi Wood

is a member.  REJ wholly owns Drive Capital Holdings (USA), Inc., which, in turn, wholly owns Aspire.  Randi Wood is a Director of Aspire and is directly involved in the conspiracy to have Aspire's steal and misappropriate Hemostemix's IP and other assets in Florida.

17.     During the period covered by this Complaint, Randi Wood was involved in or orchestrated, committed or directed the commission of tortious and illegal acts against Hemostemix in Florida and elsewhere, all or a substantial part of which were in furtherance of a vast conspiracy with Makofka, Jed Wood and others to impair Hemostemix financially, steal Hemostemix's IP and other assets, and ultimately take control of Hemostemix and its operations.

### E.  Alan Jacobs, MD

18.     Defendant **Alan Jacobs, MD** is an individual who, during the period covered by this Complaint, resided in or around Greenwood Village, Colorado. Jacobs served as President and Chief Medical Officer ("CMO") of Hemostemix from on or about March 29, 2019 through on or about October 31, 2019, at which time he resigned from both positions at Hemostemix and became employed by Aspire in contravention of his agreement with Hemostemix.

19.     Jacobs owns Defendant AJIA through which Jacobs provided services to Hemostemix.

20.     During the period covered by this Complaint, Jacobs engaged in business ventures for Hemostemix and Aspire in Florida, executed or directed the execution of contract obligations for Aspire in Florida, and was involved in and/or orchestrated, committed or directed the commission of tortious and illegal acts against Hemostemix in Florida and elsewhere, all or a substantial part of which were in furtherance of a vast conspiracy with Makofka, Jed Wood and others to impair Hemostemix financially, steal Hemostemix's IP and other assets, and ultimately take control of Hemostemix and its operations.

**F.  Reginald Cooper**

21.     Defendant **Reginald Cooper** is an individual who is an employee of Defendant KSM and has worked for Makofka for years.  During the period covered by this Complaint, Cooper resided in, and continues to reside in, Red Deer, Alberta, Canada.

22.     During the period covered by this Complaint, Cooper was involved in or orchestrated, committed or directed the commission of tortious and illegal acts against Hemostemix in Florida, as well as breached or caused the breach of one or more contracts with Hemostemix in Florida and elsewhere, all or a substantial part of which were in furtherance of a vast conspiracy with Makofka, Jed Wood and others to impair Hemostemix financially, steal Hemostemix's IP and other assets, and ultimately take control of Hemostemix and its operations.

10

### G. **Kingsman Scientific Management Inc.**

23.     Defendant **Kingsman Scientific Management Inc.** is a corporation formed under the laws of Alberta and has its principal place of business in Calgary, Alberta, Canada.  KSM was formed by, and is wholly owned and controlled by, Defendant Makofka.

24.     During the period covered by this Complaint, Makofka used KSM to enter into contracts for or on behalf of Hemostemix that were intended to be, and were, performed in Florida, executed acts in Florida in violation of the controlling contract and/or omitted to do certain acts in Florida otherwise contractually required of it for or on behalf of Hemostemix in Florida, and did so in ways that violated Hemostemix's contractual and other rights.

### H. **Aspire Health Science, LLC**

25.     Defendant **Aspire Health Science, LLC** is a Florida limited liability company with its principal place of business in Orlando, Florida.  Aspire was created by Jed Wood, with the aid and assistance of Makofka, Randi Wood and Blake Wood, in or about January 2017 as part of and in furtherance of the conspiracy to ultimately take control of the Hemostemix IP and other assets.

26.     Aspire is owned and controlled by Jed Wood through his various corporate holdings under the Wood Group Family Office syndicate.   Upon

11

information and belief, Aspire has been funded by Jed Wood through one or more entities under the Wood Group Family Office syndicate.

27.     Aspire is the principal corporate entity through which Makofka, Jed Wood and other co-conspirators sought to perpetrate the conspiracy to impair Hemostemix financially, steal Hemostemix's IP and other assets, and ultimately take control of Hemostemix and its operations.   During the period covered by this Complaint, Aspire carried out substantial business in Florida, brought legal action in Florida, entered into contracts in Florida that were to be performed in Florida, owns and/or leases property in Florida, and had during the relevant period its base of operations in Florida.   At Makofka's and Jed Wood's direction, Aspire has unlawfully retained and misappropriated Hemostemix's IP and other property related to ACP-01 and the Clinical Trial, HS 12-01.

### I.   AJIA Global Services, LLC

28.     Defendant **AJIA Global Services, LLC** is a Delaware limited liability company registered as a foreign limited liability doing business in and having its principal place of business at 4610 S. Ulster Street, Suite 150, Denver, Colorado 80237.   AJIA is also believed to operate under the name, or is affiliated with, AJIA Global, LLC, and, upon information and belief, is a trade name for Stemix Pharma, LLC, also a Delaware limited liability company also having its principal place of business at 4610 S. Ulster Street, Suite 150, Denver, Colorado 80237.

12

29.     AJIA, a/k/a AJIA Global, LLC, a/k/a Stemix Pharma, LLC, was formed by Defendant Jacobs on or about April 2, 2019, in Delaware and filed as a foreign LLC to do business in Colorado on or about April 8, 2019.

30.     Effective on or about February 1, 2019, two (2) months before its proper formation or registration to do business in Colorado, AJIA purported to enter into a contractor agreement to provide consulting services to Hemostemix.  Pursuant to that agreement, Jacobs was to serve as President and Chief Medical Officer for Hemostemix.

31.     During the period covered by this Complaint, Jacobs used AJIA to provide services to Hemostemix related to the ACP-01 Clinical Trial based principally in Florida, carried out substantial business in Florida, engaged in business ventures for Hemostemix and Aspire in Florida, executed and/or directed the execution of contract obligations in Florida, and was involved in and/or orchestrated, committed or directed the commission of tortious and illegal acts against Hemostemix in Florida and elsewhere, all or a substantial part of which were in furtherance of a vast conspiracy with Makofka, Jed Wood and others to impair Hemostemix financially, steal Hemostemix's IP and other assets, and ultimately take control of Hemostemix and its operations.

## JURISDICTION & VENUE

32.    This Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1331.  There is federal question jurisdiction over one or more claims asserted herein, including the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*, the Defend Trade Secrets Act, 18 U.S.C. §§ 1831-39, and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030.  This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 to consider and adjudicate all state law statutory and common law claims asserted herein. Supplemental jurisdiction over the state law claims is appropriate because they arise from the same common nucleus of operative facts from which the federal claims arise.

33.    This Court has personal jurisdiction over Defendants Makofka, Jed Wood, Blake Wood, Randi Wood, Jacobs, AJIA, Cooper, KSM, and Aspire pursuant to, among others, Fla. Stat. § 48.193(1)(a)(1) (operating, conducting, engaging in, or carrying on a business or business venture in Florida), (a)(2) (committing a tortious act in Florida), and (a)(7) (breaching a contract in Florida by failing to perform acts required by the contract to be performed in Florida).  Further, this Court has general personal jurisdiction over Defendant Aspire, a limited liability company having its principal place of business and "home" in the State of Florida.

34.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b).   Conduct giving rise to the claims occurred within or involved business activities within the Middle District of Florida.   Upon information and belief, IP and other property at issue in this litigation is located within the Middle District of Florida.

## STATEMENT OF FACTS

### I.   HEMOSTEMIX'S FORMATION AND DEVELOPMENT OF ACP-01, ITS LIFE SAVING PROPRIETARY STEM CELL THERAPY

35.     Hemostemix was co-founded as TheraVitae Inc. in 2006 by Thomas Smeenk, its current CEO and President.   TheraVitae, as licensee, amalgamated with its licensor in 2008.   Following a plan of arrangement, it amalgamated with Technical Ventures RX Corp. in 2014 to become the public company, Hemostemix.

36.     Hemostemix's shares trade on the TSX Venture Exchange ("the Exchange") under the trading symbol "HEM."

37.     Hemostemix's principal business is to develop, manufacture, and commercialize blood-derived cell therapies to treat various diseases not addressed by current therapies.

38.     Hemostemix is the Food and Drug Administration ("FDA") approved Sponsor of the Clinical Trial # HS-1201 for ACP-01 (the "Clinical Trial").   Hemostemix was the winner of the World Economic Forum Technology Pioneer

Award.  Hemostemix has worked relentlessly to develop and commercialize its lead product ACP-01 for the treatment of critical limb ischemia ("CLI"), peripheral artery disease ("PAD"), angina, ischemic cardiomyopathy, dilated cardiomyopathy and other conditions of ischemia.

39.    ACP-01 is a therapeutic developed by Hemostemix for the treatment of ischemic diseases such as CLI, angina and heart disease.  ACP-01 has been used to treat over 300 patients, and it is the subject of a randomized, placebo-controlled, double blind trial of its safety and efficacy in patients with advanced critical limb ischemia who have exhausted all other options to save their limb from amputation.

40.    Hemostemix owns ninety-one (91) patents across five (5) patent families titled: Regulating Stem Cells, In Vitro Techniques for use with Stem Cells, Production from Blood of Cells of Neural Lineage, and Automated Cell Therapy. Its IP is a highly valuable and coveted asset.

41.    CLI is a severe form of PAD caused by reduced blood flow to the legs which, if untreated, can result in complications such as nerve and tissue damage. Without treatment, approximately 50% of all CLI patients either die or require amputation of the affected limb within a year of diagnosis.  Demand for treatment of CLI has steadily increased over time.  CLI predominantly affects diabetic individuals over the age of 50.

42.   On or about August 21, 2015, the FDA cleared Hemostemix's Investigational New Drug ("IND") application to expand the Clinical Trial for CLI. The FDA's approval of Hemostemix's IND was a major milestone in the Clinical Trial.

43.   During the period covered by this Complaint, the Clinical Trial was in Phase II.  During that time, ACP-01 was being administered and tested at multiple sites as part of a double-blinded, randomized, placebo-controlled trial to demonstrate the safety and medical efficacy of ACP-01 as a treatment of CLI.

44.   A double-blinded, randomized, placebo-controlled trial is widely accepted as an objective scientific methodology that, when ideally performed, produces knowledge and results untainted by bias.  This is because a randomized controlled trial is a prospective, comparative, quantitative study performed under controlled conditions with random allocation of interventions to comparison groups.

45.   The randomized controlled trial is considered the most rigorous and robust research method of determining whether a causal relation exists between an intervention and an outcome.

46.   Hemostemix has served as the Phase II Clinical Trial Sponsor in the approved application in order to enroll patients at clinical sites across the United States.  As the Sponsor, and since inception, Hemostemix has invested over $38 million to date in its efforts to bring ACP-01 to market.

17

47.    During the period covered by this Complaint, Hemostemix has been and continues to be the owner of all IP related to ACP-01.  This is true regardless of any contracted-for management services, license agreement, or manufacturing agreement granting limited rights to a third party.

48.    Until in or about 2017, Kwalata Trading Limited ("Kwalata"), a Cyprus entity and wholly-owned subsidiary of Hemostemix established to own IP, owned the patents related to ACP-01 and the Clinical Trial.  After a corporate reorganization initiated and directed by Makofka, Makofka intimated a plan to wind up Kwalata and transfer the IP ownership rights to Hemostemix to enable Jed Wood to perfect his control over Hemostemix's IP.  Makofka never actually followed through on winding up Kwalata, but did transfer from Hemostemix Ltd. (Israel) ("**HEM-Israel**") to Aspire possession and custody of all Hemostemix trade secrets—"know-how," "show-how," confidential information, IP, data, batch records—related to manufacturing of ACP-01.  Hemostemix retained its title and ownership rights to the IP related to ACP-01 and the Clinical Trial, but the move revealed his primary objective, which was to give himself and Jed Wood direct day-to-day control over and sole access to the IP at Hemostemix.

49.    During the period covered by this Complaint, the IP owned by Hemostemix has included, and continues to include: (a) intellectual property; (b) industrial property; (c) proprietary rights and interests; (d) patents and patent

applications; (e) inventions; (f) improvements and developments on any of the categories within this definition; (f) copyrights; (g) industrial designs; (h) integrated circuit topographies; (i) math works; (j) design patents; (k) utility models; (l) trade secrets; (m) <u>confidential information</u>; (n) "know how"; (o) "show how"; (p) trademarks; (q) domain names; (r) business names; (s) goodwill; (t) all rights to apply for and all applications and registrations for any of the foregoing categories, as well as any and all continuations, substitutions, confirmations, divisions, reissues, extensions and renewals thereof; and/or (u) all legal rights to bring actions or other proceedings against third parties for infringement, misuse or misappropriation of any of the foregoing categories (one, some or all collectively defined herein as "**Hemostemix's IP**" or the "**Hemostemix IP**").

50.     "Confidential information" includes all of Hemostemix's Clinical Trial Data such as patient data, batch and manufacturing data, the randomization key or table, as well as trade secrets, inventions, innovations, processes, information, records and specifications owned or licensed by Hemostemix in connection with ACP-01 and the Clinical Trial.

51.     At all times, Hemostemix took careful, prudent, and reasonable steps to secure the confidentiality of all the Hemostemix IP, including without limitation, the Clinical Trial Data by, among other things, entering into agreements that contained strict confidentiality provisions.

52.     Throughout the course of the Clinical Trial, more than seventeen (17) clinical trial sites were established across North America, including Florida, Pennsylvania, Texas, North Carolina, South Carolina, Colorado and California. Each trial site has produced Clinical Trial Data and IP that is the property of Hemostemix.

53.     Moreover, as a testament to the safety and effectiveness of the therapy, hundreds of patients have been safely treated with ACP-01 on a compassionate care basis.  On October 21, 2019, Hemostemix announced the results from its Phase II CLI trial abstract presentation entitled "Autologous Stem Cell Treatment for CLI Patients with No Revascularization Options: An Update of the Hemostemix ACP-01 Trial With 4.5 Year Follow-up" which noted healing of ulcers and resolution of ischemic rest pain occurred in 83% of patients, with outcomes maintained for up to 4.5 years.

54.     A successful Phase II result in the Clinical Trial would conservatively add at least $300 million of commercial value to Hemostemix.  Efforts by Makofka and Wood, as detailed in this Complaint, have caused the loss, disruption, and/or diminution in value to Hemostemix of its ACP-01 therapy.

55.     Unfortunately, Makofka, Jed Wood, and others have interfered with and jeopardized Hemostemix's ability to commercialize ACP-01 by intentionally

and illegally committing fraud and tortious acts as part of a broad-ranging pattern of racketeering activity and civil RICO conspiracy, causing direct loss to Hemostemix.

## II.    EARLY ASSAULTS ON HEMOSTEMIX AND ITS LEADERSHIP WEAKENED HEMOSTEMIX IN 2016 WHILE POSITIONING MAKOFKA AND JED WOOD TO SCHEME TO TAKE CONTROL OF HEMOSTEMIX.

56.    Makofka and Jed Wood are long-time business partners.  Both have a track record of using legally questionable or illegal tactics to gain control of companies such as Hemostemix.

57.    Makofka and Jed Wood executed their conspiracy through corporate entities they owned and/or controlled including, but not limited to, Drive Capital Corp. ("**Drive Capital**"), KSM, J.M. Wood Investments, Ltd. ("**JMWI**"), Wood Capital Ltd. ("**Wood Capital**"), REJ, and Aspire.  They also utilized corporate entities owned or controlled by co-conspirators, including Jacobs' company AJIA.

58.    During the period covered by this Complaint, Drive Capital was a Canadian corporation owned and controlled by both Makofka and Jed Wood.  It was later amalgamated into an entity that is currently owned and controlled by Jed Wood, through JMWI, also an entity wholly-owned and controlled by Jed Wood.

59.    Makofka and Jed Wood conspired to take control of Hemostemix.  The scope and contour of the conspiracy evolved over time, as did the members, participants and means of executing the conspiracy.  Principally, the conspiracy

involved: (a) gaining access to and control over Hemostemix's management and operations; (b) engaging in related and self-dealing transactions in order to empower Makofka and Jed Wood and weaken Hemostemix; (c) impairing Hemostemix financially by precluding the Company from obtaining outside financing from independent investors through arms-length transactions; (d) presenting "last resort" repressive and exploitive financing arrangements through Makofka and Jed Wood further weakening Hemostemix, paving the way for Makofka and Jed Wood to take control of Hemostemix and its operations when Hemostemix was at its most vulnerable financially impaired state; and (e) vesting Aspire, Makofka's and Jed Wood's Florida-based entity, with all IP and other rights to ACP-01 and the Clinical Trial to ultimately acquire Hemostemix IP and other assets and effectively step into the shoes of Hemostemix as Clinical Trial sponsor.

60.    Because the conspiracy evolved over time, and was not apparent to independent Board members at the time, the full extent of the damage to Hemostemix would not be realized for several years.

## **2016 Loan-to-Own Offer Rejected by Hemostemix Board**

61.    In or about February 2016, Makofka and Jed Wood, through Drive Capital, approached Hemostemix regarding a proposed secured debenture financing transaction.

22

62.     Drive Capital offered Hemostemix up to $4 million in secured debenture financing, according to the following terms: (a) Drive Capital offered to make an initial $1 million payment for a 90-day due diligence period; (b) the initial $1 million funding was to be secured by all of Hemostemix's IP and other assets; (c) Drive Capital would make the remaining $3 million payment upon conclusion of a 90-day due diligence investigation by Makofka and Jed Wood; and (d) payment of the remaining $3 million would trigger Hemostemix's obligation to repay the initial $1 million payment within nine (9) months of the initial payment (or six (6) months after conclusion of the 90-day due diligence period) (the "**2016 Loan-to-Own Offer**").  Hemostemix's failure to repay the initial $1 million in full within the required repayment period would trigger Drive Capital's right to acquire all of Hemostemix's IP and other assets pledged as security for the 2016 Loan-to-Own.

63.     The 2016 Loan-to-Own Offer was the first attempt by Makofka and Jed Wood to exploit Hemostemix's capital financing needs to gain control over Hemostemix and its IP.

64.     In early August 2016, the Hemostemix Board rejected the 2016 Loan-to-Own Offer after determining it exposed Hemostemix and its shareholders to unreasonable risk.

## 2016 Secured Debenture Acquired by Jed Wood

65.     Instead, the Hemostemix Board issued a $1 million secured convertible debenture (the "**2016 Secured Debenture**").

66.     On or about January 12, 2017, Makofka, who was serving as President and CEO of Hemostemix, and Jed Wood had Drive Capital acquire the 2016 Secured Debenture, and, in turn, sell it to Wood Capital, Jed Wood's and Blake Wood's company.

67.     Whereas Hemostemix was able to resist the initial run at Hemostemix by Makofka and Jed Wood, the debt obligations were later assumed by Jed Wood through his various business entities as a way to gain control over Hemostemix.

## 2016 Frivolous Litigation and Unsuccessful Proxy Challenge

68.     Additionally, to illustrate how petty and vindictive Jed Wood and Makofka are, *despite later acquiring the 2016 Secured Debenture*, Jed Wood and Makofka formulated a plan to challenge the Hemostemix Board's authority to even issue the 2016 Secured Debenture, bringing a frivolous legal challenge to the Alberta Securities Commission, which was later dismissed as without merit.  This was all part of Makofka's and Jed Wood's grand plan to take over Hemostemix by either draining the Company of all working capital through frivolous litigation, or exploiting and exacerbating the Company's financial struggles.

69.     Makofka and Jed Wood were just getting started at this point.  Angered by the Board's rejection of the 2016 Loan-to-Own Offer, Makofka and Wood

orchestrated a proxy challenge on or about August 22, 2016, in advance of the 2016 Annual General Meeting ("AGM") (the "**Proxy Challenge**").  The Proxy Challenge was designed to unseat the Hemostemix Board and install new Board members, including Jed Wood himself, as well as others loyal to Makofka and Jed Wood.

70.     The Proxy Challenge failed.  Hemostemix shareholders voted to retain the Directors during a vote on September 9, 2016 at the 2016 AGM, again beating back Makofka's and Jed Wood's frontal assault on the Company.

71.     The failure of the Proxy Challenge did not deter Makofka or Jed Wood in their scheme to take control of Hemostemix.  They threatened to pursue, and in fact were pursuing, additional frivolous litigation against Hemostemix.   The frivolous litigation was designed to cause, and resulted in, the diversion of significant financial resources out of Hemostemix in defense costs that would and could otherwise have been dedicated to underwriting bona fide Clinical Trial costs.

72.     Makofka and Jed Wood threatened that there would be "no end in sight" to legal challenges against Hemostemix unless and until Hemostemix ceded control to them.

73.     At a meeting with new Hemostemix board member Angus Jenkins on or about September 13, 2016, despite having lost the Proxy Challenge, Jed Wood and Makofka demanded the right to reconstitute the Board and to take total control

over the Board and Hemostemix, including its day-to-day management and operations.

74.     Makofka and Jed Wood knew the abusive litigation strategy significantly impaired Hemostemix's ability to secure outside financing for its operations.

75.     Makofka and Jed Wood had the motivation, intent and, most importantly, the financial means to make good on their threats unless Hemostemix agreed to their demands.

76.     Jenkins, who was viewed as loyal to Makofka and Jed Wood, determined that Hemostemix should capitulate to the pressure from Makofka and Jed Wood, including the purported threat of future litigation.

77.     On or about December 21, 2016, Makofka and Jed Wood induced and coerced the Hemostemix Board to approve a management agreement with Drive Capital (the "**Drive Capital Agreement**").  A true and correct copy of the Drive Capital Agreement is attached hereto as **Exhibit 1.**

**III.  MAKOFKA AND JED WOOD USED DRIVE CAPITAL AND LATER KSM TO FURTHER THEIR CONSPIRACY TO IMPAIR HEMOSTEMIX FINANCIALLY, STEAL HEMOSTEMIX'S IP AND OTHER ASSETS, AND TAKE CONTROL OF HEMOSTEMIX.**

**A.  The Drive Capital Agreement for Management/Operational Services.**

78.     Drive Capital was owned and controlled by Makofka and Jed Wood, both of whom were principals of Drive Capital.

26

79.    The Drive Capital Agreement had a two-year term, expiring in December 2018.  (Ex. 1, § 3 at 3.)

80.    The Drive Capital Agreement was signed by Makofka., as Managing Director for Drive Capital, and Angus Jenkins, as Director for Hemostemix.

81.    Makofka and Jed Wood intended the Drive Capital Agreement, as part and parcel to the overall conspiracy, to be carried out and affect activities and operations in Florida.

82.    The Drive Capital Agreement vested Makofka with "authority to exercise exclusive work control, direction and management over" the scope of work items set forth in the Agreement.  (Ex. 1, § 1 at 1.)  As Hemostemix would later learn, Makofka and Jed Wood used this authority to benefit themselves at the expense of Hemostemix.

83.    As part of this authority and control, Makofka's scope of work required him to provide "[a]dvice, assistance and support in all matters (including with respect to financing, management, strategic and operational issues, restructurings, dispositions, and mergers and acquisitions) to . . . effect [Hemostemix's . . . business and strategic plans." (Ex. 1, § 2 at 1.)

84.    The Drive Capital Agreement vested Makofka authority to reconstitute the Hemostemix Board.  (Ex. 1, § 2 at 2.)  Makofka used this authority to appoint

individuals who were loyal to Makofka and Jed Wood for the purpose of benefitting Makofka and Jed Wood.

85.    At the direction of Makofka and Jed Wood, Jenkins was elevated to be Chairman of the Board despite having no prior experience whatsoever in the biotechnology industry, let alone serving on a board of a clinical trial biotechnology company.   Jenkins was viewed as loyal to Makofka and Jed Wood and, as Hemostemix would later learn, was someone who would, and did, give deference and priority to Makofka and Jed Wood at the expense of Hemostemix.

86.    At the direction of Makofka and Jed Wood, Don Friesen ("**Friesen**") was installed as a Board member.  Friesen had no prior experience serving on a board of a clinical trial biotechnology company.  Instead, Friesen had a long-standing business relationship with Wood.  Friesen was viewed as loyal to Makofka and Jed Wood and, as Hemostemix would later learn, was someone who would, and did, give deference and priority to Makofka and Jed Wood at the expense of Hemostemix.

87.    The Drive Capital Agreement gave Drive Capital and its principals, Makofka and Jed Wood, access to "all required systems and data" of Hemostemix. (Ex. 1, § 4 at 3.)  As Hemostemix would later learn, Makofka and Jed Wood used this access to benefit themselves at the expense of Hemostemix.

28

88.     The Drive Capital Agreement imposed limits and restrictions on what its principals and agents, including Makofka and Jed Wood, could do with Hemostemix's IP and other "confidential information," to wit:

    a.  Drive Capital and, as principals, Makofka and Jed Wood, were required to maintain all Hemostemix IP and other property as strictly confidential;

    b.  Drive Capital and its principals Makofka and Jed Wood, as well as anyone else affiliated with Drive Capital, were prohibited from retaining any IP or other property after termination or expiration of the Drive Capital Agreement; and

    c.  Drive Capital and its principals Makofka and Jed Wood, as well as anyone else affiliated with Drive Capital who acquired access to or copies of Hemostemix IP, were required to return all Hemostemix IP, including all files, records, documents, data and other information, to Hemostemix upon termination or expiration of the Drive Capital Agreement.

(Ex. 1, § 8 at 4-5.)

89.     Hemostemix, as an entity, thus took reasonable steps to at least protect its Confidential Information.  These duties of confidentiality and proper handling

and return of confidential information set forth under Section 8 survived termination of the Drive Capital Agreement.  (Ex. 1, § 11(d) at 7.)

90.    The Drive Capital Agreement granted Drive Capital and its principals, Makofka and Jed Wood, authority to oversee and manage the operations, management and even proposed "reorganization" of Hemostemix.  As Hemostemix would later learn, Makofka and Jed Wood used this oversight and management authority to benefit themselves at the expense of Hemostemix.

91.    The Drive Capital Agreement provided lucrative compensation and financial incentives and inducements to increase operating costs.  Specifically, Drive Capital's and, by extension, Makofka's and Jed Wood's, compensation or remuneration, was required to be equivalent to 15% of all Clinical Trial costs.  (Ex. 1, § 5 at 3.)  Increasing Clinical Trial costs directly benefitted Drive Capital and its principals, Makofka and Jed Wood, at the expense of Hemostemix, by increasing compensation Hemostemix was compelled to pay to Drive Capital.

92.    The Drive Capital Agreement required Drive Capital and its principals and agents to "undertake all of the Work diligently in a good and workmanlike manner."  (Ex. 1, § 7 at 4.)  As Hemostemix would later learn, Makofka and his team failed to perform in accordance with this standard.

93.    The Drive Capital Agreement imposed limits and restrictions on what Drive Capital and its principals could do in furtherance of a reorganization, explicitly

30

limiting Makofka and Jed Wood from taking any action that would benefit another entity or individual over Hemostemix.

94.     Specifically, Section 9 permitted Drive Capital and its principals to provide services for other clients, "*provided that* [Drive Capital's] other services for other clients does not interfere with or detract from the provision of the Work and the performance of [Drive Capital's] duties and obligations pursuant to this Agreement."  (Ex. 1, § 9 at 5 (emphasis added).)  As Hemostemix would later learn, Makofka and Jed Wood violated this covenant by taking action designed to benefit Makofka, Jed Wood and Aspire at the expense of Hemostemix.

95.     The Drive Capital Agreement contained a "Non-Solicitation" covenant. Drive Capital and its principals Makofka and Jed Wood were prohibited, for a one-year period following the expiration date of the Drive Capital Agreement (whether or not terminated earlier than the expiration date), directly or indirectly, from: (a) soliciting, encouraging or facilitating clients or customers of Hemostemix from altering, modifying, varying, diminishing or ceasing their client or customer relationships with Hemostemix; (b) soliciting, inducing, encouraging or facilitating any employees, consultants, suppliers or subcontractors of Hemostemix to leave the employment of, or the consulting, supply or subcontractor relationship with Hemostemix.  (Ex. 1, § 10(a) at 5-6.)  These duties and restrictions arising under the Non-Solicitation provision survived termination of the Agreement.  (Ex. 1, § 11(d)

31

at 7.)   As Hemostemix would later learn, Makofka and Jed Wood violated this covenant in the Drive Capital Agreement.

96.   Within one year of the termination and/or expiration of the Drive Capital Agreement, Makofka and Jed Wood, as well as other Drive Capital agents, solicited, encouraged, and/or facilitated clients and customers, including without limitation vendors and consultants, to alter, modify, diminish and/or cease their respective relationships with Hemostemix.  They also solicited, induced, encouraged and/or facilitated, some under false and fraudulent pretenses, certain employees, consultants, suppliers, contractors and/or subcontractors, including without limitation, Jacobs, Cooper, Laura Fairbairn, Medrio, Inc. ("**Medrio**"), Accudata Solutions, Inc. ("**Accudata**"), and Anju ClinPlus, LLC ("**Anju**"), among others, to leave the employment of, consultancy, contractor or subcontractor or other relationship with Hemostemix in favor of Aspire, a company formed and controlled by Makofka and Jed Wood.

### B. **Makofka and Jed Wood Used the Hemostemix Reorganization to Exploit Hemostemix's Financial Difficulties.**

97.   One "reorganization" action taken was the appointment of Makofka as Hemostemix's Chief Restructuring Officer ("CRO").  Makofka's appointment as CRO was designed to give Makofka and Jed Wood access to and control over Hemostemix's operations, finances and accounting, financing and fundraising, and contracting, as well as management of the Hemostemix IP.

98.     By design, Makofka served simultaneously as both Managing Director to Drive Capital and as Chief Restructuring Officer to Hemostemix, which enabled him to engage in self-dealing designed to benefit himself and Jed Wood at the expense of Hemostemix.

99.     As Hemostemix's CRO, Makofka owed fiduciary duties of loyalty and care to Hemostemix.  These fiduciary duties were separate and independent of any contractual duties owed by Makofka to Hemostemix under the Drive Capital Agreement.

100.    Makofka's appointment as CRO was not due to his education or experience.  Indeed, Makofka was ill-equipped to serve as CRO for Hemostemix. Makofka had a high school level education and no scientific-basis record-of-success as a CRO of any company, much less a clinical-stage biotechnology company.

101.    Makofka failed as CRO.  Makofka's principal job as CRO was to turn Hemostemix around financially and operationally.   Makofka instead steered Hemostemix to business ventures that benefited Makofka and Jed Wood at the expense of Hemostemix.

102.    Makofka's efforts as CRO exacerbated Hemostemix's financial condition, making it more dependent upon Jed Wood and Jed Wood's financing. This was by design.

103.   Makofka's adverse performance as CRO was part of the plan to take control of Hemostemix.  He used his position as CRO to affirmatively undermine Hemostemix's opportunities for growth and financing and affirmatively worked to weaken Hemostemix financially.

104.   Makofka's appointment as CRO positioned him to direct reorganization efforts and control the management and operations of Hemostemix in furtherance of the conspiracy to ultimately take control of Hemostemix's IP.

105.   Further to this plan, upon being appointed as CRO, Makofka worked in concert with Jed Wood to restructure Hemostemix.

106.   One restructuring effort involved targeting Hemostemix's IP by purportedly winding up Kwalata and transferring the IP ownership rights from Kwalata to Hemostemix.

107.   This purported corporate restructuring was not done to benefit Hemostemix, but rather in furtherance of the conspiracy and to benefit Makofka and Jed Wood.  Makofka did not complete the winding up of Kwalata.  Makofka did, however, move all of the assets of Hemostemix from HEM-Israel to Aspire in Florida, winding up HEM-Israel to consolidate day-to-day control and ownership of the IP of Hemostemix in a manner that Makofka could exercise virtually total control as CRO.  Thus, Makofka positioned himself and Jed Wood to seize control over the

Hemostemix IP after driving Hemostemix further into financial hardship and closer to insolvency and receivership.

108.   As CRO, Makofka also moved all manufacturing activities related to ACP-01 to the United States and vested those activities in Aspire.

109.   Aspire was formed after Makofka and Jed Wood orchestrated a takeover of another company doing business with Hemostemix.   In late 2016, Makofka and Jed Wood collaborated to take over a distressed company, Advanced Innovative Medicine ("**AIM**"), a development laboratory company that had a license agreement with Hemostemix.

110.   Makofka and Jed Wood presented a "loan to own" scheme to AIM, pursuant to which AIM pledged its assets and shares as security—similar to the leveraged loan-to-own schemes used by Makofka and Jed Wood with Hemostemix. The AIM loan was called when AIM was least able to service its debt obligations, which ultimately enabled Makofka and Jed Wood to gain control of all AIM assets and shares.

111.   Shortly thereafter, in January 2017, Makofka and Jed Wood formed Aspire as a Florida LLC and transferred all AIM contracts and activities to Aspire, including AIM's services contract with Hemostemix.

112.   Makofka and Jed Wood appointed Makofka to be President and CEO of Aspire.

113.   Jed Wood underwrote and continues to underwrite Aspire's operations and activities.

114.   Throughout 2017, Aspire assumed an increasingly prominent role in Hemostemix's operations.

115.   Another restructuring effort involved, as referenced above, targeting Hemostemix's manufacturing operations in October 30, 2017 by winding up HEM-Israel, the wholly-owned Hemostemix subsidiary that was responsible for manufacturing ACP-01.

116.   HEM-Israel was a wholly-owned subsidiary responsible for all ACP-01 manufacturing for more than a decade.  HEM-Israel possessed all trade secrets of "know-how" and "show-how" to reliably produce ACP-01.

117.   Instead of leaving all manufacturing operations with HEM-Israel, or transferring manufacturing operations to Hemostemix or a domestic subsidiary, Makofka devised a scheme with Jed Wood to have Hemostemix transfer to Aspire all ACP-01 manufacturing operations and information.

118.   Aspire had no experience relating to the manufacture or distribution of ACP-01.

119.   Makofka falsely represented to and misled the Hemostemix Board and shareholders that shuttering HEM-Israel, transferring all manufacturing activities related to ACP-01 to the United States, and vesting such activities within Aspire

36

would benefit Hemostemix's "efficiency and logistics" for its ACP-01 manufacturing operations by decreasing manufacturing and transport costs.

120.   In reality, the transfer orchestrated by Makofka, in collaboration with and at the direction of Jed Wood, was neither necessary nor appropriate.  It did not materially decrease costs, nor did it materially improve efficiency, logistics or the manufacturing process.  On the contrary, costs increased once the manufacturing operations were transferred to Aspire, an entity that had no prior experience or infrastructure to support the manufacturing of ACP-01.

121.  Under the Drive Capital Agreement, Drive Capital's principals, Makofka and Jed Wood, controlled all management and business decisions of Hemostemix.  Drive Capital's compensation was equivalent to 15% of all Clinical Trial costs.  Increasing Clinical Trial costs, rather than decreasing such costs, directly benefitted Makofka by increasing compensation Hemostemix paid to Drive Capital and Makofka.

122.  Expensing through Hemostemix the legal costs of the consolidation of Hemostemix's IP from Kwalata to Hemostemix, and the transition of manufacturing operations from HEM-Israel to Aspire permitted Makofka and Jed Wood to immediately gain access to and take physical possession of and control over Hemostemix's IP at Aspire at no cost.  This was part of the scheme and conspiracy

to benefit Makofka and Jed Wood by consolidating and solidifying Aspire's control over Hemostemix and its IP.

123.   Pursuant to the Drive Capital Agreement, Makofka and Jed Wood also secured significant financial and other benefits for Drive Capital and themselves, to the detriment of Hemostemix and in furtherance of their conspiracy.  Such financial benefits included receiving unearned compensation and options rights to acquire a sizeable equity stake in Hemostemix at a discounted price per share.

124.   The Drive Capital Agreement further obligated Hemostemix to reimburse Drive Capital for all expenses, including those incurred for Drive Capital's legal and advisory services.  Hemostemix bore all financial risk and expenses under the Drive Capital Agreement, while Drive Capital and its principals, Makofka and Jed Wood, bore no risk.

125.   Makofka and Jed Wood used Hemostemix as their personal and professional slush fund.  Any financial support from Makofka and Jed Wood were highly leveraged loan-to-own schemes, as discussed below, designed to saddle Hemostemix with greater debt obligations and expose it to a takeover while ultimately lining Makofka's and Jed Wood's pockets.

### 2017 Loan-to-Own Scheme

126.   In all cases, all financing arrangements presented by Makofka to the Board involved Jed Wood—or entities Makofka or Jed Wood owned and

controlled—providing financing to Hemostemix for Hemostemix to then pay outstanding "debts" of purported "creditors" relating to the conduct of the Clinical Trial.  The purported "creditors" were, in turn, entities largely owned and controlled by Makofka or Jed Wood, or both, giving Makofka and Jed Wood a double-windfall.

127.   Such repressive and exploitive round-trip funding schemes were Makofka's and Jed Wood's stock-in-trade and were designed to increase Makofka's and Jed Wood's financial control and leverage over Hemostemix.

128.   On or about January 12, 2017, for instance, Drive Capital acquired the 2016 Secured Debenture discussed above and, in turn, sold it to Wood Capital, a company owned and controlled by Jed Wood and Blake Wood.

129.   While formalizing the purchase of the 2016 Secured Debenture, on or about January 25, 2017, at Makofka's direction, Drive Capital agreed to provide, and Hemostemix agreed to accept, $750,000 in purported "emergency funding." The purported "emergency," as presented by Makofka to the Hemostemix Board, was a machination created by Makofka and Jed Wood.

130.   The Drive Capital alleged "emergency funding" involved extending a secured demand loan to Hemostemix at a 12% interest rate.  It was secured by all of Hemostemix's IP and assets, required interest-only monthly payments, but was repayable *in full* on demand (the "**2017 Loan-to-Own**").  Drive Capital ensured the

terms of the 2017 Loan-to-Own allowed it to exercise its demand option at any time in its sole discretion.

131.   The 2017 Loan-to-Own was a sham and its terms were commercially unreasonable.

132.   Makofka and Jed Wood prepared the terms of the 2017 Loan-to-Own, which weighed heavily in Drive Capital's favor, and presented it to the Hemostemix Board.  Despite the commercially unreasonable terms, the Board approved the 2017 Loan-to-Own based on the misleading advice and recommendation of Makofka that the "emergency funding" was necessary.   Drive Capital then advanced to Hemostemix $375,000 in purported "emergency" funding.

133.   Drive Capital assigned the 2017 Loan-to-Own to Wood Capital, an entity controlled by Jed Wood and Blake Wood under the Wood Group Family Office syndicate.

134.   In the course of only a few days, then, Jed Wood, individually or through corporate entities he owned and controlled, acquired $1.375 million in debt obligations secured by all of Hemostemix's IP and assets.

135. On March 21, 2017, at Makofka's and Jed Wood's direction, Hemostemix issued a press release announcing the Company's purported deteriorating financial health, its difficulty obtaining financing to maintain operations, and the possibility that Jed Wood could force Hemostemix into

receivership and acquire all of Hemostemix's IP and assets, as secured collateral for the 2017 Loan-to-Own.

136.   The March 21, 2017 press release was intended to, and did, imperil and impede Hemostemix's financing efforts, increase its dependency on Jed Wood's financing, and further solidify Makofka's and Jed Wood's control over Hemostemix.

### 2017 Wood Capital Loan

137.   On April 10, 2017, at Makofka's direction, Hemostemix announced another repressive and exploitive round-trip funding scheme: a $4.4 million convertible secured loan with Wood Capital (the "**Wood Capital Loan**").   The Wood Capital Loan was designed to benefit Makofka and Jed Wood at the expense of Hemostemix.

138.   The Wood Capital Loan was a sham and its terms were commercially unreasonable.

139.   More than half of the funds offered under the Wood Capital Loan were earmarked to pay, and were in fact used to pay, Wood Capital to benefit Jed Wood and Makofka.  This included costs Makofka and Jed Wood, or entities they owned or controlled, incurred in the failed 2016 Proxy Challenge and costs of conducting due diligence of Hemostemix related to the failed 2016 Loan-to-Own Offer, none of which should have been charged to or paid by Hemostemix.

41

140.   For instance, of the $4.4 million available under the Wood Capital Loan, Hemostemix was required to use $2.4 million as a "Bridge Refinancing Advance" to benefit Makofka and Jed Wood, specifically:

a. **$1 million** was to be used to pay, two years *early*, the $1 million *owed to Wood Capital* under the 2016 Secured Debenture;

b. **$750,000** was to be used to pay outstanding secured credit obligations related to the 2017 Loan-to-Own, also *assigned to Wood Capital*;

c. approximately **$500,000** was to be used to *pay Wood Capital* for costs related to the due diligence investigation of Hemostemix and expenses incurred by Makofka and Jed Wood personally related to the failed 2016 Proxy Challenge; and

d. approximately **$150,000** was to be used to *pay Wood Capital* for costs related to the due diligence investigation of Hemostemix and the expenses incurred by Drive Capital related to the failed 2016 Proxy Challenge.

141.   Makofka and Jed Wood ultimately paid themselves while saddling Hemostemix with the costs, including debt load obligations, associated with the payments on the Wood Capital Loan.

142.   Additionally, the Wood Capital Loan increased Hemostemix's secured debt obligations and impaired Hemostemix financially.

143.   Consequently, Hemostemix became further impaired in its ability to obtain financing from other outside sources and, instead, became increasingly dependent on Makofka and Jed Wood.

144.   A May 25, 2017 Information Circular published at the direction of Makofka and Jed Wood and filed on SEDAR[1] June 6, 2017 sought, *inter alia*, shareholder approval of the sham Wood Capital Loan and the purported "Bridge Refinancing Advance."

145.   The May 2017 Information Circular was intended to and did mislead Hemostemix's shareholders by, among other things, mischaracterizing components of the $2.4 million "Bridge Refinancing Advance" as repayment to the adverse and losing parties who stood against Hemostemix in the Proxy Challenge—an amount that never was nor could be considered a pre-existing debt owed by Hemostemix.

146.   Further, Drive Capital provided no funding to Hemostemix under the Wood Capital Loan.  Instead, Makofka and Jed Wood restructured the 2016 Secured Debenture and the 2017 Loan-to-Own to benefit themselves and their corporate interests, at the expense of Hemostemix, by further increasing Hemostemix's secured debt obligations.

---

[1] "SEDAR" is an abbreviation for "System for Electronic Document Analysis and Retrieval," which is a mandatory electronic document filing system for publicly traded Canadian companies to report securities-related information. It is similar to "EDGAR" in the United States.

147.   Under the Wood Capital Loan, then, Hemostemix paid millions to entities owned and controlled by Makofka and Jed Wood while Hemostemix realized no material financial benefit from the transaction and, instead, emerged with even more repressive debt obligations.

148.   Throughout 2017, Makofka continued to serve as CRO of Hemostemix pursuant to the Drive Capital Agreement.  He and other Drive Capital employees tasked to provide services to Hemostemix were expected to provide full time and attention to Hemostemix in exchange for a lucrative compensation package.

149.   At no time during the period covered by this Complaint did Makofka or the other Drive Capital employees dedicate full time or attention to Hemostemix. Instead, Makofka divided allocated more time, attention and loyalty to Aspire and Drive Capital than to Hemostemix.

150.   Despite dividing his time and loyalties, Makofka never once pro-rated his compensation accordingly.

151.   Makofka thereby stole hundreds of thousands of dollars in unearned compensation from and at the expense of Hemostemix through the Drive Capital Agreement.

152.   Makofka's theft in the form of unearned compensation was one of many ways Makofka misused and abused his position as CRO of Hemostemix.

44

### C. **Makofka Misused and Abused his Position as President and Chief Executive Officer of Hemostemix.**

153.   Despite Makofka already failing at his duties as CRO, and having no experience leading a clinical stage biotechnology company, on or about November 30, 2017, Makofka and Jed Wood coerced and induced the Hemostemix Board to appoint Makofka to be the President and CEO of Hemostemix pursuant to the Drive Capital Agreement.

154.   Separate and independent of any contractual duties owed by Makofka to Hemostemix under the Drive Capital Agreement, Makofka owed fiduciary duties of loyalty and care as President and CEO of Hemostemix.  Makofka continued to breach and violate those duties.

155.   At the same time Makofka was serving as President and CEO of Hemostemix, he also served as President and CEO of Aspire pursuant to a substantially similar agreement with Drive Capital.

156.   At all times under the Drive Capital Agreement, Makofka had, as one of his principal duties and responsibilities secured capital investment for Hemostemix to fund its operations, including the Clinical Trial.  Makofka was expected to capitalize on opportunities for fundraising and promoting Hemostemix, ACP-01 and its Clinical Trial successes in Florida and elsewhere.

157.   Hemostemix even engaged outside consultants specifically to assist Makofka in raising capital.  Makofka still failed and should have been terminated.

The only reason Makofka was not terminated was because he and Jed Wood effectively controlled the Hemostemix Board. Despite how poorly Makofka performed, he was assured of a management position at Hemostemix during the period of the ongoing conspiracy.

158. On or about July 12, 2018, Hemostemix engaged "Capital Find Partners" ("CFP") as an equity market consultant to attract capital investment. CFP provided Makofka with multiple promising investment opportunities. Makofka met with CFP's investment leads, but refused to disclose any meeting notes or a critical path to close a financing.

159. Obtaining outside financing meant Makofka and Jed Wood would lose some degree of control over Hemostemix and its operations, which was unacceptable to Makofka and Jed Wood.

160. Makofka squandered the CFP financing opportunities. Instead, Makofka continued to focus his attention on managing Aspire's operations in Florida in order to position Aspire, and therefore himself and Jed Wood, to take control of Hemostemix.

161. Despite CFP's knowledge of the industry and promising prospects, Makofka never invited CFP to accompany him to any of the investor meetings or conferences. He was also secretive about what occurred at those investor meetings

and conferences.  Makofka failed to secure investor funding from any of the CFP financing opportunities.

162.   Makofka's poor presentation skills, lack of industry knowledge and experience, and ulterior motivations of focusing on raising funds for Aspire rather than Hemostemix, caused Hemostemix to miss out on critical financing opportunities.

163.   Makofka's failure to raise meaningful capital for Hemostemix—whether by design, negligence or incompetence—led Hemostemix to become even more heavily dependent on highly leveraged funding from Jed Wood.

164.   Despite owing fiduciary duties to Hemostemix, Makofka's actions were designed and directed to benefit Aspire and, by extension, Makofka and Jed Wood, to Hemostemix's detriment.

165.   Among other things, Makofka misused his position with Hemostemix to mislead and misdirect the Hemostemix Board to take actions to benefit Makofka and Jed Wood, not Hemostemix, including transferring manufacturing operations to Aspire, and entering into manufacturing and licensing agreements to benefit Aspire.

**Manufacturing Agreement and Original License Agreement (February 2018)**

166.   Soon after convincing the Hemostemix Board to transition manufacturing operations from HEM-Israel to Aspire, Makofka and Jed Wood convinced the Board to have Hemostemix enter into a Contract Manufacturing

47

Services Agreement with Aspire dated February 15, 2018 ("**Manufacturing Agreement**"). A true and correct copy of the Manufacturing Agreement is attached hereto as **Exhibit 2.**

167. Under the Manufacturing Agreement, Aspire was to provide laboratory manufacturing services to Hemostemix in Florida.

168. At the direction of Makofka and Jed Wood, Jenkins signed the Manufacturing Agreement for Hemostemix.

169. Also at the direction of Makofka and Jed Wood, Matthew Bolin, Vice President of Operations for Aspire, signed the Manufacturing Agreement on behalf of Aspire to conceal the fact that Makofka was negotiating both sides of the transaction.

170. Makofka and Jed Wood negotiated for and advised Hemostemix on the purported benefits of entering the Manufacturing Agreement while at the same time, negotiating for the benefit of and in furtherance of Aspire's interests.

171. Hemostemix received no compensation or other consideration from Aspire for the rights conferred on Aspire under the Manufacturing Agreement. Instead, Makofka secured approval of the Jed Wood-controlled Board by making false representations to the Board about the need for and benefit of Hemostemix approving the Manufacturing Agreement, and by leveraging Jed Wood's financial and other control over Hemostemix and the Board members.

172.   Despite the Manufacturing Agreement, Hemostemix remained the sole owner of the Hemostemix IP, including all Clinical Trial Data.

173.   At the same time, Makofka and Jed Wood convinced the Board that Hemostemix enter into a License Agreement with Aspire dated February 15, 2018 ("**Original License Agreement**").  A true and correct copy of the Original License Agreement is attached hereto as **Exhibit 3**.

174.   Under the Original License Agreement, Aspire received licensing rights to use, sell and import ACP-01 in Florida and certain Central American and Caribbean countries.

175.   At the direction of Makofka and Jed Wood, Jenkins signed the Original License Agreement for Hemostemix.

176.   Also at the direction of Makofka and Jed Wood, Matthew Bolin, Vice President of Operations for Aspire, signed the Original License Agreement on behalf of Aspire to conceal the fact that Makofka was negotiating both sides of the transaction for his and Jed's benefit.

177.   Makofka and Jed Wood advised and negotiated for Hemostemix on the purported benefits of entering the Original License Agreement while at the same time, negotiating for the benefit of and in furtherance of Aspire's interests.

178.   Hemostemix received no compensation or other consideration from Aspire for the rights conferred on Aspire under the Original License Agreement.

49

Instead, Makofka secured approval from the Jed Wood-controlled Board by making false representations to the Board about the need for and benefit of Hemostemix approving the Original License Agreement, and by leveraging Jed Wood's financial and other control over Hemostemix and the Board members.

179. The Original License Agreement delegated to Aspire certain responsibilities with respect to the registration of new patients and testing sites for Phase II of the ACP-01 Clinical Trial.  Aspire was also obligated to treat all Hemostemix IP and other property as confidential.  This obligation survived termination or expiration of the OLA.  Aspire and Makofka failed and refused to comply with and, in fact, violated their duty to treat and protect all Hemostemix property as confidential.

180. Section 16.2 of the Manufacturing Agreement and Section 13.2 of the Original License Agreement contain identical language regarding the parties' obligations to protect confidential information during the term of each agreement and even after termination or expiration of each agreement.  These confidentiality obligations were separate and exclusive from the duty of confidentiality of Hemostemix's IP set forth in the Drive Capital Agreement discussed above.

181. At all times, Hemostemix remained the sole owner of all IP related to ACP-01 and the Clinical Trial.

182.   Nonetheless, Makofka gained unfettered access to Hemostemix's IP and its proprietary Clinical Trial Data both through the terms of the Manufacturing Agreement and Original License Agreement, but also through the Drive Capital Agreement which remained in effect through December 2018.

183.   Throughout the course of the relationship with Aspire, Hemostemix took careful, prudent, and reasonable steps to secure the confidentiality of the Hemostemix IP, including all Clinical Trial Data, by among other things, ensuring that the Manufacturing Agreement and Original License Agreement contained strict confidentiality provisions.

184.   Aspire and Makofka were obligated to return all Hemostemix IP, including Clinical Trial Data, to Hemostemix upon the termination or expiration of the Manufacturing Agreement and Original License Agreement.  These obligations to return and not retain are separate and exclusive from the obligations of Aspire and Makofka to return Hemostemix's IP set forth in the Drive Capital Agreement discussed above.

185.   Aspire and Makofka failed and refused to comply with and, in fact, violated their duties and contractual obligations to return all Hemostemix IP, including Clinical Trial Data, to Hemostemix upon termination of the Original License Agreement, the Manufacturing Agreement and the Drive Capital Agreement.

51

186.   In late December 2018, the Drive Capital Agreement expired by its terms.

187.   Makofka and Jed Wood convinced the Hemostemix Board to substitute the Drive Capital Agreement with a management agreement with KSM (the "**KSM Agreement**"), effective January 1, 2019.   A true and correct copy of the KSM Agreement is attached hereto as **Exhibit 4**.

### D. <u>The KSM Agreement for Management/Operational Services.</u>

188.   The KSM Agreement had an initial one-year term.  (Ex. 4, § 3 at 4.)

189.   The KSM Agreement did not supersede or nullify any obligations Makofka, Jed Wood, or Drive Capital owed to Hemostemix after termination of the Drive Capital Agreement.   Instead, their obligations survived expiration or termination of the Drive Capital Agreement.

190.   Likewise, Makofka's and KSM's contractual obligations under the KSM Agreement were independent of, mutually exclusive from, and not superseded or nullified by any obligations Makofka owed to Hemostemix under the Manufacturing Agreement or Original License Agreement, discussed above, or by the Amended License Agreement, discussed below.

191.   The KSM Agreement was signed by Makofka for KSM, and Angus Jenkins for Hemostemix.

192.   Makofka and Jed Wood intended the KSM Agreement, as part and parcel to the overall conspiracy, to be carried out and affect activities and operations in Florida.

193.   Like the preceding Drive Capital Agreement, the KSM Agreement authorized KSM and Makofka to advise, manage, assist and support Hemostemix in its day-to-day operations in order to effectuate Hemostemix's business and strategic plans.  (Ex. 4, § 2 at 2.)  As Hemostemix would later learn, Makofka and Jed Wood used this authority to benefit themselves at the expense of Hemostemix.

194.   According to Section 2 of the KSM Agreement, Makofka, as both owner of and agent to KSM and as President and CEO of Hemostemix, reported directly to the Hemostemix Board, chaired by Jenkins.  (Ex. 4, § 2 at 3.)  In reality, Makofka and Jed Wood controlled Jenkins' decision-making.

195.   Like the preceding Drive Capital Agreement, the KSM Agreement gave KSM, Makofka and all KSM employees assigned to provide services under the KSM Agreement access to "all required systems and data . . . ."  (Ex. 4, § 4 at 3.)  As Hemostemix would later learn, Makofka and Jed Wood used this access to benefit themselves at the expense of Hemostemix.

196.   Like the preceding Drive Capital Agreement, the KSM Agreement imposed limits and restrictions on what KSM, its principal (Makofka) and agents

assigned to provide services under the KSM Agreement could do with Hemostemix's IP and other "confidential information," to wit:

    a.  KSM and its principal (Makofka) and agents were required to maintain all Hemostemix IP and other property as strictly confidential;

    b.  KSM and its principal (Makofka) and agents were prohibited from retaining any IP or other property after termination or expiration of the KSM Agreement; and

    c.  KSM and its principal (Makofka) and agents who acquired access to or copies of Hemostemix IP, were required to return all Hemostemix IP, including all files, records, documents, data and other information, to Hemostemix upon termination or expiration of the KSM Agreement.

(Ex. 4, § 8 at 7.)

197.   Hemostemix, as an entity, thus took reasonable steps to at least protect its Confidential Information.  These duties of confidentiality and proper handling and return of confidential information set forth under Section 8 survived termination of the KSM Agreement.  (Ex. 4, § 13(e) at 12.)  As Hemostemix would later learn, KSM and Makofka violated their duties and responsibilities under Section 8 in the handling, misappropriation and improper retention of Hemostemix's confidential information, all for the benefit of Makofka and Jed Wood, at the expense of Hemostemix.

198.  Like the preceding Drive Capital Agreement, the KSM Agreement granted KSM and Makofka authority to oversee and manage all aspects of the operations and management of Hemostemix.  As Hemostemix would later learn, Makofka and Jed Wood used this authority to benefit themselves at the expense of Hemostemix.

199.  Like the preceding Drive Capital Agreement, the KSM Agreement provided Makofka lucrative compensation whereby he was paid a fixed fee for key management personnel costs, support services, accounting and office rental.  KSM and Makofka were provided financial incentives and inducements to increase operating costs.  Specifically, KSM's and, by extension, Makofka's, compensation or remuneration was to be equal to 15% of all Clinical Trial costs.  (Ex. 4, § 5 at 4.) Increasing Clinical Trial costs directly benefitted KSM and its principal, Makofka, by increasing compensation Hemostemix paid to KSM and Makofka.

200.  Pursuant to the KSM Agreement, Makofka retained his position as President and CEO of Hemostemix and maintained control over Hemostemix's day-to-day operations.  Makofka continued to owe fiduciary duties to Hemostemix, which he violated through his self-dealing conduct.

201.  Like the preceding Drive Capital Agreement, the KSM Agreement required KSM, Makofka, and agents assigned to provide services to Hemostemix to "undertake all of the Work diligently in a good and workmanlike manner."  (Ex. 4,

55

§ 7 at 6.) As Hemostemix would later learn, KSM, as well as Makofka and his team failed to perform in accordance with this standard.

202. Like the preceding Drive Capital Agreement, the KSM Agreement required KSM, Makofka, KSM and agents to provide full time services and attention to Hemostemix. As Hemostemix would later learn, neither Makofka nor any KSM personnel provided full time services to Hemostemix. Rather, KSM and Makofka dedicated far less than full time due to KSM and Makofka also providing services to Aspire that were contrary to and inconsistent with its responsibilities for Hemostemix.

203. Despite dividing his time between Hemostemix and Aspire, however, Makofka and KSM did not reduce the compensation due from Hemostemix. Instead, Makofka continued to pay himself and his KSM employees unearned compensation for full time work that they did not perform in violation of the KSM Agreement

204. The KSM Agreement reaffirmed that all property owned by Hemostemix and provided to KSM during the term of the KSM Agreement remained the "exclusive property" of Hemostemix and, further, must be surrendered upon Hemostemix's request or upon termination of the KSM Agreement. (Ex. 4, § 10 at 8.) KSM and Makofka breached this covenant by wrongfully retaining, refusing to return and misappropriating Hemostemix's IP and other property.

205.   Like the preceding Drive Capital Agreement, the KSM Agreement restricted KSM and its principal (Makofka) and agents providing services to Hemostemix from taking any action that would benefit another entity or individual over Hemostemix.   Specifically, Section 11 permitted KSM and its principal (Makofka) to provide services for other clients, "*provided* [KSM's] other services for other clients does not interfere with or detract from the provision of the Work and the performance of [KSM's] duties and obligations pursuant to this Agreement." (Ex. 4, § 11 at 9 (emphasis added).)   As Hemostemix would later learn, KSM and Makofka violated this covenant by taking action designed to benefit KSM, Makofka as well as Jed Wood and Aspire at the expense of Hemostemix.

206.   The KSM Agreement contained a "Non-Solicitation" covenant.   KSM and its principal (Makofka) and agents, for a three-year period following the expiration date of the Agreement (whether or not terminated earlier than the expiration date), directly or indirectly, from:

      a.   soliciting, encouraging or facilitating Hemostemix clients or customers to alter, modify, vary, diminish or cease their client or customer relationships with Hemostemix;

      b.   using or permitting Hemostemix's name to be used in connection with any business or enterprise competing with Hemostemix;

    c. soliciting, inducing, encouraging or facilitating any employees, consultants, suppliers or subcontractors of Hemostemix to leave the employment of, or the consulting, supply or subcontractor relationship with Hemostemix; and

    d. soliciting business from any person known by it to be a customer or vendor of Hemostemix, whether or not KSM or any of its personnel had personal contact with such person during the term of the Agreement.

(Ex. 4, § 12(a) at 9.)

207. These duties and restrictions arising under the Non-Solicitation provision survived termination of the KSM Agreement. (Ex. 4, § 13(e) at 12.)

208. As Hemostemix would later learn, Makofka and Jed Wood violated this covenant in the KSM Agreement.

209. Within one year of the termination and/or expiration of the KSM Agreement, Makofka and Jed Wood, as well as other KSM agents, solicited, encouraged, and/or facilitated clients and customers, including without limitation vendors and consultants, to alter, modify, diminish and/or cease their respective relationships with Hemostemix. They also solicited, induced, encouraged and/or facilitated, some under false and fraudulent pretenses, certain employees, consultants, suppliers, contractors and/or subcontractors, including without limitation, Jacobs, Cooper, Fairbairn, Medrio, Accudata, and Anju, among others, to

leave the employment of, consultancy, contractor or subcontractor or other relationship with Hemostemix.

210.   Unbeknownst to the Hemostemix Board at the time, KSM had a virtually identical management agreement with Aspire, effective in or about January 2017.

211.   KSM's agreement with Aspire called for Makofka to provide substantially the same management and operational services to Aspire as it was providing to Hemostemix.

212.   Makofka served as President and CEO of Aspire at the same time that he served as President and CEO of Hemostemix.

213.   Makofka assigned the same employees to provide services to Aspire as he assigned to provide services to Hemostemix.

214.   KSM and Makofka stole money in the form of unearned compensation from Hemostemix.  Pursuant to the KSM Agreement, KSM and Makofka were obligated to provide full-time services to Hemostemix.  In exchange, KSM and Makofka were entitled to compensation under the KSM Agreement.

215.   Makofka did not provide full time services to Hemostemix.  Instead, Makofka, through KSM, was serving as Aspire's President and CEO for which he earned compensation under Aspire's agreement with KSM.

216.   Despite dividing his time between Hemostemix and Aspire, however, Makofka did not reduce his compensation from Hemostemix.  Because Makofka controlled Hemostemix's finances, Makofka continued to pay himself and his KSM employees unearned compensation for full time work that they did not perform.

217.   In fact, Makofka paid himself and other KSM employees tens of thousands of dollars in unearned compensation.  In other words, Makofka stole tens of thousands of dollars from Hemostemix in unearned compensation.

218.   Further, by simultaneously serving as President and CEO of both Aspire and Hemostemix, Makofka subordinated Hemostemix's rights and interests to those of Aspire, Makofka and Jed Wood.

### E. **Makofka Misused and Abused his Position as President and CEO of Hemostemix.**

219.   By ratifying and approving the KSM Agreement, the Jed Wood-controlled Board ensured that Makofka would remain a part of Hemostemix's decision-making and strategy development processes.  This was part of and in furtherance of the conspiracy to take control of Hemostemix.

220.   Pursuant to the KSM Agreement, Makofka owed a fiduciary duty to Hemostemix including a duty of care and duty of loyalty.

221.   Makofka failed to fulfill and, in fact, breached, his fiduciary duty, including his duty of care and duty of loyalty, to Hemostemix, as evidenced by his

multiple instances of self-dealing and subordinating the interests of Hemostemix to those of Aspire, Makofka and Jed Wood.

222.    Pursuant to the KSM Agreement, Makofka was responsible for overseeing and managing all aspects of the operations and management of Hemostemix from January 1, 2019 until its termination on October 31, 2019.

223.    Pursuant to the KSM Agreement, Makofka assigned KSM employees to provide services, including information technology and information security, administrative support, controller and accounting services, and oversight of the Clinical Trial to Hemostemix.

224.    Pursuant to the KSM Agreement, KSM and its principal (Makofka) and agents including Cooper, Laura Fairbairn, and other assigned personnel gained access to Hemostemix's IP.

225.    The KSM Agreement required KSM and its personnel to, at all times, maintain and protect the confidentiality of all Hemostemix IP.  KSM and Makofka failed and refused to comply with and purposefully and intentionally violated this duty of confidentiality.

226.    The KSM Agreement prohibited KSM from retaining the Hemostemix IP without proper written consent or permission from Hemostemix.  KSM and Makofka failed and refused to comply with and purposefully and intentionally violated this duty of confidentiality.

227.   The KSM Agreement required KSM to return all Hemostemix IP to Hemostemix upon termination of the KSM Agreement.  KSM and Makofka failed and refused to comply with and purposefully and intentionally violated this duty.

228.   Pursuant to the KSM Agreement, Makofka was principally responsible as President and CEO of Hemostemix of raising capital for Hemostemix to fund its operations, including the Clinical Trial.  Makofka was expected to capitalize on opportunities for fundraising and promoting Hemostemix, ACP-01 and its Clinical Trial successes.

229.   Makofka failed to fulfill his responsibilities as President and CEO.

230.   Similar to his failure to capitalize on the CFP investment opportunities presented in 2018, Makofka continued in 2019 to be incapable of or unwilling to raise meaningful capital for Hemostemix to grow the business or improve operations.

231.   Makofka's inexperience, ineptitude and opportunistic intentions resulted in Hemostemix raising little new financing under his tenure as President and CEO.  Instead, Makofka steered financing to companies owned and/or controlled by Makofka and Jed Wood.

232.   Makofka misled the Board into accepting new repressive and exploitive secured debt obligations in transactions financed by entities owned and controlled by Makofka and Jed Wood.

## 2019 Wood Debenture and 2019 Wood Loan-to-Own

233.   On April 15, 2019, Hemostemix, at Makofka's direction, announced a $6 million private placement of secured convertible debentures at 8% interest, with a maturity of twenty-four (24) months.

234.   Only two weeks later, on May 3, 2019, Hemostemix, at Makofka's direction, announced a $1 million private placement of secured convertible debentures with a 12% interest rate and a seven (7) month maturity date of December 31, 2019.

235.   The 2019 secured debenture offering was designed by Makofka.  Not surprisingly, on May 15, 2019, Jed Wood purchased, through JMWI, $500,000 and agreed to advance this amount to Hemostemix (the "**2019 Wood Debenture**").

236.   That same day, on May 15, 2019, at Makofka's and Jed Wood's direction, Hemostemix entered into a general security agreement with Jed Wood, granting Jed Wood a security interest in all Hemostemix "present and after-acquired" assets and property, in order to secure repayment of Hemostemix's obligation under the repressive and exploitive 2019 Wood Debenture.

237.   During this time period, Makofka and Jed Wood conspired to further financially leverage Hemostemix in order to acquire the Hemostemix IP rights.  In particular, Makofka's written and oral communications with the Board warned, falsely, that Hemostemix was at risk of a receivership and, therefore, it should agree

to a "royalty" and a new joint venture or new licensing agreement with Aspire that was the only hope of saving the Company.

238.  Makofka further advised that Hemostemix must enter into a loan agreement with Jed Wood.

239.  Makofka threatened to resign as CEO and withdraw all KSM staff unless Hemostemix complied.  Makofka knew that resigning as CEO, and withdrawing all KSM staff, would violate the KSM Agreement and his fiduciary duties.

240.  Makofka knew at the time he made these communications that the Board would rely on his warnings and threats.

241.  Makofka knew that his assessment of the financial condition of Hemostemix was exaggerated but, to the extent any aspect was true, the financial hardships were created by his acts and omissions.

242.  Makofka knew at the time that the Board would also consider the hardship to flow from Makofka's threatened resignation and withdrawal of all KSM employees.

243.   Consistent with the latest efforts to create a "loan-to-own" scheme under the 2019 Wood Debenture, Makofka and Jed Wood initially proposed and later pursued a deal between Hemostemix and Aspire that would purportedly create a Hemostemix receivership.

244.   Makofka and Jed Wood routinely tried to extort Hemostemix into acquiescing to their demands by threatening to force Hemostemix into insolvency and halting Aspire's day-to-day operations to manufacture and distribute ACP-01 despite its contractual obligation to do so.

245.   Makofka's and Jed Wood's conduct was so egregious and troubling that, on June 17, 2019, Kristen Gulka ("Gulka"), then-CFO of Hemostemix and Aspire, resigned from her position at Hemostemix effective that same day.   In resigning, Gulka cited "severe conflicts of interest" related to Makofka and Wood's extortionist tactics.   Having observed the tactics firsthand, Makofka's and Wood's conduct raised serious ethical conflicts and fiduciary breaches.   Gulka also had significant concerns about Makofka's destructive acts directed at driving Hemostemix into insolvency.

246.   To further solidify financial control over Hemostemix, on August 1, 2019, Makofka and Jed Wood compelled and induced Hemostemix to enter into another repressive and exploitive "loan to own" scheme loan for up to $2 million financed by Jed Wood, through JMWI (the "**2019 Wood Loan-to-Own**").

247.   The repressive and exploitive 2019 Wood Loan-to-Own gave Jed Wood a 12% interest rate payable over a twelve (12) month term starting the date of execution.

248.   The repressive and exploitive 2019 Wood Loan-to-Own became payable on demand on or after September 30, 2019, with *only sixty (60) days'* notice to Hemostemix.

249.   The repressive and exploitive 2019 Wood Loan-to-Own was used by Makofka and Jed Wood to compel Hemostemix to enter into a more oppressive license agreement with Aspire.

250.   Makofka's prediction about the impending demise and insolvency of Hemostemix was highly questionable.  Indeed, at the same time he was threatening and extorting the Hemostemix Board, Makofka, on September 19, 2019, sat for an interview to discuss Hemostemix's stem cell technology with *Bio Informant*, a trade publication.  During the interview, Makofka made several statements of material fact that undermined his threats to ruin Hemostemix.

251.   When describing Aspire's work and data collection on behalf of Hemostemix, for instance, Makofka admitted that "[I]t is important to mention that all of the data collected by Aspire belongs to Hemostemix."

252.   Regarding the safety and efficacy of ACP-01, Makofka advised: "I cannot emphasize this message clearly enough. ACP-01 is a platform that has shown safety and efficacy in treating multiple indications without severe adverse events."

253.    Nonetheless, Makofka continued to peddle in lies and false threats to the Hemostemix Board in order to intimidate the Board into ultimately executing a more repressive and exploitive license agreement with Aspire.

254.    To seal the deal, on or about October 1, 2019, Jed Wood delivered a notice to Hemostemix demanding repayment on or before November 30, 2019 of the 2019 Wood Loan-to-Own and 2019 Wood Debenture ("**Wood Demand Notice**"). Delivery of the Wood Demand Notice was designed to force the Hemostemix Board into believing it had no choice but to execute a more repressive and exploitive license agreement proposed by Makofka, on behalf of Aspire.

## Amended License Agreement (September 2019)

255.    At Makofka's and Jed Wood's direction, and under the impending Wood Demand Notice, sometime between October 1 and October 8, 2019, the Board finally relented and entered into an amended license agreement with Aspire effective September 30, 2019 (the "**Amended License Agreement**").  A true and correct copy of the Amended License Agreement is attached hereto as **Exhibit 5**.

256.    Compared to the Original License Agreement, the terms of the Amended License Agreement significantly expanded Aspire's licensing rights and created new rights heavily favoring Aspire at the expense of Hemostemix.

257.    The Amended License Agreement had a ten (10) year term.  (Ex. 5, § 11.1, at 27.)

258.   The Amended License Agreement, drafted at the direction of Makofka and Jed Wood, contained terms that were significantly less favorable to Hemostemix than the Original License Agreement.

259.   The Amended License Agreement removed any realistic benefit for Hemostemix to obtain revenue from the commercialization of ACP-01 and provided all benefit to Aspire.

260.   The Amended License Agreement granted and greatly increased Aspire's ability to unilaterally convert Hemostemix's IP.

261.   The Amended License Agreement removed significant controls that Hemostemix had in the Original License Agreement relating to the Clinical Trial.

262.   The Amended License Agreement included a clause that the Agreement would survive and remain in full force in the event of a Hemostemix insolvency. (Ex. 5, § 11.3(g), at 28.)  This term was added by or at the direction of Makofka and Jed Wood in anticipation of their effort to force Hemostemix into a receivership or insolvency, and thereafter take control of Hemostemix.

263.   The Amended License Agreement vastly expanded the scope of the license granted to Aspire, making it a global license.  (*Compare, e.g.*, Ex. Recitals at 3, *with* Ex. 5, Recitals at 3, and § 9 at 23-25.)  This, in turn, drastically reduced any potential benefit for Hemostemix in relation to ACP-01 by precluding Hemostemix, *the clinical trial sponsor and holder of the patents*, from obtaining

additional license revenue from other potential licensees while expressly providing for Aspire, a mere contractor, all licensing revenue and royalties.  (Ex. 5, § 8.1 at 22.)

264.   Further punctuating the repressive and exploitive nature of the Amended License Agreement is the insertion of a "Partnering Event" concept designed by Makofka and Jed Wood.  (Ex. 5, § 1.1, at 9, § 9.1-9.4 at 23-25; *see also* Ex. 5 Appendix B.)

265.   This "Partnering Event" concept effectively ensured that *all* upside potential of ACP-01 would flow to Makofka and Jed Wood through Aspire rather than to Hemostemix.

266.   A Partnering Event included any agreement among Aspire and any third party relating to the development, manufacturing and commercialization of ACP-01, including "partnering, licensing, joint venture, co-development, sales and marketing alliance, investment, merger or acquisition activity."  (Ex. 5, § 1.1 at 9.) This clause was exceedingly broad and would capture even a sub-license executed by Aspire.

267.   In addition, the Partnering Event set virtually unattainable monetary thresholds for triggering any rights for Hemostemix to receive a share of the revenues.  Specifically, this clause established that $75 million or less in revenue, if *during* the Phase II clinical trials, or less than $150 million *after* the conclusion of

69

the Phase II clinical trials, entitled Aspire to take *all* revenue from the Partnering Event and share none with Hemostemix.  Only if the $75 million or $150 million thresholds were met during the respective designated time periods would Hemostemix be entitled to any net proceeds and, even then, only a mere 5% to 25% of the net proceeds of the Partnering Event.  (Ex. 5, Appendix B, § 2.)

268.   Moreover, these thresholds, and whether Hemostemix surpassed those, was determined principally by Aspire and could be manipulated to ensure Aspire, not Hemostemix, received all monetary benefits.

269.   The Amended License Agreement substantially weakened a requirement in the Original License Agreement that Aspire obtain Hemostemix's consent to enter into sub-licenses and, thus, provided an uninterrupted licensing revenue stream for Aspire that would preclude providing any Partnering Event consideration to Hemostemix.  (*Compare* Ex. 3, § 2.2 at 13, *with* Ex. 5, § 3.2 at 13.)

270.   The Amended License Agreement changed the Royalty from a 15% net sales royalty in the Original License Agreement, to a 4% gross revenue royalty, which greatly reduced Hemostemix's potential to benefit financially from any sales.  (Ex. 5, § Appendix B § 1(ii).)

271.   The Amended License Agreement restricted Hemostemix, *the rightful owner of the IP*, from transferring the Hemostemix IP or assigning the Amended License Agreement without Aspire's consent.  (Ex. 5, § 7.2(a) at 20.)

70

272.   While severely restricting Hemostemix's ability to share in the financial upside of the Clinical Trial, the Amended License Agreement restricted Hemostemix's ability to even oversee the Clinical Trial, a restriction that was contrary to FDA and Health Canada regulations and requirements of Hemostemix as the clinical trial sponsor.

273.   For instance, the Amended License Agreement removed provisions preserving Hemostemix's oversight rights over the Clinical Trial.  (*Compare* Ex. 3, § 2.1 at 13, *with* Ex. 5, § 3.1 at 13.)  While Aspire remained obligated to file required reports and applications with the FDA, Aspire was no longer required to obtain Hemostemix's written consent before making any such submissions.  (Ex. 5, § 7.1(i) at 20.)

274.   The Amended License Agreement further restricted Hemostemix's ability to sell its own IP.

275.   The Amended License Agreement imposed two conditions precedent to becoming effective.  As a first condition precedent ("Condition Precedent 1"), Aspire was required to pay $1 million directly to Hemostemix by no later than November 13, 2019—thirty (30) business days of September 30, 2019.  (Ex. 5, § 2, at 12-13.)

276.   The Amended License Agreement permitted Hemostemix, in its sole discretion, to rescind the Amended License Agreement if Aspire failed to timely satisfy Condition Precedent 1.

277.   Should Hemostemix exercise its right of rescission, the Amended License Agreement released Hemostemix from any further obligation thereunder and made clear that the Original License Agreement—the prior license agreement— would remain in full force and effect unless or until otherwise terminated.

278.   Aspire failed to pay *any amount* to Hemostemix by November 13, 2019.

279.   Hemostemix properly sent a written notice of rescission to Aspire by letter dated December 5, 2019.

280.   Some time afterward, Makofka produced a fraudulent document prepared by and/or at the direction of himself and Jed Wood that Makofka falsely claimed and represented to be an "addendum" to the Amended License Agreement (the "**Sham Addendum**").  The Sham Addendum is attached hereto as **Exhibit 6**.

281.   The Sham Addendum purportedly was executed on November 22, 2019 by Jenkins on behalf of Hemostemix, Randi Wood on behalf of Aspire, and Jed Wood on behalf of himself and JMWI.  (Ex. 6, at 1-2.)

282.   Makofka falsely represented that the Sham Addendum amended the Amended License Agreement by modifying Condition Precedent 1, including Aspire's payment deadline and to whom the $1 million payment would be made.

283.   The Sham Addendum did not modify Condition Precedent.  It did not extend Aspire's payment deadline and it did not permit Aspire to make the payment to creditors in lieu of paying Hemostemix directly.

284.   Makofka and Jed Wood, together with co-conspirator Randi Wood, generated the Sham Addendum with the design and intention of depriving Hemostemix of its contractual rights.

285.   Jenkins had no authority to act for Hemostemix on November 22, 2019 and his action in signing the Sham Addendum was a legal nullity.  The Sham Addendum was neither discussed nor approved by a properly constituted Hemostemix Board prior to November 22, 2019.

286.   Friesen resigned from the Board effective November 21, 2019.  Upon Friesen's resignation, there were only two Board members: Jenkins and David Wood (who is no relation to Defendants and co-conspirators Jed Wood, Randi Wood or Blake Wood).

287.   With only two active members of the Board, Hemostemix lacked a properly constituted Board.  The Board had no authority to conduct business without the three-director quorum required by its articles of incorporation and by-laws. Thus, neither the Board nor any individual member could take any action on behalf of Hemostemix until the Board was properly constituted.

288.   The only other Board member, David Wood, had never been told of the Sham Addendum, never voted on it, and was not even aware of its existence until, at earliest, December 17, 2019 when Makofka sent David Wood a copy of it after Makofka received the December 5 rescission notice.

289.   The Sham Addendum also was not supported by additional consideration and, thus, was not a proper amendment to or modification of the Amended License Agreement.

290.   The Sham Addendum also did not provide for the payment of true "clinical trial costs" as required by its plain language, and that of the Amended License Agreement.  Instead, the Sham Addendum required the vast majority of the $1 million payment (or $1.328 million CAD) to be paid to Makofka (through KSM), Jed Wood, Aspire, Jacobs (through AJIA), and two separate law firms engaged by Aspire unrelated to clinical trial operations and costs, as follows:

   a.   KSM (Makofka) was to be paid **$229,713.46 (CAD)**;

   b.   Aspire (Makofka/Jed Wood/Randi Wood) was to be paid **$235,140.84 (CAD);**

   c.   Aspire outside law firms Bennett Jones LLP and Clark Wilson LLP (handling work for Makofka and Jed Wood) were to receive a combined total of **$168,754.29 (CAD)**;

   d.   AJIA (Jacobs) was to be paid **$90,010.68 (CAD)** and

      e.  Jed Wood was to be paid **$283,536.55 (CAD)**.

(Ex. 6, at 3 (A/P Aging Summary).)

291.  Of the $1.328 million (CAD) to be paid by Aspire on behalf of Hemostemix purportedly in satisfaction of the Sham Addendum, over $1 million (CAD) was to be paid to Defendants in this action or their counsel for costs unrelated to clinical trial costs.

292.  Makofka, nonetheless, falsely and fraudulently held the Sham Addendum out as a proper modification and amendment of the Amended License Agreement and, in particular, Condition Precedent 1.

293.  The Sham Addendum was created by Makofka and Jed Wood, in conjunction with co-conspirator Randi Wood, in furtherance of the scheme and conspiracy to impair Hemostemix financially and ultimately take control of Hemostemix and its IP.

294.  That Makofka and Jed Wood held the Sham Addendum out as a valid modification to the Amended License Agreement was predicated, at least in part, on the contention that Aspire paid the full amount required by Condition Precedent 1 of the Amended License Agreement.

**F.  <u>Makofka and Jed Wood conspire with Jacobs and Cooper in furtherance of the Conspiracy.</u>**

295.  Makofka poor performance as Hemostemix's President and CEO threatened the success of Hemostemix.

296.   Makofka and Jed Wood conspired to recruit Jacobs, a co-conspirator with medical and bio-tech credentials who could advance their takeover scheme.

297.   On or about February 1, 2019, at Makofka's and Jed Wood's direction, Hemostemix executed a contractor agreement with AJIA Global Services, LLC, Jacobs' company, to provide services to Hemostemix (the "**Jacobs Agreement**"). Makofka executed the Jacobs Agreement for Hemostemix.  A true and correct copy of the Jacobs Agreement is attached hereto as **Exhibit 7.**

298.   At Makofka's and Jed Wood's direction, pursuant to the Jacobs Agreement, Jacobs was named President and Chief Medical Officer ("CMO") of Hemostemix.

299.   As President and CMO, Jacobs was responsible for managing and coordinating Hemostemix's various research operations and, most importantly, overseeing the Phase II Clinical Trial.

300.   Under the Jacobs Agreement, Jacobs was obligated to provide his full time and attention to "Work" for Hemostemix, as defined in the Jacobs Agreement, including but not limited to providing scientific guidance on strategic and operating decisions, managing and coordinating the scientific and research operations for Hemostemix, advancing Hemostemix's manufacturing processes, overseeing and managing the execution of the clinical trial at the trial sites, and assisting in financing and fundraising efforts.  (Ex. 7, § 2, at 2-3.)

76

301.   Jacobs failed to fulfill his duties and obligations, and was negligent in his actions, to Hemostemix.   Jacobs failed to provide competent and adequate guidance on strategic and operating decisions and failed to perform his duties in the best interests of Hemostemix, in particular, relating to the manufacturing of ACP-01 and licensing of ACP-01.

302.   Because Jacobs was conspiring with Makofka and Jed Wood to exploit Hemostemix and misappropriate its IP, Jacobs failed to intervene on behalf of Hemostemix when, on the advice and direction of Makofka and Jed Wood, the Board approved repressive and exploitive loan-to-own schemes, or when the Board approved the Amended License Agreement, or when Aspire sought to unlawfully access Hemostemix's network and server and steal Hemostemix's confidential and proprietary business information.

303.   Jacobs further violated and failed to fulfill his duties and obligations to Hemostemix when he failed to ensure Aspire was fulfilling its obligations as the de facto Contract Research Organization and Aspire's obligations under the Original License Agreement.   These failures by Jacobs include, but were not limited to, failing to ensure the Clinical Trial was being conducted and carried out appropriately, that the Clinical Trial sites were being compensated appropriately, that competent KSM personnel were being tasked by Makofka to attend to the operation and finances of Hemostemix, and that Hemostemix's IP and other

confidential information was being handled and treated appropriately and in the best interests of Hemostemix.  Jacobs provided substandard, poor quality services to Hemostemix.

304.   Jacobs earned a lucrative salary of $32,500 per month.  He was also eligible for additional incentive compensation, stock options, substantial bonus and expenses reimbursement from Hemostemix at a time when Hemostemix had already been driven deep into financial hardship by Makofka and Jed Wood.  (Ex. 7, §§ 3-4 at 4-5.)

305.  Jacobs' compensation was purportedly in exchange and in consideration for full time services provided solely and exclusively to Hemostemix.

306.   During all or portions of his service as CMO and President of Hemostemix, Jacobs failed to provide full time services to Hemostemix and, instead, served the interests of Aspire, Makofka and Jed Wood.

307.   Section 10 of the Jacobs Agreement ("Confidentiality") provided that Jacobs would, as CMO and President, have access to Hemostemix's "financial information, trade secrets, inventions, innovations, processes, information, intellectual property, records and specifications owned or licensed by [Hemostemix] and or used by [Hemostemix] in connection with the operation of its businesses including, without limitation, [Hemostemix's] business and product processes, methods, customer lists, accounts and procedures."  (Ex. 7, § 10, at 4-5.)

308.   Section 10 prohibited Jacobs from disclosing, directly or indirectly, during the term of the Jacobs Agreement or anytime thereafter, such confidential information, as well as any "files, records, documents, notebooks and similar items relating to the business" of Hemostemix, which remained, for all purposes, "the exclusive property" of Hemostemix.  (Ex. 7, § 10, at 4-5.)

309.   Section 10 further prohibited Jacobs from retaining any copies of Hemostemix's IP and other confidential information without Hemostemix's written permission and, more importantly, required that he promptly deliver such documents and information to Hemostemix upon demand or within 30 days of termination of the Jacobs Agreement.  (Ex. 7, § 10, at 4-5.)

310.   Jacobs breached his duty of confidentiality under Section 10 of the Jacobs Agreement.

311.   Following termination of the Jacobs Agreement and Jacobs' resignation, Jacobs took, retained, misappropriated, transferred to Aspire, Makofka and Jed Wood, and refused to return Hemostemix's confidential information, contractor and consultant contracts, IP and other information and material, including a $10,000 laptop that contained the above information to which he gained access in his capacity as CMO and President of Hemostemix.

312.   In or about September and October 2019, Jacobs conspired with Makofka to make a series of material and fraudulent misrepresentations as President

of Hemostemix.  Specifically, Jacobs omitted a material fact that he had a duty to disclose as President and that is required in order to ensure a statement is not misleading, to wit: (a) Jacobs omitted from a press release the October 1, 2019 Wood Demand Notice; (b) Jacobs omitted reference to the Wood Demand Notice in the Hemostemix financial statements that were prepared during his tenure and issued in late November 2019; and (c) following his resignation from Hemostemix, Jacobs omitted and deliberately concealed from contractors, consultants, vendors, suppliers, and regulators such as the FDA Health Canada his true relationship with Hemostemix and Aspire.

313.   Jacobs further conspired and colluded with Makofka, Jed Wood and Cooper during this same time period to misappropriate Hemostemix's consultant and contractor agreements for the benefit of Aspire in or about November 2019, after he had resigned as CMO and President of Hemostemix.

314.   Jacobs conspired and colluded with Makofka, Jed Wood and Cooper to access, redirect and steal Hemostemix's emails and other electronically-stored information, including financial information, clinical trial data, trade secrets and confidential and proprietary information of Hemostemix.

315.   Section 11 of the Jacobs Agreement ("Conflict of Interest") prohibits Jacobs from engaging in activities that create a conflict of interest with Hemostemix. Section 11 requires Jacobs to "devote as much of [his] productive time, energy and

80

abilities to the performance of the duties hereunder as is necessary to perform the required duties in a timely and productive manner."  Jacobs was prohibited from taking any action that would "interfere with or detract from the provision of the Work and the performance of [Jacobs'] duties and obligations pursuant to this Agreement . . . ."  (Ex. 7, § 11, at 5.)

316.   Jacobs breached his duty to avoid conflicts of interest and to maintain loyalty to Hemostemix when he conspired with Makofka, Jed Wood and Cooper to serve the interests of Aspire and, specifically, stole and misappropriated Hemostemix's property for the benefit of Aspire, provided Hemostemix's IP and Clinical Trial Data to Aspire, failed to demand such IP and data back upon Hemostemix's demand, and subordinated Hemostemix's interests to Aspire's interests.

317.  The Jacobs Agreement contained a non-solicitation covenant that Jacobs violated.

318.  Section 12 ("Non-Solicitation") prohibited Jacobs, for one year after termination of the Jacobs Agreement, from:

> a.  "solicit[ing], encourag[ing] or facilitat[ing] clients or customers of [Hemostemix] . . . . to alter, modify, diminish or cease their client or customer relationships with [Hemostemix]"; or

b.  "solicit[ing], induc[ing] or facilitat[ing] any employees, consultants, suppliers or sub-contractors of [Hemostemix] . . . . to leave the employment of, or the consulting, supply or sub-contractor relationship with, [Hemostemix] . . . ." or

c. "solicit[ing] business from any customer of [Hemostemix] whom [Jacobs] served or whose name became known to [Jacobs] by virtue of his engagement with [Hemostemix], for the purpose of inviting, encouraging, or requesting any such customer of [Hemostemix] to transfer from [Hemostemix] to himself, his new employer or new client . . . ."

(Ex. 7, § 12, at 5-6.)

319.  Jacobs breached the non-solicitation covenant in Section 12.   In collusion with and conspiracy with Makofka, Jed Wood, and Cooper, he solicited, encouraged or facilitated, or directed, that customers or contractors of Hemostemix, including without limitation, Medrio, Accudata, and Anju, transfer their contractual relationship from Hemostemix to Aspire, and that KSM and other contractors of Hemostemix abandon or cease their relationship with Hemostemix for Aspire.

320.  Section 13 of the Jacobs Agreement ("Indemnification") requires Jacobs to indemnify Hemostemix in for all damages, liabilities, and costs, including

attorneys' fees for any negligent, reckless or intentionally wrongful act of Jacobs, or breach of the Jacobs Agreement.  (Ex. 7, § 13, at 6.)

321.   Jacobs owes indemnification to Hemostemix for his negligent, reckless and intentionally wrongful acts enumerated herein, as well as breach of the Jacobs Agreement.

322.   Jacobs' tenure with Hemostemix was short-lived.

323.   Jacobs resigned as President and CMO effective on or about October 31, 2019.

324.   Jacobs immediately began serving as Aspire's Chief Medical Officer the next day, on November 1, 2019.

325.   Jacobs knew about and freely and voluntarily participated in Makofka's and Jed Wood's scheme and conspiracy to financially impair Hemostemix, steal its IP and take control of Hemostemix using Aspire as the corporate vehicle to achieve these goals.

326.   Upon joining Aspire, Jacobs knew, then, that Aspire and Hemostemix had competing interests and that Aspire was a competitor of Hemostemix.

327.   During his tenure with Hemostemix, Jacobs assisted Makofka, Jed Wood and others at Aspire to misappropriate Hemostemix's IP, including Clinical Trial Data and other trade secrets and proprietary information.

328.   Following his resignation from Hemostemix, Jacobs continued to falsely hold himself out as a representative of, and authorized to act on behalf of, Hemostemix.   One example was Jacobs' continued use of his Hemostemix email address to misrepresent to the FDA, vendors, consultants and Clinical Trial sites that actions by him to transfer contracts and services from Hemostemix to Aspire were, in fact, authorized by and at the direction of Hemostemix.  They were not.

329.   On or about December 6, 2019, for instance, five (5) weeks after Jacobs' resignation was effective and *one (1) day* after receipt of the Hemostemix rescission notice, Jacobs expressly requested, in furtherance of the conspiracy, that Cooper create an Aspire email address for Jacobs and his assistant.  Jacobs further requested that Cooper program all of Jacobs's and his assistant's Hemostemix emails to automatically forward to their new Aspire email addresses.

330.   Additionally, in January 2020, Jacobs directed that Accudata transition the Clinical Trial to Aspire despite the terms of Hemostemix's contract with Accudata.

331.   Jacobs backdated the Accudata consulting agreement with Aspire in order to falsely make it appear that the agreement predated Makofka's resignation and that Makofka would, therefore, have been authorized to act on behalf of Hemostemix in assigning Hemostemix's rights to Aspire.

332.   In collusion with Makofka and Jed Wood, Jacobs falsely held himself out as acting on behalf of Hemostemix when he instructed Accudata to transfer the Midpoint Analysis and all Clinical Trial Data to Aspire in January 2020.  Jacobs continued to falsely and fraudulently hold himself out to Accudata as being affiliated with or acting on behalf of Hemostemix.

333.   To perpetuate Jacobs' fraud, as part of the overall conspiracy with Makofka and Jed Wood, Jacobs purposefully withheld and did not disclose to Accudata that he had resigned from Hemostemix or that he had become Chief Medical Officer for Aspire at the time he instructed Accudata to transfer the Midpoint Analysis and Clinical Trial data to Aspire.

334.   In collaboration with Makofka and Jed Wood, Jacobs deceived the vendors, consultants and trial sites and fraudulently induced them to transfer contracts and services from Hemostemix to Aspire when no such authority—contractual or otherwise—existed to do so.

335.   Jacobs had no authority to continue acting for or on behalf of Hemostemix following his resignation and the termination of the Jacobs Agreement.

336.   Jacobs also violated his fiduciary duties to Hemostemix when he subordinated Hemostemix's rights to those of Aspire.  He did so in order to continue facilitating Makofka's and Jed Wood's efforts, through Aspire, to steal, misappropriate and use for their own purposes Hemostemix's IP.

337.   At Makofka's and Jed Wood's direction, Jacobs colluded with other KSM employees, including Cooper, to participate in the scheme, including the theft and conversion of Hemostemix property.

338.   Cooper, a KSM employee, was contracted by Makofka to serve as Chief Technology Officer ("CTO") and Chief Information Officer ("CIO") for both Hemostemix and Aspire at the same time.  In that position, Cooper was encouraged to, and did, steal Hemostemix confidential proprietary and business information, trade secrets and IP owned by Hemostemix.

339.   Cooper had administrator access rights to Hemostemix's computers, server and network.  At Makofka's and Jed Wood's direction, and in furtherance of the conspiracy, Cooper used his administrative access rights prior to termination of the KSM Agreement to access Hemostemix's computers, server and network and transfer Hemostemix's confidential proprietary and business information, including financial information, as well as trade secrets and IP to Aspire.

340.   After termination of the KSM Agreement, Cooper's administrative access rights were not immediately terminated since Cooper, and Cooper alone, controlled who had administrative access rights and who did not.

341.   As such, Cooper, at Makofka's direction, continued to access without authority Hemostemix's computers, server and network to access and transfer to

Aspire certain Hemostemix confidential proprietary and business information, trade secrets and IP to Aspire.

**G. Even after his resignation as CEO of Hemostemix, Makofka continued to carry out acts in furtherance of the Conspiracy with Jed Wood to impair Hemostemix financially, and take control of Hemostemix and its IP.**

342.   The KSM Agreement was terminated effective October 31, 2019.

343.   Makofka resigned as CEO of Hemostemix effective October 31, 2019.

344.   Following termination of the KSM Agreement and Makofka's resignation, he refused to provide Hemostemix's new management with full and complete access to Hemostemix IP, including the books, records and information in Makofka's and KSM's possession, including all Hemostemix "Confidential Information," in violation of the KSM Agreement.

345.   Even after termination of the KSM Agreement, at Makofka's direction, Cooper and other KSM personnel falsely and fraudulently continued to hold themselves out as having authority to act on behalf of Hemostemix in order to secure the conversion of certain contractual relationships from Hemostemix to Aspire.

346. Following termination of the KSM Agreement and Makofka's resignation, Makofka and Jed Wood conspired to and did divert substantial sums of money from Hemostemix to Makofka and Jed Wood, and/or companies that Makofka and Jed Wood owned or controlled including principally Aspire.

347.   Makofka engaged in business ventures for Hemostemix and Aspire in Florida, executed or directed the execution of contract obligations for or on behalf of Hemostemix and Aspire in Florida, and committed or directed the commission of tortious acts against Hemostemix in Florida.

348.   Makofka issued, or caused the issuance of, misleading press releases regarding Hemostemix and its manufacturing operations in order to conceal Makofka's and Jed Wood's true intentions.

349.   Soon after formal termination of the KSM Agreement, Makofka directed Cooper to access Hemostemix's computers, internal servers and network using his Hemostemix credentials and reactivated the Hemostemix email accounts for Makofka, Jacobs, Cooper, and others.

350.   Cooper, at Makofka's and Jacobs' direction, also programmed the email server to automatically forward all incoming emails sent to Cooper's, Makofka's, Jacobs' and others Hemostemix.com email addresses to their new Aspire email addresses at aspire2cure.com.

351.   Cooper, also at Makofka's and Jacobs' direction, then enabled auto-forwarding so that all emails sent to their Hemostemix email account automatically would be forwarded to their respective Aspire email accounts.

352.   Cooper, also at Makofka's and Jacobs' direction, enabled auto-forwarding for three Hemostemix corporate accounts (the "Corporate Accounts"):

"SAE" (severe adverse event), used for communications related to severe adverse events; "Booking," used for communications related to Clinical Trial treatments; and "Accounting," used for general accounting-related correspondence with Hemostemix.

353.   Hemostemix neither authorized nor approved of Cooper's access to its internal systems, nor was it aware of Cooper's access to its internal servers after terminating the KSM Agreement.

354.   Following termination of the KSM Agreement and Jacobs Agreement, Makofka, Jacobs and Cooper intended to and did use their former Hemostemix email accounts to falsely hold themselves out as authorized agents or representatives of Hemostemix despite having no authority to act on behalf of Hemostemix.

355.   Makofka, Cooper and Jacobs worked together to deceive vendors, consultants, trial sites and even the FDA and Health Canada in order to falsely and without authority transfer contracts and services from Hemostemix to Aspire.  Such actions interfered with Hemostemix's contractual relationships and also undermined and impeded Hemostemix's ability to continue the progress of the Clinical Trial.

356.   Makofka, Jacobs and Cooper knew their actions were wrongful and illegal at the time.  They concealed their actions from the new Board and incoming management for months.

357.   Hemostemix did not learn of Cooper's improper and illegal access to Hemostemix's network and server or auto-forwarding of Hemostemix emails for months.   Once new management at Hemostemix learned of Cooper's unlawful conduct, Hemostemix took immediate action to disable the auto-forwarding functionality but not before Makofka, Jacobs, Cooper and others had already received months of email communications, including highly sensitive Hemostemix information, without any authority to otherwise access such information legitimately

358.   Also following termination of the KSM Agreement and Makofka's resignation, at Makofka's direction, Cooper, through use of his Hemostemix email account and other means, held himself out as Hemostemix's agent in connection with third parties who provided various services to Hemostemix related to the Clinical Trial.  While purporting to act as Hemostemix's agent, Cooper arranged for the transfer of several accounts and contracts from Hemostemix to Aspire.

359.   One such account was a consulting contract with Accudata.  In January 2020, in furtherance of the scheme and conspiracy and unbeknownst to Hemostemix, Makofka and Jacobs falsely represented to Accudata that Hemostemix had assigned its rights and obligations to Aspire and further falsely represented that Accudata should enter into a new consulting agreement with Aspire, thereby superseding Accudata's consulting agreement with Hemostemix.

360.   To conceal the true nature of the fraud, Makofka and Jacobs backdated the new agreement to show a purported execution date in November 2019 to appear as if the parties had executed it before Makofka resigned from Hemostemix. Makofka and Jacobs, also in furtherance of the scheme and conspiracy, directed Accudata to only communicate with Jacobs relating to the analysis Accudata was conducting in order to prevent Hemostemix from learning of the fraud or taking any action to protect its rights thereafter.

361.   Nobody at Hemostemix with the authority to act for or bind Hemostemix authorized, ratified or even reviewed any such assignment or transfer of rights.

## IV.    MAKOFKA AND JED WOOD FURTHER THEIR CONSPIRACY EVEN AFTER TERMINATION OF THE KSM AGREEMENT AND AMENDED LICENSE AGREEMENT.

### 2019 Unauthorized Access to and Alteration of Accounting/Financial Information

362.   Termination of the KSM Agreement effective October 31, 2019, and rescission of the Amended License Agreement effective December 5, 2019, did not stop Makofka and Jed Wood from continuing to exploit Hemostemix.

363.   During the transition to new management and a newly constituted Board of Directors, Makofka and Jed Wood unlawfully accessed, or directed and caused unauthorized access, to Hemostemix's financial and accounting information in QuickBooks (an accounting software for businesses) for an improper purpose.

364.   Dwight Fieseler ("Fieseler") was at the time a KSM employee and CFO who served, temporarily and prior to termination of the KSM Agreement, as the contractor controller to Hemostemix.  Makofka and Jed Wood directed and caused Fieseler to access Hemostemix's online QuickBooks account approximately 80 times, between October 31 and December 31, 2019, more than half of which occurred on or after December 5, 2019 when the Amended License Agreement was rescinded by Hemostemix.

365.   Neither Makofka, Jed Wood, Fieseler, nor anyone else affiliated with KSM or Aspire had any authority to access, or direct access to, Hemostemix's financial and accounting information following termination of the KSM Agreement on October 31, 2019, and rescission of the Amended License Agreement on December 5, 2019.

366.   Upon information and belief, by unlawfully accessing Hemostemix's financial and accounting records in its QuickBooks account, Fieseler or another agent of KSM and Aspire, at the direction of Makofka and Jed Wood, altered certain journal entries, including backdating the transaction date of several entries related to payments Aspire allegedly made to purported "creditors" of Hemostemix in furtherance of Condition Precedent 1.

## **2020 Abusive and Fraudulent Canadian Receivership Action**

367.   After Makofka secured the fraudulent Accudata-Aspire Agreement, Jed Wood commenced a Canadian receivership action against Hemostemix on January 24, 2020 (the "**Receivership**").

368.   The Receivership was another act by Jed Wood and Makofka in furtherance of the conspiracy.

369.   On January 9, 2020, JMWI sent Hemostemix a "Notice of Default" and Demand for the immediate repayment of the 2019 Wood Debenture and 2019 Wood Loan.  The Notice and Demand were premature but nonetheless pursued despite Jed Wood's previous assurances that he would not demand repayment of the loan or debenture for 120 days.

370.   At Jed Wood's direction, JMWI initiated the Receivership action by filing a complaint deliberately timed to prevent Hemostemix from closing an announced $3 million (CAD) financing that was structured to be raised to repay the 2019 Wood Debenture and 2019 Wood Loan.  The Receivership complaint was further deliberated timed as Hemostemix's newly reconstituted  Board was fighting to obtain the return of its IP and other trade secrets from Aspire, Makofka and Jed Wood who had misappropriated it.

371.   Hemostemix timely acted and did defend against the receivership that it argued was the final step in Jed Wood's and Makofka's repressive and exploitive "loan-to-own" scheme.

372.   Accordingly, the receivership application properly was dismissed by order dated February 28, 2020.  Pursuant to the Order, Hemostemix timely paid $2,330,633.84 to Jed Wood for debts allegedly owed.

373.   Unbeknownst to Hemostemix at the time, Jed Wood had included in the Receivership demand the amount of **$283,536.55** as due and owing at the time— an exact amount, *to the penny*, of a payment Aspire, Makofka and Jed Wood (less $10,000 paid to another purported "creditor") contend was paid to Jed Wood in satisfaction of the Condition Precedent 1 as amended by the Sham Addendum.

374.   Jed Wood's contention that this amount was still owed, and was later paid in March 2020, in connection with the Receivership Action, conclusively establishes that Aspire, Makofka and Jed Wood falsely and fraudulently misrepresented that the full amount owed under Condition Precedent 1 was paid in a timely manner.  Aspire, Makofka and Jed Wood made this false representation in furtherance of their scheme and conspiracy to financially impair Hemostemix, exploit its IP and other assets, and ultimately take over control of Hemostemix.

## 2020 Conversion of Hemostemix Data and IP

375.  In or about February 2020, Accudata received raw Clinical Trial statistics and data for approximately sixty-five (65) clinical trial subjects.  Although Accudata was required to return this Clinical Trial data to Hemostemix, it refused to do so, at the direction of Jed Wood and Makofka.  This refusal caused Hemostemix to incur substantial costs and expenses associated with defending against the material interference of its rights to use and enjoy its Clinical Trial data.

376.  Using Hemostemix's misappropriated property, Aspire announced its patent filing for ACT-20, a product Aspire claimed treated COVID-19-related pneumonia.  Upon information and belief, Aspire was able to develop ACT-20 after misappropriating Hemostemix's IP and, thus, Hemostemix is entitled to disgorgement and recovery of all revenues resulting from the development of ACT-20.

## 2020 Improper and Fraudulent Trial Suspension Notice

377.  On or about May 6, 2020, at the direction of and with input from Makofka and Jacobs, Aspire sent a misleading, false and fraudulent letter to all Clinical Trial sites advising, among other things, that Aspire was suspending HS-1201, the clinical trial of ACP-01 ("**Trial Suspension Notice**").  A true and correct copy of the Trial Suspension Notice is attached hereto as **Exhibit 8**.

378.  The Trial Suspension Notice stated, in pertinent part, that

95

> Since November 2019 activities have been managed by the [Contract Research Organization], Aspire Health Science, as part of a licensing agreement between the sponsor HEM and CRO.  This encompasses all aspects of the trial management, including manufacturing, electronic data capture and distribution of site payments.  The sponsor Hemostemix Inc. has made a request to **rescind** the ACP-01 licensing agreement of which AHS has declined.  Until these issues can be resolved AHS will be suspending its trail [sic] management activities provided to Hemostemix Inc.

(Ex. 8 (emphasis in original).)

379.   The Trial Suspension Notice contained material false and misleading representations about the status of the Clinical Trial and actions of Hemostemix which were intended to mislead the Clinical Trial sites.

380.   First, as Makofka, Jed Wood, Jacobs and Aspire knew, the December 5, 2019 Rescission Notice was a notice, not a request, pursuant to Hemostemix sole discretion in the Amended License Agreement to do so upon the failure of Aspire to satisfy Condition Precedent 1.

381.   Second, suggesting, as Aspire does in the Trial Suspension Notice, that Hemostemix's rescission of the Amended License Agreement was a recent occurrence was also materially false and designed to mislead the clinical trial sites into believing it was Hemostemix that was at fault for suddenly causing the suspension of the trial.  Indeed, nowhere in the Trial Suspension Notice does Aspire reference the 2020 Florida Litigation *Aspire* commenced against Hemostemix and its improper withholding of Hemostemix's IP.

382.   Third, Aspire falsely contends that "[s]ince November 2019 activities have been managed by the CRO, Aspire Health Science, as part of a licensing agreement between the sponsor HEM and CRO." (Ex. 8.)  In reality, the Amended License Agreement was not effective, by its own terms, until Aspire's satisfaction of Condition Precedent 1—the payment of $1 million to Hemostemix by November 13, 2019, the Condition Precedent Satisfaction Date.  Aspire did not make the $1 million payment to Hemostemix.  The Amended License Agreement was thus, not effective in November 2019, the parties were not operating under that agreement, and the "activities were not managed by Aspire" since November 2019 under that agreement.

383.   Fourth, if Aspire was obligated to pay any and all Clinical Trial costs, including expenses by the clinical trial sites.  Aspire had stopped paying those trial site expenses and falsely and misleadingly blamed the failure to pay on Hemostemix in order to interfere with Hemostemix's relationships with the clinical trial sites.

384.   Fifth, the Trial Suspension Notice falsely and misleadingly represents that "trial compensation" related issues should be addressed with Hemostemix.  Makofka, Jed Wood, Jacobs and Aspire knew, however, that the party responsible for "trial compensation" under the Amended License Agreement was Aspire, if, as Aspire contended, the Amended License Agreement was valid.  By directing the trial sites to the new CEO and President, Thomas Smeenk, and Hemostemix to address

"trial compensation" issues, Aspire not only breached its obligations under the Original License Agreement, but also falsely represented that Hemostemix, not Aspire, was responsible for paying those costs. This was yet another effort by Makofka, Jed Wood, Jacobs and Aspire to mislead participants in the trial, taint the trial sites and exert undue pressure on Hemostemix to capitulate to their financial and other threats.

385.   Shortly after the Trial Suspension Notice was sent, Aspire conducted a conference call with the clinical trial sites but purposefully and intentionally excluded Hemostemix from that call. During that call, Aspire falsely advised the Clinical Trial Sites that the Hemostemix "trial was done." Aspire had no authority to make any declaration that the trial was "suspended," or "done." Additionally, doing so interfered with Hemostemix's ongoing relationship with the Clinical Trial Sites, which had already been usurped by Aspire.

386.   Aspire had no authority or grounds to send the Trial Suspension Notice to the trial sites, or, for that matter, to suspend the Clinical Trial. Aspire did so for the sole purpose of sabotaging Hemostemix and the Clinical Trial, and negatively impacting Hemostemix's financial condition, thereby putting pressure on Hemostemix to pay exorbitant sums of money to obtain the return of its IP at the risk of losing all gains of the Clinical Trial.

387. Following issuance of the Trial Suspension Notice, Hemostemix received numerous notifications from Clinical Trial sites indicating they were terminating the trial at those locations.

388. Aspire's wrongful interference with Hemostemix's business relationships with the Clinical Trial sites continues, following a consistent pattern of escalation by which Aspire intended to cause significant and permanent damage to such relationships in order to obstruct the results of Hemostemix's Clinical Trial.

## 2020 Improper and Misleading Disclosure of ACP-01 Midpoint Analysis "Report"

389. By press release dated July 6, 2020, Aspire, by Makofka, wrongfully and in a misleading fashion disclosed the purported results of the ACP-01 Midpoint Analysis by Accudata ("**Aspire Press Release**").  A true and correct copy of the Aspire Press Release is attached hereto as **Exhibit 9**.

390. The disclosure was one more attempt by Makofka, Jed Wood and Aspire to exert additional market and financial pressure on Hemostemix to capitulate to their demands.

391. The Aspire Press Release contained numerous knowingly false and misleading statements.

392. The Aspire Press Release indicated that "**Under protest by Aspire**, the Midpoint Statistical Analysis has been released to both Aspire and Hemostemix for

review." (Ex. 9 (emphasis added).)   That is materially false for several reasons including, but not limited to:

    a.  no final analysis was released.  As Makofka, Jed Wood and Aspire know, and knew at the time, Aspire produced an unsigned, unverified *draft* of a report, whose authenticity, origination and integrity is in doubt.  It was counsel for Aspire that produced the unsigned, unverified draft report and Aspire and its counsel were in possession of this draft for an unknown period of time, during which time it was subject to change or alteration;

    b.  the purported summary report that Aspire claimed to have provided to Hemostemix was unsigned and addressed to an individual who was not, at the time of the report, a director or officer of Hemostemix and who did not act for Hemostemix at that time in any capacity;

    c.  although Hemostemix never requested the unsigned, unverified draft of an analysis, Aspire counsel falsely suggested it was provided under protest and counsel produced it for the sole purpose of disseminating a misleading press release to announce not the disclosure of the report to Hemostemix counsel but the results, the veracity of which are disputed; and

      d.  neither Aspire nor any of its agents or representatives, including

counsel, had any ownership rights to Hemostemix's ACP-01 Clinical

Trial Data nor any rights to publish any type of report or results,

including the Midpoint Analysis, and, in fact, breached the

confidentiality provisions of the ALA, OLA, Drive Capital Agreement,

KSM Agreement, and Jacobs Agreement in doing so.

393.  The Aspire Press Release failed to disclose the foregoing material facts necessary to make it accurate to the public.  Aspire never issued a correcting press release.

394.  Aspire also continued to block Hemostemix from obtaining the return of its  Clinical Trial Data.  And, because Aspire, at Makofka and Jed Wood's direction, continued then, and continues now, to refuse to return to Hemostemix, or provide Hemostemix access to, its Clinical Trial Data, as Aspire knows, there is no ability by anyone other than Aspire, Makofka, and Jed Wood, to challenge the unfounded statements in the Aspire Press Release.

395.  The Aspire Press Release also makes materially false and misleading statements about the efficacy of ACP-01.  At all times leading up to the disclosure by Aspire's counsel of an unsigned, unverified draft report, not once had there been any indicators that the therapy was not effective.  To the contrary, all indications, including six (6) studies of more than 215 subjects as published in six (6) scientific

101

publications demonstrate that ACP-01 therapy was effective for the purposes it was designed and tested.

396.   At a time when he believed he and Jed Wood would be securing control and ownership of Hemostemix's IP, Makofka *himself* had publicly stated, on behalf of Hemostemix, the effectiveness of ACP-01.   In September 2019, for instance, during his interview with *Bio Informant*, Makofka stated "I cannot emphasize this message clearly enough.  ACP-01 is a platform that has shown safety and efficacy in treating multiple indications without severe adverse events."

397.   The Aspire Press Release further states, in pertinent part, that "Aspire is not comfortable with past claims by Hemostemix regarding the current status and efficacy of ACP-01 and question the capability, established procedures, and credentials of those charged with the task of accurately and effectively interpreting and publishing results on behalf of Hemostemix."

398.   This statement is materially false, misleading and designed to further impugn Hemostemix, its management, and the ACP-01 therapy.

399.   First, it was Makofka, as CEO and President of Hemostemix who, until termination of the KSM Agreement drafted and issued press releases and other public statements on behalf of Hemostemix regarding the positive and encouraging status and progress of the clinical trial.

400.   Second, it was Makofka, as CEO of Aspire, who, together with co-conspirators Jed Wood, Jacobs, and Cooper, designed the protocols for the midpoint analysis.  Any defect in those constructs were attributable to the incompetence and ineptitude of Makofka, Jed Wood, Jacobs, and Cooper.

401.   Aspire also had no authority to disclose the results, accurate or not, of the Midpoint Analysis, in a press release or any other public statement.  Hemostemix was at the time, and still is, a public company with disclosure requirements.  Aspire is not, and was not on July 6, 2020, a public company but rather a privately-owned LLC, owned and/or controlled, directly or indirectly, by Jed Wood, Randi Wood, Blake Wood, and Makofka with no disclosure requirements or obligations.

402.   In July 2020, Aspire had no authority to speak for Hemostemix, hold itself out as a representative or authorized agent of Hemostemix, or provide any disclosures for or on behalf of Hemostemix.

403.   Aspire also had confidentiality obligations pursuant to the Amended License Agreement and Original License Agreement that survived termination, expiration and rescission.  Aspire was obligated to maintain the confidentiality of, and not disclose without the consent of Hemostemix (which it did not have), any confidential, proprietary and trade secret information of Hemostemix.  (Ex. 5, § 13 at 30-31.)

404.  Makofka had separate and independent confidentiality obligations pursuant to his fiduciary obligations stemming from his role as the former CEO and President of Hemostemix, not to disclose confidential, proprietary and trade secret information of Hemostemix that would have been received, obtained, and maintained by him.  Makofka violated his fiduciary obligations of confidentiality including under a duty of care and loyalty he owed Hemostemix.

405.  Makofka, through KSM, had confidentiality obligations to Hemostemix pursuant to the KSM Agreement, that survived termination or expiration.  Makofka, through KSM, was obligated to maintain the confidentiality of, and not disclose without the consent of Hemostemix (which it did not have), any confidential, proprietary and trade secret information of Hemostemix.

406.  There was no justification for Aspire to issue a press release disclosing the results, accurate or not, of the Midpoint Analysis other than to falsely impugn Hemostemix, its management, and the ACP-01 therapy, thereby calling into question the Clinical Trial and the value of any investment by present or prospective shareholders, putting additional financing pressure on Hemostemix.

407.  The Aspire Press Release, directed by Makofka and Jed Wood, was an attempt by Makofka and Jed Wood to falsely and fraudulently impugn and disparage Hemostemix and its management, and to falsely call into question and undermine ACP-01 and the Clinical Trial, to drive the Hemostemix stock price down so that

Hemostemix was left with no choice but to cede and surrender to Makofka's and Jed Wood's demands.

408.   Aspire, at the direction of Makofka and Jed Wood, were willful and reckless in issuing, and causing the issuance of, the Aspire Press Release to the marketplace and for failing to correct misleading information contained in the Aspire Press Release.

409.   On the day Aspire issued the Aspire Press Release, Blake Wood and Jed Wood colluded and conspired to sell and, in fact, sold through a broker approximately 57,465,000 shares of Hemostemix out of approximately 88 million owned by Wood Capital.

410.   Jed Wood and Blake Wood coordinated this sale with the knowledge and intent to contribute to an artificial low price for the Hemostemix shares.  In particular, the massive transaction was intended by Jed Wood and Blake Wood to be a public vote of no confidence.  The sale, together with the contemporaneous false and materially misleading Aspire Press Release, by design and effect, directly caused Hemostemix's stock price to drop almost 70% in value.

411.   The Aspire Press Release had a dramatic, negative effect on the trading of Hemostemix shares.

412.   On Friday, July 3, 2020, the last trading day before the Aspire Press Release, the total volume of shares traded was 1,188,000 at $.015/share (*i.e.*, one-and-one-half cents per share).

413.   On Monday, July 6, 2020, by contrast, the day of the Aspire Press Release and the Jed Wood/Blake Wood massive sale, the total trading volume was 59,557,345, driving the stock price down to $.006/share (*i.e.*, just over *half* of one cent per share).

414.   Of the 59,557,345 shares traded on July 6, 2020, 57,465,000 were owned by Jed Wood and Blake Wood through Wood Capital.

415.   The actions of Jed Wood, Blake Wood, Makofka and Aspire constitute breaches of various securities laws, including sections 92(4.1) and 93(a)(ii) of the Alberta Securities Act prohibiting misrepresentations and fraud, and, specifically, market manipulation.

416.   Jed Wood, Blake Wood, Makofka and Aspire also knew weeks before that they held and were planning to disclose in the Aspire Press Release an unsigned, unverified draft report of questionable authenticity and credibility but which, when disclosed in the form it was, would impugn ACP-01, Hemostemix and its management causing the stock price to drop considerably.

417.   Jed Wood and/or Blake Wood received the unsigned, unverified draft editable version of the Midpoint Analysis report of questionable authenticity and

credibility in at least early May 2019, if not before then.  Armed with this document in editable form, Jed Wood and Blake Wood thereafter schemed and executed a plan to sell and, in fact, sold, 10 million, 10 million, and 7,855,000 shares on or about May 21, 25 and 26, 2019, respectively, in violation of insider trading laws under the Alberta Securities Commission, including section 147(3) of the Alberta Securities Act.

### Canadian Replevin Action

418.   On or about May 26, 2020, Hemostemix sought, among other things, an order for replevin for Hemostemix's property in an action brought in the Court of Queens Bench, Calgary and an order for an injunction for the return of Hemostemix's IP and other property ("**Canadian Replevin Action**").  A true and correct copy of the originating application in the Canadian Replevin Action is attached hereto as **Exhibit 10**.

419.   Aspire was in possession of Hemostemix's property, consisting primarily of records in electronic format and refused to return it to Hemostemix.

420.   The Hemostemix property related to the clinical trials at each site, including the manufacturing and business records, was critical to the core business of Hemostemix.

421.   Such property relating to clinical trials which Hemostemix sought to recover included, but was not limited to, the following:

a. documents contained in the "Electronic Document Control" System;

b. patient data;

c. clinical trial midpoint data, statistical analysis of the data and reports in all formats;

d. correspondence with the FDA, Health Canada, and other regulatory authorities related to the clinical trial;

e. correspondence with each former contract research organization, clinical trial site and clinical related to the clinical trial.

422.   Such property related to manufacturing which Hemostemix sought to recover included, but was not limited to:

a. Standard parenting procedures (SOPs), reports, and validation reports;

b. Improvements to SOPs;

c. patient manufacturing batch records, QC results, shipment information, certification of analysis and administration to the patient records;

d. patient manufacturing batch records, QC results, shipment information, certification of analysis and notes to all files of all patient records, including any patient treated with ACP-01;

e. out of specifications (OOS) reports and investigations;

f. faculty inspection records and outcomes;

108

g.  "show how" of the creation of ACP-01, NCP-01, and BCP-01 and any other derivative products of any of the foregoing;

h.  a list of best practices pertaining to the technology;

i.  a detailed description and a back-up copy of all work carried out to automate the production process of ACP-01, NCP-01, and BCP-01, or otherwise with respect to autologous stem cell product creation;

j.  a list of suppliers used to obtain the ingredients and supplies to make ACP-01 and a copy of the contract terms of the relationship; and

k.  all existing records of batches of all Hemostemix products.

423.  Such property relating to business records which Hemostemix sought to recover included, but was not limited to:

a.  electronic records, documents, historical data, SOPs that were transferred to Aspire from HEM-Israel, TheraVitae Israel, TheraVitae Thailand, TheraVitae Inc., and Kwalata Trading Limited; and

b.  electronic business records of HEM-Israel.

424.  Counsel for Aspire represented to the Court of Queens Bench that all property related to the clinical trials, manufacturing, and business records set forth above were located in Florida, not Calgary, Alberta, Canada.

425.  Based on Aspire counsel's representations, the Court of Queens Bench determined that the property sought above was in fact located in Florida, not Calgary,

Alberta, Canada, and that to obtain the return of such property, Hemostemix must pursue an action in Florida.

426.   The location of all such Hemostemix property in Florida has been confirmed by Aspire through Cooper.   In particular, Aspire maintains all clinical trial data is located on a hard drive belonging to Hemostemix in a locked filing cabinet.

427.   Hemostemix is entitled to recover such property.

428.   Hemostemix has retained undersigned counsel as its representation in this case and is obligated to pay counsel a reasonable fee for their services.

**COUNT I**
**RACKETEERING INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")**
**18 U.S.C. § 1962(c) (RICO Enterprise)**
**(Against Defendants Makofka and Jed Wood)**

429.   Hemostemix hereby realleges and incorporates as if fully set forth herein paragraphs 1 through 428 above.

430.   Hemostemix brings this claim against Defendants Makofka and Jed Wood.

431.   Hemostemix is a "person" with standing to sue under 18 U.S.C. § 1962(c) within the meaning of 18 U.S.C. § 1964(c).

432.   Makofka and Jed Wood constitute an association-in-fact and, therefore, an enterprise (the "**RICO Enterprise**") within the meaning of 18 U.S.C. § 1961(4)

whose activities affect interstate commerce.  The RICO Enterprise is engaged in interstate commerce in that its activities and transactions relating to predicate RICO acts involved the international and interstate actions of Makofka and Jed Wood which affect interstate commerce, and frequently required travel and communication across state and international lines.

433.    The RICO Enterprise consists of the long-standing business relationship between and among Makofka and Jed Wood with the common and similar purpose of: impairing Hemostemix financially by, for example, engaging in abusive and frivolous litigation and causing Hemostemix to enter into predatory loans they knew Hemostemix would not be able to repay within the allotted time; stealing Hemostemix's IP and other assets; taking control of Hemostemix and its operations; self-dealing by enriching themselves and their separate companies at Hemostemix's expense, for example, through the Drive Capital Agreement and KSM Agreement; and profiting from Makofka's and Jed Wood's fraudulent and unlawful conduct by taking ACP-01 to market for significant financial gain.

434.    Makofka and Jed Wood agreed to and did conduct and participate in the conduct of the RICO Enterprise's affairs through a pattern of racketeering activity and for the unlawful common purpose of impairing Hemostemix financially, stealing Hemostemix's IP and other assets, and ultimately taking control of Hemostemix and its operations through such acts as: (a) fraud; (b) computer fraud;

111

(c) commercially unreasonable loans and other funding arrangements; (d) self-dealing and related transactions; (e) wire fraud; (f) extortion; (g) theft and misappropriation of assets; and (h) tortiously and unlawfully interfering with and misappropriating contractual relationships.

## Fraud

435.   Makofka and Jed Wood engaged in fraud to mislead the Board.   In particular, Makofka and Jed Wood falsely advised the Board, and the Board relied to its detriment thereon, that entering into the 2016 Drive Capital Agreement and 2019 KSM Agreement were in Hemostemix's best interests.   In reality, the intent and design by Makofka and Jed Wood of those agreements was to give them access to and control over Hemostemix's operations and IP in furtherance of the overall scheme to impair Hemostemix financially, steal Hemostemix's IP and other assets and ultimately take control of Hemostemix and its operations.

436.   Makofka and Jed Wood engaged in fraud when they advised the Board as part the proposed restructuring and reorganization in or about 2017, and the Board relied to the detriment of Hemostemix thereon, that winding up Kwalata and transferring the IP ownership rights from Kwalata to Hemostemix was in Hemostemix's best interests.   In reality, the intent and design by Makofka and Jed Wood was not to benefit Hemostemix but to consolidate ownership of the IP within

Hemostemix, over which Makofka and Jed Wood exercised virtually total control, and position themselves to seize control of Hemostemix's IP.

437.   Makofka and Jed Wood engaged in fraud when they advised the Board as part the proposed restructuring and reorganization in or about October 2017, and the Board relied to the detriment of Hemostemix thereon, to wind up HEM-Israel and move all manufacturing operations to Aspire, which had no experience, infrastructure or know-how to handle a clinical trial manufacturing operation of any scale.  In reality, the intent and design by Makofka and Jed Wood was not to benefit Hemostemix but to consolidate all manufacturing operations over ACP-01 in Aspire, to benefit Makofka and Jed Wood.

438.   Makofka and Jed Wood engaged in fraud when they advised the Board, and the Board relied to the detriment of Hemostemix thereon, that Hemostemix needed "emergency funding" and, thus, must enter into the 2017 Loan-to-Own scheme.  In reality, the 2017 Loan-to-Own scheme had commercially unreasonable terms, benefitted only Makofka and Jed Wood and increased Hemostemix's debt obligations with no material benefit to Hemostemix.

439.   Makofka and Jed Wood engaged in fraud when they advised the Board, and the Board relied to the detriment of Hemostemix thereon, that Hemostemix needed additional "emergency funding" and it was in Hemostemix's best interest to enter into the 2017 Wood Capital Loan.  In reality, the 2017 Wood Capital Loan was

secured by all Hemostemix assets, increased Hemostemix's secured debt obligations, impaired Hemostemix financially, impeded its ability to obtain financing from other outside sources, and resulted in no material benefit to Hemostemix. In fact, as Makofka and Jed Wood were aware, more than half of the funds allocated through the Wood Capital Loan were *used to pay Wood Capital to benefit Jed Wood and Makofka*.

440. Makofka and Jed Wood engaged in fraud when they advised the Board, and the Board relied to the detriment of Hemostemix thereon, that Hemostemix should enter into the 2018 Manufacturing Agreement and 2018 Original License Agreement for no consideration or benefit to Hemostemix. In reality, the intent and design by Makofka and Jed Wood of those agreements was to give them access to and control over Hemostemix's manufacturing and licensing operations and rights, access to and control over Hemostemix's IP and proprietary clinical trial data, with no material benefit to Hemostemix.

441. In November 2019 and the months that followed, Makofka and Jed Wood engaged in fraud when they falsely held themselves out, and directed Jacobs, Cooper, and others to hold themselves out, as authorized representatives and agents of Hemostemix to act on behalf of Hemostemix after Makofka's resignation as CEO, after termination of the KSM Agreement, and after termination of the Jacobs Agreement, in order to lure, solicit, and induce vendors, consultants and contractors,

114

including without limitation Medrio, Accudata and Anju, to leave their contractor, consultant, or vendor relationship with Hemostemix in favor of Aspire. Medrio, Accudata and Anju relied on such representations. In reality, the intent and design by Makofka and Jed Wood, and their agents, was to benefit Makofka, Jed Wood and Aspire, to harm Hemostemix and undermine its operations and ability to continue conducting the Clinical Trial.

442. Makofka engaged in fraud when he purported to provide full time and attention to his duties as CRO, CEO and President of Hemostemix and received compensation equivalent to full time service. Hemostemix relied on Makofka that he was complying with his contractual and professional obligations. In reality, Makofka dedicated very little of his time to services for Hemostemix, prioritized Aspire's interests and subordinated Hemostemix's interests. Despite this, he continued to receive full-time equivalent compensation, thereby defrauding Hemostemix of tens of thousands of dollars in unearned compensation.

443. Makofka and Jed Wood engaged in fraud when they advised the Board, and the Board relied to the detriment of Hemostemix thereon, that Hemostemix needed additional "emergency funding" and it was in Hemostemix's best interest to enter into the 2019 Wood Debenture and 2019 Wood Loan-to-Own. In reality, the predatory 2019 Wood Debenture and 2019 Wood Loan-to-Own had commercially unreasonable terms, were secured by all Hemostemix assets, increased

115

Hemostemix's secured debt obligations, impaired Hemostemix financially, impeded its ability to obtain financing from other outside sources, and resulted in no material benefit to Hemostemix.

444.   Makofka and Jed Wood engaged in fraud when they advised the Board, and the Board relied to the detriment of Hemostemix thereon, that Hemostemix should enter into the September 30, 2019 Amended License Agreement for no consideration or benefit to Hemostemix.  The Amended License Agreement imposed drastically unfavorable and commercially unreasonable terms on Hemostemix, essentially stripped Hemostemix functionally of any oversight or ownership rights over its IP and control over its licensing activities, and provided no financial benefit whatsoever to Hemostemix.  In reality, the intent and design by Makofka and Jed Wood of the Amended License Agreement was to give them full and complete access to and control over Hemostemix's manufacturing and licensing operations and rights, and access to and control over Hemostemix's IP and proprietary clinical trial data for which Hemostemix received no material benefit.

445. Makofka and Jed Wood engaged in fraud when they misled shareholders by failing to disclose material information and changed information in the consolidated financial statements in 2019, which they had an obligation to do, including omitting disclosure about Wood Demand Notice to collect principal and interest on the 2019 Wood Debenture and 2019 Wood Loan-to-Own, all the while

116

not paying Hemostemix $1 million (USD) as required by the Condition Precedent 1 of the Amended License Agreement.

446.   Makofka and Jed Wood engaged in fraud when, after failing to satisfy Condition Precedent 1 and knowing they could not obtain Board approval of any extension of the Condition Precedent Satisfaction Date, they manufactured the November 22, 2019 Sham Addendum and sought to pass it off to new management, the reconstituted Board, the clinical trial sites, regulators, and contractors, vendors, and consultants as a valid and enforceable modification of the Amended License Agreement in an attempt to allow Makofka and Jed Wood to provide "emergency funding" to Hemostemix to pay its clinical trial costs.  In reality, the intent and design by Makofka and Jed Wood of the Sham Addendum was to give them the ability to impose on Hemostemix one more round-trip funding scheme by which Makofka and Jed Wood purported, falsely, to be providing necessary financial assistance when, in fact, more than 75% of the funds were "round-tripped" and were used for Aspire, Makofka, Jed Wood, Jacobs, and Aspire's attorneys, none of which amounted to bona fide Clinical Trial costs and which provided no benefit whatsoever to Hemostemix.

447.   Makofka and Jed Wood further engaged in fraud when they falsely represented that the full $1 million payment was made to the benefit of Hemostemix by paying Hemostemix's purported "creditors" thereby satisfying Condition

Precedent 1 of the Amended License Agreement. In reality, among other payments never made, Aspire never paid Hemostemix $273,000. Instead, Hemostemix paid Jed Wood $273,000 related to the 2019 Wood Debenture and/or 2019 Wood Loan-to-Own under the payout order of the Canadian receivership court-approved process. It was not until the Canadian receivership court ordered the payment to be made in response to Jed Wood's receivership application demand was that payment made. Accordingly, Jed Wood's and Makofka's contention that Aspire satisfied Condition Precedent 1 was and is false.

448.   Makofka and Jed Wood engaged in fraud when they directed Cooper and others to access, without authority, Hemostemix's computer network and server, hard-code program its emails to automatically forward from the Hemostemix email addresses to an Aspire email address, to use those email addresses to falsely hold themselves out as Hemostemix representatives and agents, to steal sensitive, proprietary trade secret and other information, and to steal Hemostemix's financial information and banking information.

449.   Makofka and Jed Wood engaged in fraud when they disseminated the false and misleading Trial Suspension Notice that Aspire was suspending the clinical trial of ACP-01 due to Hemostemix's conduct through no fault of Aspire. In reality, the Trial Suspension Notice was not only false and misleading, as discussed above, but was issued without Aspire having any authority to do so. The intent and design

by Makofka and Jed Wood was to falsely disparage Hemostemix, disrupt and sabotage the clinical trial, and further impair Hemostemix financially.

450.   Makofka and Jed Wood engaged in fraud when they issued the improper, false and misleading Aspire Press Release on July 6, 2020.  In reality, no final analysis was ever released, Aspire did not do so "under protest," the report was unsigned and of no verifiable authenticity, and despite its false representations, neither Aspire nor any of its agents or representatives had any ownership rights to ACP-01 Clinical Trial Data, the Hemostemix IP, or the results of any midpoint analysis.  The Aspire Press Release further made false and fraudulent representations about the efficacy of ACP-01 and Aspire falsely held itself out as having authority to speak for or on behalf of Hemostemix or the clinical trial.  The intent and design by Makofka and Jed Wood of issuing the Aspire Press Release was to falsely and fraudulently impugn and disparage Hemostemix and its management, falsely call into question and undermine ACP-01 and the Clinical Trial, and to drive the Hemostemix stock price down so that Hemostemix would be left with no choice but to cede and surrender to Makofka's and Jed Wood's extortionate, repressive and exploitive demands.

451.   Hemostemix and others relied to their detriment on all of Makofka's and Jed Wood's false and fraudulent representations above, all of which harmed

Hemostemix by undermining and impeding its operations and ability to continue conducting the Clinical Trial.

## Predatory and commercially unreasonable loans and other funding arrangements

452.   Makofka and Jed Wood induced and coerced Hemostemix to enter into predatory secured loans and debentures on commercially unreasonable terms, including such round-trip, self-dealing funding schemes as the 2017 Loan-to-Own, the 2017 Wood Capital Loan, the 2019 Wood Debenture, and the 2019 Wood Loan-to-Own, all of which furthered the goal of the RICO Enterprise to impair Hemostemix financially, steal Hemostemix's IP and other assets, and ultimately take control of Hemostemix and its operations.

## Self-dealing and related transactions

453.   Makofka and Jed Wood coerced and induced Hemostemix to enter into the Drive Capital Agreement and KSM Agreement which, in turn, allowed Makofka and Jed Wood to install and maintain Makofka as CRO, President and CEO of Hemostemix despite his failures at those positions, in order to benefit Makofka and Jed Wood.

454.   Makofka and Jed Wood took control of Hemostemix's day-to-day management and operations which allowed them to access and take possession of Hemostemix's IP and other assets, reorganize Hemostemix's manufacturing

operations from HEM-Israel to Aspire to benefit Makofka and Jed Wood, reconstitute and reorganize Hemostemix's Board with members loyal and deferential to Makofka and Jed Wood, induce and coerce Hemostemix to enter into the commercially unreasonable loans and other funding arrangements discussed above that were designed to benefit Makofka and Jed Wood at the expense of Hemostemix, and induce and coerce Hemostemix to enter into the Manufacturing Agreement, the Original License Agreement, and the Amended License Agreement all to benefit Makofka and Jed Wood.

455.   Makofka's and Jed Wood's self-dealing and related transactions also included disseminating the false and misleading Aspire Press Release and immediately selling, or directing the sale, of more than 57 million shares of Hemostemix stock with the intent and design to cause the share price to drop by more than 70%.

456.   Makofka's and Jed Wood's self-dealing and related transactions above furthered the goal of the RICO Enterprise to impair Hemostemix financially, steal Hemostemix's IP and other assets, and ultimately take control of Hemostemix and its operations.

## Wire Fraud: 18 U.S.C. § 1343 and Fla. Stat. § 817.034

457.  Makofka and Jed Wood used wire communications, including telephone and email, throughout 2018, 2019, and 2020 to further their fraudulent scheme.

458.  Makofka and Jed Wood used wire communications, including telephone and email, to disparage Hemostemix and its new management, including but not limited to the Aspire Press Release and the phone conference with Clinical Trial sites convened by Makofka and Jed Wood shortly after issuing the Aspire Press Release.

459.  Makofka and Jed Wood used wire communications, including telephone and email, to misrepresent Hemostemix's financial obligations, the status of the Clinical Trial and effectiveness of ACP-01.

460.  Makofka and Jed Wood used wire communications, including telephone and email, to mislead the Clinical Trial sites and prospective investors.

461.  Makofka's and Jed Wood's willful, knowing and intentional acts above constitute wire fraud in violation of 18 U.S.C. § 1343 and Fla. Stat. § 817.034.

462.  Makofka's and Jed Wood's wire fraud furthered the goal of the RICO Enterprise to impair Hemostemix financially, steal Hemostemix's IP and other assets, and ultimately take control of Hemostemix and its operations.

**Theft of IP/trade secrets: 18 U.S.C. §§ 1831-1839 and Fla. Stat. 688.001, *et seq***

463.   Makofka and Jed Wood have wrongfully retained and refused to return the Hemostemix IP until Hemostemix has no option remaining but to cede control over Hemostemix and its IP.

464.   Makofka and Jed Wood used their positions of trust and confidence to gain access to, misappropriated, and unlawfully retain and refuse to return Hemostemix's IP and trade secrets relating to the clinical trial, including the Clinical Trial data generated in the course of the Clinical Trial such as computerized records of the batch data, quality control and quality assurance data, cell count and cell viability data of each clinical trial batch, and the randomization key or table, all of which constitute trade secrets under the Defend Trade Secrets Act, 18 U.S.C. §§ 1831-1839, and the Florida Uniform Trade Secrets Act, Fla. Stat. 688.001, *et seq.*

465.   Makofka's and Jed Wood's willful, knowing and intentional acts to steal, convert, improperly retain and misappropriate Hemostemix's IP furthered the goal of the RICO Enterprise to impair Hemostemix financially, steal Hemostemix's IP and other assets, and ultimately take control of Hemostemix and its operations.

**Extortion: 18 U.S.C. § 1951 and Fla. Stat. § 836.05**

466.   Makofka and Jed Wood have wrongfully and fraudulently and through other unlawful means obtained access to and use of Hemostemix's IP, finances and contracts.

467.   Makofka and Jed Wood used abusive litigation, threats of continued abusive litigation, abusive and opportunistic corporate attacks including a frivolous proxy fight, to weaken Hemostemix, cause it to capitulate to demands by Makofka and Jed Wood to take control over Hemostemix, and install Makofka as the CRO, CEO and President of Hemostemix which enabled Makofka and Jed Wood to use self-dealing activities to undermine Hemostemix's operations and slowly and methodically take control of and ownership over Hemostemix and its IP.

468.   Additionally, Makofka and Jed Wood have now held Hemostemix's IP for more than (2) years, unlawfully and without authority, including Clinical Trial Data and other property, and refused to return such property, or allow Hemostemix access to such property.

469.   At all times, Makofka and Jed Wood have known that Hemostemix is the rightful owner of all Hemostemix IP.

470.   At all times, Makofka and Jed Wood have known that the Hemostemix IP is critical for and essential to the continuation of the Clinical Trial.

471.   Makofka and Jed Wood now hold, refuse to return and are threating harm to Hemostemix's IP, including Clinical Trial Data and other property, absent the payment of exorbitant sums of money that are not otherwise due and owing.

472.   Makofka and Jed Wood obstructed, delayed, or affected interstate commerce or the movement of any article or commodity in commerce—that being

ACP-01—by extorting and attempting to extort Hemostemix through Makofka's and Jed Wood's: (a) refusal to return Hemostemix's data and property unless Hemostemix acquiesced to their demands; (b) threats to destroy and destruction of Hemostemix's relationships with its Clinical Trial sites and vendors, contractors, and consultants; (c) abusive litigation; (d) threats of continued abusive litigation; (e) abusive and opportunistic corporate attacks including a frivolous proxy fight to weaken Hemostemix and cause it to capitulate to demands by Makofka and Jed Wood to take control over Hemostemix and install Makofka as CRO, CEO and President of Hemostemix, which enabled Makofka and Jed Wood to use self-dealing activities to undermine Hemostemix's operations and slowly and methodically take control of Hemostemix and its IP.

473.   The extortion affected interstate commerce because, among other things: Hemostemix's Clinical Trial Data, IP and other assets were stolen outside of the State of Florida and are being held in Florida; and the abusive litigation and threats of abusive litigation occurred in Florida and other jurisdictions.

474.   Makofka's and Jed Wood's acts of extortion furthered the goal of the RICO Enterprise to increase the control over Hemostemix, its IP and business and confidential proprietary information, thereby increasing and perfecting their control over Hemostemix directly and attempting to secure payment of exorbitant funds from Hemostemix for the return of its own property.

## **Tortiously and unlawfully interfering with and misappropriating contractual relationships**

475.   Makofka and Jed Wood have falsely and fraudulently held themselves, and KSM employees including Cooper and others, out as representatives of and authorized agents for Hemostemix in order to misappropriate, convert and acquire the full benefit of Hemostemix's vendor, consultant and Clinical Trial site contracts and relationships, including but not limited to Medrio, Accudata and Anju.

476.   The predicate acts set forth above constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

477.   Makofka and Jed Wood have directly and indirectly, through entities they own and/or control or by directing others to carry out the activities set forth above, conducted and participated in the conduct of the RICO Enterprises affairs through the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(c).

478.   As a direct and proximate result of Makofka's and Jed Wood's racketeering activities and violations of 18 U.S.C. § 1962(c), Hemostemix has been injured in its business and property, to wit:

> a.   being forced to divert precious assets and resources to funding a defense to frivolous litigation and corporate attacks that would otherwise have been applied to underwriting clinical trial costs;

126

b. being defrauded out of millions of dollars;

c. being deprived the use and benefit of having its IP and proprietary data;

d. being deprived the opportunity to capitalize on bona fide capital finance opportunities intentionally squandered by Makofka and Jed Wood;

e. being deprived the ability to continue the Clinical Trial;

f. being impeded from taking the ACP-01 therapy to market; and

g. being disparaged and having its management publicly disparaged in retaliation for not succumbing and ceding to Makofka and Jed Wood's demands.

WHEREFORE Plaintiff Hemostemix Inc. demands judgment be entered in its favor and against Makofka and Jed Wood for actual damages in an amount to be determined at trial but in any event not less than $46 million in actual damages and not less than $300 million for Hemostemix's inability to take its ACP-01 therapy to market due to the foregoing conduct. Hemostemix further seeks treble damages, an award of reasonable attorneys' fees and costs, an order for preliminary and permanent injunction ordering the immediate return of all Hemostemix IP and other assets, an order affirmatively preventing Makofka and Jed Wood from taking any action to impede on, encroach on or impair Hemostemix's ability to exercise and enjoy the full benefits of its IP, and all other and such further relief as this Court deems just and proper under the circumstances.

## COUNT II
## RACKETEERING INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")
## 18 U.S.C. § 1962(b) (Acquisition of Control of Enterprise)
## (Against Defendants Makofka and Jed Wood)

479.    Hemostemix hereby realleges and incorporates as if fully set forth herein paragraphs 1 through 428 above.

480.    Hemostemix brings this claim against Defendants Makofka and Jed Wood.

481.    Hemostemix is a "person" with standing to sue under 18 U.S.C. § 1962(b) within the meaning of 18 U.S.C. § 1964(c).

482.    Hemostemix is an "enterprise" engaged in an whose activities affect interstate commerce.

483.    Makofka and Jed Wood acquired and maintained interests in and control of Hemostemix through a pattern of racketeering activity.  Specifically, Makofka and Jed Wood agreed to and did conduct and participate in a pattern of racketeering activity for the unlawful common purpose of acquiring control over Hemostemix.  Once in control of Hemostemix, Makofka and Jed Wood impaired Hemostemix financially and stole Hemostemix's IP and other assets.

484.    Makofka and Jed Wood engaged in the certain conduct in furtherance of their efforts to acquire and maintain interests in and control Hemostemix, to wit: (a) fraud; (b) predatory and commercially unreasonable loans and other funding

arrangements; (c) self-dealing and related transactions; (d) wire fraud; (e) extortion; (f) theft and misappropriation of assets; and (g) tortiously and unlawfully interfering with and misappropriating contractual relationships, discussed above in **Count I**.

485.   The predicate acts set forth above constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

486.   Makofka and Jed Wood have directly and indirectly, through entities they own and/or control or by directing others to carry out the activities set forth above, acquired and maintained interests in and control of Hemostemix, the enterprise, through the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(b).

487.   As a direct and proximate result of Makofka's and Jed Wood's racketeering activities and violations of 18 U.S.C. § 1962(b), Hemostemix has been injured in its business and property, to wit:

    a.   being forced to divert precious assets and resources to funding a defense to frivolous litigation and corporate attacks that would otherwise have been applied to underwriting clinical trial costs;

    b.   being defrauded out of millions of dollars;

    c.   being deprived the use and benefit of having its IP and proprietary data;

    d.   being deprived the opportunity to capitalize on bona fide capital finance opportunities intentionally squandered by Makofka and Jed Wood;

e.  being deprived the ability to continue the Clinical Trial;

f.  being impeded from taking the ACP-01 therapy to market; and

g.  being disparaged and having its management publicly disparaged in retaliation for not succumbing and ceding to Makofka and Jed Wood's demands.

WHEREFORE Plaintiff Hemostemix Inc. demands judgment be entered in its favor and against Makofka and Jed Wood for actual damages in an amount to be determined at trial but in any event not less than $46 million in actual damages and not less than $300 million for Hemostemix's inability to take its ACP-01 therapy to market due to the foregoing conduct.  Hemostemix further seeks treble damages, an award of reasonable attorneys' fees and costs, an order for preliminary and permanent injunction ordering the immediate return of all Hemostemix IP and other assets, an order affirmatively preventing Makofka and Jed Wood from taking any action to impede on, encroach on or impair Hemostemix's ability to exercise and enjoy the full benefits of its IP, and all other and such further relief as this Court deems just and proper under the circumstances.

## COUNT III
## RACKETEERING INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")
## 18 U.S.C. § 1962(d) (RICO Conspiracy)
## (Against Defendants Makofka, Jed Wood, Blake Wood, Randi Wood, Jacobs,

## and Cooper)

488.    Hemostemix hereby realleges and incorporates as if fully set forth herein paragraphs 1 through 428 above.

489.    Hemostemix brings this claim against Defendants Makofka, Jed Wood, Blake Wood, Randi Wood, Jacobs and Cooper (the "**RICO Conspiracy Defendants**").

490.    Hemostemix is a "person" with standing to sue under 18 U.S.C. § 1962(d) within the meaning of 18 U.S.C. § 1964(c).

491.    The RICO Conspiracy Defendants engaged in interstate commerce in that their activities and transactions relating to RICO Conspiracy and predicate acts involved their international and interstate actions which affect interstate commerce, and frequently required travel and communication across state and international lines from Alberta or other provinces in Canada into to Florida, during the period covered by this Complaint to secure Hemostemix's IP at Aspire's laboratory in or around Orlando, Florida, confirm the status of the production and manufacturing processes controlled entirely by Aspire, and collect, retain and refuse Hemostemix access to the IP and Clinical Trial Data.

131

492.   These travels for Makofka, Cooper and Fairbairn occurred throughout 2017. 2018, 2019 and into 2020.   Likewise, these travels for Jacobs occurred throughout 2019 and 2020

493.   As set forth above, the RICO Conspiracy Defendants agreed and conspired to violate 18 U.S.C. § 1962(c), specifically, by engaging in a pattern of racketeering activity for the unlawful common purpose of impairing Hemostemix financially, stealing Hemostemix's IP and other assets, and ultimately taking control of Hemostemix and its operations through such acts as: (a) fraud; (b) predatory and commercially unreasonable loans and other funding arrangements; (c) self-dealing and related transactions; (d) wire fraud; (e) extortion; (f) theft and misappropriation of assets; and (g) tortiously and unlawfully interfering with and misappropriating contractual relationships.

494.   As set forth above, the RICO Conspiracy Defendants agreed and conspired to violate 18 U.S.C. § 1962(b), specifically, acquiring and maintaining interests in and control of Hemostemix through a pattern of racketeering activity for the unlawful common purpose of acquiring control over Hemostemix and, once in control of Hemostemix, to impair Hemostemix financially and steal Hemostemix's IP and other assets.

495.   The RICO Conspiracy Defendants have intentionally conspired and agreed to conduct and participate in the conduct of the affairs of the RICO Enterprise

through a pattern of racketeering activity, and to acquire or maintain interests in Hemostemix through a pattern of racketeering activity.

496.   The RICO Conspiracy Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.  That conduct constitutes a conspiracy to violate 18 U.S.C. §§ 1962(c) and (b), in violation of 18 U.S.C. § 1962(d).

497.   As a direct and proximate result of the RICO Conspiracy Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Hemostemix has been injured in its business and property, to wit:

    a.  being forced to divert precious assets and resources to funding a defense to frivolous litigation and corporate attacks that would otherwise have been applied to underwriting clinical trial costs;

    b.  being defrauded out of millions of dollars;

    c.  being deprived the use and benefit of having its IP and proprietary data;

    d.  being deprived the opportunity to capitalize on bona fide capital finance opportunities intentionally squandered by Makofka and Jed Wood;

    e.  being delayed and deprived the ability to continue the Clinical Trial;

    f.  being delayed and impeded from taking the ACP-01 therapy to market; and

g. being disparaged and having its management publicly disparaged in retaliation for not succumbing and ceding to Makofka and Jed Wood's demands.

WHEREFORE Plaintiff Hemostemix Inc. demands judgment be entered in its favor and against the RICO Conspiracy Defendants—Makofka, Jed Wood, Blake Wood, Randi Wood, Jacobs, and Cooper—for actual damages in an amount to be determined at trial but in any event not less than $46 million in actual damages for lost equity and not less than $300 million for Hemostemix's inability to take its ACP-01 therapy to market.  Hemostemix further seeks treble damages, an award of reasonable attorneys' fees and costs, an order for preliminary and permanent injunction ordering the immediate return of all Hemostemix IP and other assets, an order affirmatively preventing Makofka and Jed Wood from taking any action to impede on, encroach on or impair Hemostemix's ability to exercise and enjoy the full benefits of its IP, and all other and such further relief as this Court deems just and proper under the circumstances.

## COUNT IV
## VIOLATION OF DEFEND TRADE SECRETS ACT
## 18 U.S.C. § 1832
**(Against Defendants Makofka, Jed Wood, Jacobs, Cooper, KSM, and Aspire)**

498.  Hemostemix hereby realleges and incorporates as if fully set forth herein paragraphs 1 through 428 above.

499.   As set forth above, Hemostemix's IP, including confidential and proprietary trade secrets, include the Clinical Trial Data generated in the course of the Clinical Trial.  Such Clinical Trial Data includes computerized records of the batch data, quality control and quality assurance data, cell count and cell viability data of each Clinical Trial batch, and the randomization key or table.   These materials constitute trade secrets under 18 U.S.C. § 1839.

500.   Hemostemix's trade secrets relate to products used in, or intended for use in, interstate commerce.

501.   The Clinical Trial data is valuable and proprietary, and is the result of years of work and more than $46 million invested by Hemostemix.

502.   Hemostemix has taken reasonable steps to protect the confidentiality of the Clinical Trial Data, by, among other things, entering into contracts with Drive Capital and KSM, both entities owned and controlled by Makofka and Jed Wood, that include strict confidentiality provisions.

503.   The records in the possession or under the control of Makofka, Jed Wood, Jacobs, Cooper, KSM and Aspire are central to the core business of Hemostemix, are required immediately to ensure Hemostemix's regulatory and statutory compliance requirements, and are currently being held and maintained at Aspire's office and laboratory in Florida.

504.   Makofka, Jed Wood, Jacobs, Cooper, KSM and Aspire were at all relevant times aware of the confidentiality of the data, the fact that Hemostemix is the owner of such data, and the importance of such data to Hemostemix's business.

505.   Notwithstanding this knowledge, Makofka, Jed Wood, Jacobs, Cooper, KSM, and Aspire intentionally, willfully, maliciously and with reckless disregard of Hemostemix's rights, misappropriated Hemostemix's trade secrets by refusing to turn over the data to Hemostemix and conspiring to deprive Hemostemix of access to the data.

506.   As a direct and proximate result of Makofka's, Jed Wood's, Jacobs', Cooper's, KSM's, and Aspire's wrongful conduct, Hemostemix has suffered, is suffering and will continue to suffer incalculable financial loss and imminent and permanent irreparable harm.  Moreover, if the data is not immediately turned over, Hemostemix will continue to suffer irreparable harm that cannot be fully remedied by money damages.

WHEREFORE Plaintiff Hemostemix Inc., demands judgment be entered in its favor and against Makofka, Jed Wood, Jacobs, Cooper, KSM, and Aspire, for the full value of its trade secrets and proprietary data misappropriated by Makofka, Jed Wood, KSM and Jacobs including the full value of the benefits and improvement obtained by Makofka, Jed Wood, KSM and Jacobs while using same, in an amount to be determined at trial but in any event not less than $46 million in actual damages

and not less than $300 million for Hemostemix's inability to take its ACP-01 therapy to market due to the foregoing conduct. Hemostemix further seeks an award to Hemostemix of its reasonable attorneys' fees and costs, an order for a preliminary and permanent injunction ordering the immediate return of all Hemostemix IP and other assets, and all other and such further relief as this Court deems just and proper under the circumstances.

**COUNT V**
**VIOLATION OF FLORIDA UNIFORM TRADE SECRETS ACT**
**Fla. Stat. § 688.001 *et. seq.***
**(Against Defendants Makofka, Jed Wood, Jacobs, Cooper, KSM, and Aspire)**

507.   Hemostemix hereby realleges and incorporates as if fully set forth herein paragraphs 1 through 428 above.

508.   Hemostemix is the rightful and exclusive owner of certain property and material containing highly confidential and non-public information, processes, intellectual property and other such trade secrets used throughout the business.

509.   Hemostemix has taken reasonable steps to safeguard the secrecy and confidentiality of its property which is necessary to protect its investment of substantial time and money to obtain same. Further, Hemostemix requires high-ranking executives among others, to sign confidentiality provisions to protect against inadvertent or unwanted disclosure of same.

510.   The property at issue is in the possession or under the control of Makofka, Jed Wood, Jacobs, Cooper, KSM and Aspire and is central to the core business of Hemostemix, is required to ensure Hemostemix's regulatory and statutory compliance requirements, and is currently being held and maintained at Aspire's office and laboratory in Florida.

511.   Makofka, Jed Wood, Jacobs, Cooper, KSM and Aspire wrongfully misappropriated Hemostemix's trade secrets for their own benefit by abusing Makofka's position of trust and taking Hemostemix's property knowing it was owned by Hemostemix.   Makofka, Jed Wood, Jacobs, Cooper, KSM and Aspire have wrongfully obtained Hemostemix's Clinical Trial data by improper means and without authorization.

512.   Makofka's, Jed Wood's, Jacobs', Cooper's, KSM's and Aspire's conduct in misappropriating or causing Hemostemix's trade secrets to be misappropriated, was an unlawful act in furtherance of the Conspiracy.

513.   As a direct and proximate result of the misappropriation of its trade secrets and proprietary data, Hemostemix has suffered and continues to suffer additional damages as a result of such misappropriation and its subsequent refusal to return same.

WHEREFORE Plaintiff Hemostemix Inc., demands judgment be entered in its favor and against Makofka, Jed Wood, Jacobs, Cooper, KSM and Aspire, for the

full value of its trade secrets and proprietary data misappropriated by Makofka, including the full value of the benefits and improvement obtained by Makofka while using same, in an amount to be determined at trial but in any event not less than $46 million in actual damages and not less than $300 million for Hemostemix's inability to take its ACP-01 therapy to market due to the foregoing conduct.  Hemostemix further seeks an award to Hemostemix of its reasonable attorneys' fees and costs, an order for a preliminary and permanent injunction ordering the immediate return of all Hemostemix IP and other assets, and all other and such further relief as this Court deems just and proper under the circumstances.

## COUNT VI
## COMPUTER FRAUD AND ABUSE ACT (CFAA)
## 18 U.S.C. § 1030
## (Against Defendants Makofka, Cooper, and Jacobs)

514.   Hemostemix hereby realleges and incorporates as if fully set forth herein paragraphs 1 through 428 above

515.   During the period Makofka served as CRO, CEO and President under the Drive Capital Agreement and KSM Agreement, Makofka continuously had a Hemostemix email address and access to Hemostemix's server and confidential information.

516.   The KSM Agreement was terminated effective October 31, 2019. Makofka's resignation was effective as of that date.

517.   Following termination of the KSM Agreement, Makofka was not entitled to or authorized to use his Hemostemix email address, hold himself out as an officer or agent of Hemostemix, or take action on behalf of Hemostemix.

518.   In addition to Makofka, other KSM employees providing contracted for services to Hemostemix were Cooper, the Chief Information/Technology Officer, and others.

519.   Unbeknownst to Hemostemix's board or incoming management at the time, despite termination of the KSM Agreement, Makofka as well as Cooper and other KSM employees at Makofka's direction, continued to use and access their Hemostemix email, access the Hemostemix server, and hold themselves out as representatives of Hemostemix in order to invite and entice communications from vendors, consultants and contractors to continue uninterrupted regarding sensitive, proprietary and confidential Hemostemix business matters.

520.   Unbeknownst to Hemostemix at the time, Makofka directed Cooper, who had administrative access rights to Hemostemix's email network and server, to maintain such administrative access rights after termination of the KSM Agreement and also to hard-code the Hemostemix emails of Makofka, Cooper, Jacobs and other KSM and Aspire employees to automatically forward incoming emails to a separate aspire2cure.com email address also set up for Makofka, Cooper, Jacobs and other KSM and Aspire employees.  In other words, Makofka, Cooper, Jacobs and other

KSM and Aspire employees continued to access their Hemostemix electronically stored information, including email, for months after termination of the KSM Agreement and cessation of authority.

521.   Makofka did this in order to ensure that he, Cooper, Jacobs and other KSM and Aspire employees could falsely and fraudulently hold themselves out as authorized representatives and agents of Hemostemix to receive and access Hemostemix's sensitive, proprietary and confidential information.

522.   Also unbeknownst to Hemostemix for months after termination of the KSM Agreement, Makofka directed Cooper to continue to use his administrative access rights to access Hemostemix's network and server to access Hemostemix's highly confidential, sensitive and proprietary information such as financial and accounting information, banking information, and emails of Hemostemix employees and officers.  Makofka knew that neither he nor Cooper had authority to access the protected computer network or server following termination of the KSM Agreement.

523.   Also, in or about December 2019, at Makofka's direction, Cooper created accounting entries in Hemostemix's books to falsely and fraudulently show paid payables of Hemostemix.

524.   Additionally, Jacobs continued to access Hemostemix computers, servers and network long after his resignation as Hemostemix CMO in order to continue holding himself out as an authorized agent and representative of

Hemostemix.  As a result, Jacobs was able to continue receiving FDA and Health Canada communications directed to and designed for Hemostemix, through his pirated Hemostemix email address.

525.  Makofka, Cooper and Jacobs knew their actions were unlawful, unauthorized and wrong.

526.  The information accessed and taken included bank transfers and financial transactions to benefit Makofka, Wood and entities they own or control, far exceeding $5,000.00 in value, and more likely ranging in the hundreds of thousands to millions of dollars in value.

WHEREFORE Plaintiff Hemostemix Inc., demands judgment be entered in its favor and against Makofka, Cooper and Jacobs for violating the CFAA and injuring Hemostemix for the full value of its trade secrets and proprietary data misappropriated by Makofka, including the full value of the benefits and improvement obtained by Makofka while using same, in an amount to be determined at trial but in any event not less than $46 million in actual damages and not less than $300 million for Hemostemix's inability to take its ACP-01 therapy to market due to the foregoing conduct.  Hemostemix further seeks an award to Hemostemix of its reasonable attorneys' fees and costs, an order for a preliminary and permanent injunction ordering the immediate return of all Hemostemix IP and other assets, and

all other and such further relief as this Court deems just and proper under the circumstances.

## COUNT VII
## BREACH OF CONTRACT – SPECIFIC PERFORMANCE (DRIVE CAPITAL AGREEMENT)
### (Against Defendant Makofka)

527.   Hemostemix hereby realleges and incorporates as if fully set forth herein paragraphs 1 through 428 above

528.   On or about December 21, 2016, Hemostemix and Drive Capital, and entity wholly-owned and controlled by Makofka and Jed Wood, entered into the Drive Capital Agreement pursuant to which Makofka and Drive Capital were required to provide management and operational services.  Makofka and Jed Wood owned and controlled Drive Capital and were and still are responsible for all acts or omissions of Drive Capital.

529.   The Drive Capital Agreement was a valid and enforceable contract from December 21, 2016 through its expiration date of December 21, 2018.

530.   Hemostemix performed all obligations under the Drive Capital Agreement.

531.   Makofka and Drive Capital were required under the Drive Capital Agreement to maintain and protect the confidentiality all Hemostemix IP, were

prohibited from retaining and were required to return to Hemostemix its IP upon termination or expiration of the Drive Capital Agreement.

532.   Drive Capital and Makofka failed and refused to comply with and purposefully and intentionally violated this duty of confidentiality by mishandling and improperly retaining Hemostemix's IP and other assets following termination or expiration of the Drive Capital Agreement.

533.   As a result of Drive Capital's and Makofka's breach involving failure to maintain and protect the confidentiality all Hemostemix IP, and withholding, and not returning to Hemostemix its IP, Hemostemix has been deprived the benefit of its bargain under the Drive Capital Agreement, as well as deprived of the benefit and use of its IP during the intervening time, and has suffered irreparable harm. Hemostemix has no adequate remedy at law because it is seeking return of its IP and data critical to completing the Clinical Trial.

WHEREFORE Plaintiff Hemostemix Inc., demands judgment be entered in its favor and against Makofka compelling the immediate return of all IP, confidential and proprietary information and other assets of Hemostemix, and such further relief as this Court deems just and proper under the circumstances.

## COUNT VIII
## BREACH OF CONTRACT – DAMAGES (DRIVE CAPITAL AGREEMENT)
### (Against Defendant Makofka)

534.   Hemostemix hereby realleges and incorporates as if fully set forth herein paragraphs 1 through 428 above.

535.   On or about December 21, 2016, Hemostemix and Drive Capital, and entity wholly-owned and controlled by Makofka and Jed Wood, entered into the Drive Capital Agreement pursuant to which Makofka and Drive Capital were required to provide management and operational services.  Makofka and Jed Wood owned and controlled Drive Capital and were and still are responsible for all acts or omissions of Drive Capital.

536.   The Drive Capital Agreement was a valid and enforceable contract from December 21, 2016 through its expiration date of December 21, 2018.

537.   Hemostemix performed all obligations under the Drive Capital Agreement.

538.   Makofka and Drive Capital were required under the Drive Capital Agreement to advise, manage, assist and support Hemostemix in its day-to-day operations in order to effectuate Hemostemix's business and strategic plans, including assigning Drive Capital employees to provide services, including

information technology and information security, administrative support, controller and accounting services, and oversight of the Clinical Trial to Hemostemix.

539.   Makofka and Drive Capital were required under the Drive Capital Agreement to maintain and protect the confidentiality all Hemostemix IP, were prohibited from retaining and were required to return to Hemostemix its IP upon termination or expiration of the Drive Capital Agreement.

540.   Drive Capital and Makofka failed and refused to comply with and purposefully and intentionally violated this duty of confidentiality by mishandling and improperly retaining Hemostemix's IP and other assets following termination or expiration of the Drive Capital Agreement.

541.   Pursuant to the Drive Capital Agreement, Makofka's principal responsibilities as President and CEO of Hemostemix included raising funds for Hemostemix to fund its operations, including the Clinical Trial.   Makofka was expected to capitalize on opportunities for fundraising and promoting Hemostemix, ACP-01 and its Clinical Trial successes.

542.   Makofka failed to raise meaningful capital for Hemostemix to grow the business or improve operations, despite being given multiple leads and multiple promising opportunities to do so.   Instead, Makofka misled the Board into taking action designed to force Hemostemix to accept new and onerous secured debt

obligations in transactions financed by entities owned and controlled by Makofka and Wood.

543.   Makofka engaged in an ill-advised and ill-conceived reorganization of Hemostemix, including transferring manufacturing operations from HEM-Israel to Aspire, and transferring ownership of Hemostemix's IP from Kwalata to Hemostemix.

544.   Pursuant to the Drive Capital Agreement, Drive Capital and Makofka were entitled to earn lucrative compensation in exchange for full time work on behalf of Hemostemix.

545.   Drive Capital and Makofka did not provide full-time services to Hemostemix; rather, Drive Capital and Makofka dedicated far less than full-time due to Drive Capital and Makofka also providing services to Aspire that were contrary to and inconsistent with its responsibilities for Hemostemix.  Despite dividing his time between Hemostemix and Aspire, however, Makofka and Drive Capital did not reduce the compensation due from Hemostemix.  Instead, Makofka continued to pay himself and his Drive Capital employees unearned compensation for full time work that they did not perform in violation of the Drive Capital Agreement.

546.   As a result of Drive Capital's and Makofka's breach involving failure to properly and competently advise, manage, assist and support Hemostemix in its

day-to-day operations in order to effectuate Hemostemix's business and strategic plans, Hemostemix has been harmed and seeks money damages in an amount to be determined at trial.

WHEREFORE Plaintiff Hemostemix Inc., demands judgment be entered in its favor and against Makofka for the full value of its trade secrets and proprietary data misappropriated by Makofka, including the full value of the benefits and improvement obtained by Makofka while using same, in an amount to be determined at trial but in any event not less than $46 million in actual damages and not less than $300 million for Hemostemix's inability to take its ACP-01 therapy to market due to the foregoing conduct.  Hemostemix further seeks an award to Hemostemix of its reasonable attorneys' fees and costs, an order for a preliminary and permanent injunction ordering the immediate return of all Hemostemix IP and other assets, and all other and such further relief as this Court deems just and proper under the circumstances.

## <u>COUNT IX</u>
## BREACH OF CONTRACT – SPECIFIC PERFORMANCE (KSM AGREEMENT)
### (Against Defendants Makofka and KSM)

547.   Hemostemix hereby realleges and incorporates as if fully set forth herein paragraphs 1 through 428 above.

548.   On or about January 1, 2019, Hemostemix and KSM entered into the KSM Agreement pursuant to which KSM and its principal, Makofka, were required to provide management and operational services.  Makofka owns and controls KSM and is responsible for all acts or omissions of KSM.

549.   The KSM Agreement was a valid and enforceable contract by and between Hemostemix and KSM from January 1, 2019 until its termination date effective October 31, 2019.

550.   Hemostemix performed all obligations under the KSM Agreement.

551.   Pursuant to the KSM Agreement, KSM and Makofka were obligated to maintain all Hemostemix IP and other property as strictly confidential, and were obligated to return, and not retain, all Hemostemix's IP, including all files, records, documents, data and other information, to Hemostemix upon termination or expiration of the KSM Agreement.

552.  KSM and Makofka failed to comply with and purposefully and intentionally violated this duty of confidentiality, failed to maintain the confidentiality of Hemostemix's IP, failed to return and, in fact, retained Hemostemix's IP, including all files, records, documents, data and other information, to Hemostemix upon termination or expiration of the KSM Agreement.

553.   As a result of KSM's and Makofka's multiple breaches, Hemostemix has been deprived the use and benefit of its property and deprived the benefit of its bargain under the KSM Agreement.

554.   KSM has suffered irreparable harm.

555.   Hemostemix has no adequate remedy at law because it is seeking return of the Hemostemix IP, including clinical trial data, necessary to continue and complete the Clinical Trial.

WHEREFORE Plaintiff Hemostemix Inc., demands judgment be entered in its favor and against Makofka and KSM compelling the immediate return of all IP, confidential and proprietary information and other assets of Hemostemix, and such further relief as this Court deems just and proper under the circumstances.

## COUNT X
### BREACH OF CONTRACT – DAMAGES (KSM AGREEMENT)
### (Against Defendants Makofka and KSM)

556.   Hemostemix hereby realleges and incorporates as if fully set forth herein paragraphs 1 through 428 above.

557.   On or about January 1, 2019, Hemostemix and KSM entered into the KSM Agreement pursuant to which KSM and Makofka were required to provide management and operational services.  Makofka owns and controls KSM and is responsible for all acts or omissions of KSM.

558. The KSM Agreement was a valid and enforceable contract by and between Hemostemix and KSM from January 1, 2019 until its termination date effective October 31, 2019.

559. Hemostemix performed all obligations under the KSM Agreement.

560. Pursuant to the KSM Agreement, KSM and Makofka were obligated to maintain and protect the confidentiality of all Hemostemix IP and other property as strictly confidential, and were obligated to return, and not retain, all Hemostemix's IP, including all files, records, documents, data and other information, to Hemostemix upon termination or expiration of the KSM Agreement.

561. KSM and Makofka failed and refused to comply with and purposefully and intentionally violated this duty of confidentiality by mishandling and improperly retaining and failing and refusing to return Hemostemix's IP and other assets, including all files, records, documents, data and other information, to Hemostemix upon termination or expiration of the KSM Agreement.

562. Pursuant to the KSM Agreement, KSM and Makofka were obligated to provide full-time professional management services, including advising, managing, assisting and supporting Hemostemix in its day-to-day operations in order to effectuate Hemostemix's business and strategic plans, including assigning KSM employees to provide information technology and information security,

administrative support, controller and accounting services, and oversight of the Clinical Trial.

563.   Pursuant to the KSM Agreement, Makofka's principal responsibilities as CRO, CEO, and President of Hemostemix included raising funds for Hemostemix to fund its operations, including the Clinical Trial.  Makofka was expected to capitalize on fundraising and capital financing opportunities to promote Hemostemix, ACP-01 and its Clinical Trial successes, grow the business, and improve operations.

564.   Pursuant to the KSM Agreement, KSM and Makofka earned lucrative compensation in exchange for full time work on behalf of Hemostemix.

565.   Pursuant to the KSM Agreement, KSM and Makofka were obligated to abstain from conduct that reasonably could cause harm to Hemostemix's interests and to abstain from self-dealing or other self-interested conduct from which Makofka could derive benefits rightfully belonging to Hemostemix.

566.   Pursuant to the KSM Agreement, KSM and Makofka were obligated to protect and preserve confidential data, information, material or processes owned by Hemostemix.

567.   Pursuant to the KSM Agreement, KSM and Makofka were obligated to maintain all Hemostemix IP and other property as strictly confidential, and were obligated to return, and not retain, all Hemostemix's IP, including all files, records,

documents, data and other information, to Hemostemix upon termination or expiration of the KSM Agreement.

568. KSM and Makofka failed to fulfill and, in fact, breached, their contractual obligations to Hemostemix by *inter alia*:

a. violating Section 7 by failing to provide workmanlike and competent professional services to Hemostemix;

b. stealing from Hemostemix in the form of unearned compensation by failing to provide full-time services to Hemostemix;

c. failing to raise capital for Hemostemix from outside sources other than Jed Wood or corporate entities owned and controlled by Makofka or Jed Wood;

d. failing to grow Hemostemix's business or improve operations, despite being given multiple leads and multiple promising opportunities to do so

e. engaging routinely in acts of self-dealing designed to benefit himself and Jed Wood at Hemostemix's expense;

f. abusing his position as CRO, CEO and President of Hemostemix to engage in conduct to undermine and harm Hemostemix's business or other interests in order to derive a personal benefit for himself and Jed Wood, and/or corporate entities they owned or controlled;

g. violating Sections 8 and 10 by failing to properly handle, treat, protect and return and, in fact, misappropriating and improperly retaining Hemostemix's IP, confidential and proprietary information following termination of the KSM Agreement, an obligation that survived termination of the KSM Agreement;

h. violating Section 11 by taking action designed to benefit KSM, Makofka, Jed Wood and Aspire at the expense of Hemostemix;

i. violating the Non-Solicitation covenant in Section 12 by soliciting, encouraging, and/or facilitating clients, customers, vendors and consultants, to alter, modify, diminish and/or cease their respective relationships with Hemostemix, and soliciting, inducing, encouraging and/or facilitating, under false and fraudulent pretenses, employees, consultants, suppliers, contractors and/or subcontractors of Hemostemix to leave the employment of, consultancy, contractor or subcontractor or other relationship with Hemostemix; and

j. misleading the Board into taking action designed to force Hemostemix to accept new and onerous secured debt obligations in transactions financed by entities owned and controlled by Makofka and Jed Wood.

569. As a result of KSM's and Makofka's breaches involving failure to properly and competently advise, manage, assist and support Hemostemix in its day-

154

to-day operations in order to effectuate Hemostemix's business and strategic plans, Hemostemix has been harmed and seeks money damages in an amount to be determined at trial.

570.   KSM's failures and refusals to uphold its obligations under the KSM Agreement constitute material breaches of same.

571.   Hemostemix has suffered significant damages as a direct and proximate result of KSM's material breaches of the KSM Agreement

WHEREFORE Plaintiff Hemostemix Inc., demands judgment be entered in its favor and against Makofka and KSM for the full value of its trade secrets and proprietary data misappropriated by Makofka, including the full value of the benefits and improvement obtained by Makofka while using same, in an amount to be determined at trial but in any event not less than $46 million in actual damages and not less than $300 million for Hemostemix's inability to take its ACP-01 therapy to market due to the foregoing conduct.   Hemostemix further seeks an award to Hemostemix of its reasonable attorneys' fees and costs, an order for a preliminary and permanent injunction ordering the immediate return of all Hemostemix IP and other assets, and all other and such further relief as this Court deems just and proper under the circumstances.

## COUNT XI
## BREACH OF FIDUCIARY DUTY
### (Against Defendant Makofka)

572.   Hemostemix hereby realleges and incorporates as if fully set forth herein paragraphs 1 through 428 above.

573.   Makofka served as President and CEO of Hemostemix.

574.   At all times serving in those roles, Hemostemix placed its trust and confidence in Makofka appointing him to executive level positions with their attendant responsibilities.   In doing so, Hemostemix expected and entrusted that Makofka would serve in such capacity in its best interests and those of shareholders. Similarly, Hemostemix expected and trusted Makofka would act to preserve and protect its IP and proprietary data in his capacity as CRO, CEO and President of Hemostemix.  Makofka knowingly and voluntarily accepted Hemostemix's trust and confidence and agreed to act in its best interest while working in his various positions or its IP and proprietary data.

575.   Makofka committed material breaches of his fiduciary duties owed to Hemostemix by engaging in overt conduct designed to harm Hemostemix while benefitting himself, Jed Wood, and entities and organizations in which they had personal and financial interests, including, without limitation:

a.  orchestrating, planning, and engaging in a RICO and other conspiracy with Jed Wood and the other RICO defendants to harm Hemostemix in order to take control of its valuable IP and other property;

b.  and fulfilling Serving simultaneously as President and CEO of both Hemostemix and Aspire and, despite disclosure of his dual and competing roles, subordinating Hemostemix's interests to those of Aspire;

c.  failing and refusing to fulfill one of his principal responsibilities as CRO, President and CEO of Hemostemix to raise capital financing for Hemostemix to fund the Clinical Trial;

d.  providing substandard and negligent service as CRO, President and CEO of Hemostemix;

e.  steering Hemostemix to financing arrangements with entities and individuals in or with whom Makofka had or shared financial and business interests on terms unfavorable to Hemostemix that were designed instead to benefit Makofka or entities or individuals in or with whom Makofka had or shared financial and business interests;

f.  misappropriating and diverting funds from Hemostemix to Makofka, Jed Wood and the other RICO Conspiracy Defendants while amplifying the debt load and obligations on Hemostemix,

g. orchestrating and receiving payments from Hemostemix as an interested-party to each of the predatory "Loan-to-Own" transactions;

h. defrauding and misleading Hemostemix's Board and shareholders;

i. making unilateral sale and assignment of Hemostemix debt to entities or individuals in or with whom Makofka shared financial and business interests;

j. disclosing and failing to treat as confidential the confidential proprietary, business information, and trade secrets of Hemostemix without authority and for the purpose of harming Hemostemix and bolstering Aspire's interests;

k. steering contracts from Hemostemix affiliates and contractors to Aspire in order to benefit Aspire and provide Makofka and individuals and entities with and in whom Makofka shared financial and business interests more direct access to Hemostemix's IP and other confidential, proprietary business information in order to ultimately convert, misappropriate and steal such information;

l. issuing false and materially misleading press releases about Hemostemix's financial health in order to cause investor aversion and impair Hemostemix's ability to secure new capital financing;

158

m. interfering with, misappropriating and stealing Hemostemix's vendor, consultant and clinical trial site contracts and relationships;

n. misappropriating and stealing Hemostemix's IP and other property;

o. covering up and/or fraudulently concealing the misappropriation and theft of Hemostemix's IP and other property;

p. profiteering and profiting by securing control over the management and finances of Hemostemix,

q. intentionally and knowingly impairing Hemostemix's financial condition;

r. engaging in self-dealing transactions designed to benefit Makofka, Jed Wood and the other RICO Conspiracy Defendants at the expense of Hemostemix;

s. engaging in bank, mail and wire fraud to secure control over Hemostemix's liquid assets and IP;

t. taking possession and physical custody over Hemostemix's IP; and

u. while still serving as the titular CEO of Hemostemix, following his resignation, unlawfully and without authority accessing, and/or directing Cooper and other to unlawfully and without authority to access Hemostemix's computer network and server, to hard-code emails to automatically be forwarded from the Hemostemix email

addresses to an Aspire email address, and continue to steal sensitive, proprietary trade secret and other information.

576.  Makofka's actions and omissions alleged above were unlawful acts that he took in furtherance of the Conspiracy and to realize its primary purpose.

577.  As a direct and proximate result of Makofka's breach of his fiduciary duties, Hemostemix has suffered and accrued damages that will continue to accrue over time.

WHEREFORE, Hemostemix hereby demands judgment be entered in its favor and against Makofka and seeks monetary damages against Makofka in an amount to be determined at trial but in any event, not less than $46 million in actual damages and not less than $300 million for Hemostemix's inability to take its ACP-01 therapy to market due to the foregoing conduct.  Hemostemix further seeks an award to Hemostemix of its reasonable attorneys' fees and costs, an order for a preliminary and permanent injunction ordering the immediate return of all Hemostemix IP and other assets, and all other and such further relief as this Court deems just and proper under the circumstances.

## COUNT XII
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against Defendant Jed Wood)

578.  Hemostemix hereby realleges and incorporates as if fully set forth herein paragraphs 1 through 428 above.

579.   Jed Wood has had a close business partnership with Makofka for years.

580.   Jed Wood was an original member and organizer of the RICO conspiracy.

581.   As set forth above, Makofka executed multiple predicate acts in violation of his fiduciary duty of care and loyalty to Hemostemix, including without limitation:

a.   orchestrating, planning, and engaging in a RICO and other conspiracy with Jed Wood and the other RICO defendants to harm Hemostemix in order to take control of its valuable IP and other property;

b.   and fulfilling Serving simultaneously as President and CEO of both Hemostemix and Aspire and, despite disclosure of his dual and competing roles, subordinating Hemostemix's interests to those of Aspire;

c.   failing and refusing to fulfill one of his principal responsibilities as CRO, President and CEO of Hemostemix to raise capital financing for Hemostemix to fund the Clinical Trial;

d.   providing substandard and negligent service as CRO, President and CEO of Hemostemix;

e.   steering Hemostemix to financing arrangements with entities and individuals in or with whom Makofka had or shared financial and

business interests on terms unfavorable to Hemostemix that were designed instead to benefit Makofka or entities or individuals in or with whom Makofka had or shared financial and business interests;

f.  misappropriating and diverting funds from Hemostemix to Makofka, Jed Wood and the other RICO Conspiracy Defendants while amplifying the debt load and obligations on Hemostemix,

g.  orchestrating and receiving payments from Hemostemix as an interested-party to each of the predatory "Loan-to-Own" transactions;

h.  defrauding and misleading Hemostemix's Board and shareholders;

i.  making unilateral sale and assignment of Hemostemix debt to entities or individuals in or with whom Makofka shared financial and business interests;

j.  disclosing and failing to treat as confidential the confidential proprietary, business information, and trade secrets of Hemostemix without authority and for the purpose of harming Hemostemix and bolstering Aspire's interests;

k.  steering contracts from Hemostemix affiliates and contractors to Aspire in order to benefit Aspire and provide Makofka and individuals and entities with and in whom Makofka shared financial and business interests more direct access to Hemostemix's IP and other confidential,

proprietary business information in order to ultimately convert, misappropriate and steal such information;

l.  issuing false and materially misleading press releases about Hemostemix's financial health in order to cause investor aversion and impair Hemostemix's ability to secure new capital financing;

m. interfering with, misappropriating and stealing Hemostemix's vendor, consultant and clinical trial site contracts and relationships;

n.  misappropriating and stealing Hemostemix's IP and other property;

o.  covering up and/or fraudulently concealing the misappropriation and theft of Hemostemix's IP and other property;

p.  profiteering and profiting by securing control over the management and finances of Hemostemix,

q.  intentionally and knowingly impairing Hemostemix's financial condition;

r.  engaging in self-dealing transactions designed to benefit the Makofka, Jed Wood and the other RICO Conspiracy Defendants at the expense of Hemostemix;

s.  engaging in bank, mail and wire fraud to secure control over Hemostemix's liquid assets and IP;

t.  taking possession and physical custody over Hemostemix's IP; and

u.  while still serving as the titular CEO of Hemostemix, unlawfully and without authority accessing, and/or directing Cooper and other to unlawfully and without authority to access Hemostemix's computer network and server, to hard-code emails to automatically be forwarded from the Hemostemix email addresses to an Aspire email address, and continue to steal sensitive, proprietary trade secret and other information.

582.  At all times, Jed Wood was aware of, had knowledge of, encouraged, supported, facilitated, funded and otherwise worked closely with Makofka to ensure Makofka was able to execute the numerous foregoing acts in violation of Makofka's fiduciary duty.

583.  Jed Wood rendered substantial assistance to Makofka in Makofka's execution of the above predicate acts of wrongdoing, including without limitation, providing all necessary financing to Makofka, leveraging the entities under Jed Wood's control in the Wood Group Family Office including JMWI, Wood Capital, and REJ, and to such extent, Makofka was able to fully execute on his actions in violation of his fiduciary duty.

WHEREFORE, Hemostemix hereby demands judgment be entered in its favor and against Jed Wood and seeks monetary damages against Jed Wood in an amount to be determined at trial but in any event, not less than $46 million in actual

damages and not less than $300 million for Hemostemix's inability to take its ACP-01 therapy to market due to the foregoing conduct.  Hemostemix further seeks an award to Hemostemix of its reasonable attorneys' fees and costs, an order for a preliminary and permanent injunction ordering the immediate return of all Hemostemix IP and other assets, and all other and such further relief as this Court deems just and proper under the circumstances.

### COUNT XIII
### BREACH OF FIDUCIARY DUTY
### (Against Defendant Jacobs)

584.   Hemostemix hereby incorporates and realleges as if fully set forth herein paragraphs 1 through 428 above.

585.   Jacobs served as President and CMO of Hemostemix and, as such, owed fiduciary duties to Hemostemix.  By his acceptance of these positions, Jacobs agreed to act in accordance with the fiduciary duties he owed to Hemostemix.

586.   Jacobs committed a material breach of his fiduciary duty of loyalty owed to Hemostemix by acting in a disloyal and self-interested manner upon his resignation, including but not limited to: (a) joining the RICO Conspiracy and providing material support to Makofka and Jed Wood in furtherance of the Conspiracy; (b) failing to advise Hemostemix or provide any advance notice of his intention to resign, conduct that directly harmed the interests and operations of Hemostemix for his own personal benefit as Jacobs failed to allow sufficient time

for Hemostemix to locate adequate replacements for either of Jacob's executive-level positions; and (c) aligning himself Aspire and provided material support for Aspire's, Makofka's and Jed Wood's theft, misappropriation, and improper retention of Hemostemix's property for their own use and benefit.

587.   As a direct and proximate result of Jacob's breach of fiduciary duty, Hemostemix suffered and accrued damages as Jacobs' sudden departure caused substantial operational inefficiencies and threatened the Clinical Trial that was Jacobs' primary concern and responsibility as CMO.  Hemostemix suffered further damages for the costs incurred to location and train two qualified replacements for his former positions.

WHEREFORE Plaintiff Hemostemix Inc. demands judgment be entered in its favor and against Jacobs for the full value of its damages suffered as a direct and proximate result of Defendant Jacob's breaches the fiduciary duties he owed to it in an amount to be determined at trial but in any event not less than $46 million in actual damages and not less than $300 million for Hemostemix's inability to take its ACP-01 therapy to market due to the foregoing conduct.  Hemostemix further seeks an award to Hemostemix of its reasonable attorneys' fees and costs pursuant to the indemnification provision of the Jacobs Agreement, and all other and such further relief as this Court deems just and proper under the circumstances.

## COUNT XIV
### FRAUD
### (Against Defendants Makofka and Jed Wood)

588.   Hemostemix hereby realleges and incorporates as if fully set forth herein paragraphs 1 through 428 above.

589.   Makofka and Jed Wood engaged in fraud to mislead the Board.  In particular, Makofka and Jed Wood falsely advised the Board, on which the Board relied to Hemostemix's detriment thereon, that entering into the Drive Capital Agreement and KSM Agreement were in Hemostemix's best interest.  In reality, the intent and design by Makofka and Jed Wood of those agreements was to give them access to and control over Hemostemix's operations and IP in furtherance of the overall scheme to impair Hemostemix financially, steal Hemostemix's IP and other assets and ultimately take control of Hemostemix and its operations.

590.   Makofka and Jed Wood engaged in fraud when they advised the Board as part the proposed restructuring and reorganization, on which the Board relied to Hemostemix's detriment thereon, that winding up Kwalata and transferring the IP ownership rights from Kwalata to Hemostemix was in Hemostemix's best interests. In reality, the intent and design by Makofka and Jed Wood was to not to benefit Hemostemix but to consolidate ownership of the IP within Hemostemix, over which Makofka and Jed Wood exercised virtually total control and position himself and Jed Wood to seize control of Hemostemix's IP.

167

591.   Makofka and Jed Wood engaged in fraud when they advised the Board as part the proposed restructuring and reorganization, on which the Board relied to Hemostemix's detriment thereon, that winding up HEM-Israel and moving all manufacturing operations to Aspire, which had no experience, infrastructure or know-how to handle a clinical trial manufacturing operation of any scale.  In reality, the intent and design by Makofka and Jed Wood was not to benefit Hemostemix but to consolidated all manufacturing operations over the keystone therapy product in Aspire, to benefit Makofka and Jed Wood.

592.   Makofka and Jed Wood engaged in fraud when they advised the Board, on which the Board relied to Hemostemix's detriment thereon, that Hemostemix needed "emergency funding" and, thus, must enter into the 2017 Loan-to-Own scheme.  In reality, the 2017 Loan-to-Own scheme had commercially unreasonable terms, benefit only Makofka and Jed Wood while increased Hemostemix's debt obligations with no material benefit to Hemostemix.

593.   Makofka and Jed Wood engaged in fraud when they advised the Board, on which the Board relied to Hemostemix's detriment thereon, that Hemostemix needed additional "emergency funding" and it was in Hemostemix's best interest to enter into the 2017 Wood Capital Loan.  In reality, the 2017 Wood Capital Loan was secured by all Hemostemix assets, increased Hemostemix's secured debt obligations, impaired Hemostemix financially, impeded its ability to obtain

financing from other outside sources, and resulted in no material benefit to Hemostemix.  In fact, as Makofka and Jed Wood were aware, more than half of the funds allocated through the Wood Capital Loan were used to pay Wood Capital to benefit Jed Wood and Makofka.

594.   Makofka and Jed Wood engaged in fraud when they advised the Board, on which the Board relied to Hemostemix's detriment thereon, that Hemostemix should enter into the Manufacturing Agreement and Original License Agreement for no consideration or benefit to Hemostemix.  In reality, the intent and design by Makofka and Jed Wood of those agreements was to give them access to and control over Hemostemix's manufacturing and licensing operations and rights, access to and control over Hemostemix's IP and proprietary clinical trial data, with no material benefit to Hemostemix.

595.  Makofka and Jed Wood engaged in fraud when they falsely held themselves out, and directed Jacobs, Cooper, and others to hold themselves out, as authorized representatives and agents of Hemostemix to act on behalf of Hemostemix after Makofka's resignation as CEO, after termination of the KSM Agreement, after termination of the Jacobs Agreement, in order to lure, solicit, and induce vendors, consultants and contractors, including without limitation Medrio, Accudata and Anju, to leave their contractor, consultant, or vendor relationship with Hemostemix in favor of Aspire, and on which the contractors, consultants and

vendors relied to Hemostemix's detriment thereon.  In reality, the intent and design by Makofka and Jed Wood, and their agents, was to benefit Makofka, Jed Wood and Aspire, to harm Hemostemix and undermine its operations and ability to continue conducting the Clinical Trial.

596.   Makofka engaged in fraud when he purported to provide full time and attention to his duties as CRO, CEO and President of Hemostemix and received compensation equivalent to full time service.  The Board relied to Hemostemix's detriment on Makofka's representations.  In reality, Makofka dedicated very little of his time to services for Hemostemix, prioritized Aspire's interests and subordinated Hemostemix's interests.  Despite this, he continued to receive full-time equivalent compensation, thereby defrauding Hemostemix of tens of thousands of dollars in unearned compensation.

597.   Makofka and Jed Wood engaged in fraud when they advised the Board, on which the Board relied to Hemostemix's detriment thereon, that Hemostemix needed additional "emergency funding" and it was in Hemostemix's best interest to enter into the 2019 Wood Debenture and 2019 Wood Loan-to-Own.  In reality, the 2019 Wood Debenture and 2019 Wood Loan-to-Own were had commercially unreasonable terms, were secured by all Hemostemix assets, increased Hemostemix's secured debt obligations, impaired Hemostemix financially, impeded

its ability to obtain financing from other outside sources, and resulted in no material benefit to Hemostemix.

598.   Makofka and Jed Wood engaged in fraud when they advised the Board, on which the Board relied to Hemostemix's detriment thereon, that Hemostemix should enter into the Amended License Agreement for no consideration or benefit to Hemostemix.  The Amended License Agreement imposed drastically unfavorable and commercially unreasonable terms on Hemostemix, essentially stripped Hemostemix functionally of any oversight or ownership rights over its IP and control over its licensing activities, and provided no financial benefit whatsoever to Hemostemix.  In reality, the intent and design by Makofka and Jed Wood of the Amended License Agreement was to give them full and complete access to and control over Hemostemix's manufacturing and licensing operations and rights, and access to and control over Hemostemix's IP and proprietary clinical trial data. Hemostemix received no material benefit.

599.  Makofka and Jed Wood engaged in fraud when they misled shareholders by failing to disclose material information and changed information in the consolidated financial statements in 2019, which they had an obligation to do, including omitting disclosure about a demand by Jed Wood to collect principal and interest on the 2019 Wood Loan-to-Own, all the while not paying Hemostemix $1

million (USD) as required by the Condition Precedent 1 of the Amended License Agreement.

600.   Makofka and Jed Wood engaged in fraud when, after failing to satisfy Condition Precedent 1 and knowing they could not obtain Board approval of any extension of the Condition Precedent Satisfaction Date, they manufactured the Sham Addendum and sought to pass it off to new management and the reconstituted Board as a valid and enforceable modification of the Amended License Agreement which would allow Makofka and Jed Wood to provide "emergency funding" to Hemostemix to pay its clinical trial costs.   In reality, the intent and design by Makofka and Jed Wood of the Sham Addendum was to give them the ability to impose on Hemostemix one more round-trip funding scheme by which Makofka and Jed Wood purported, falsely, to be providing necessary financial assistance when, in fact, more than 75% of the funds were used to Makofka, Jed Wood, Jacobs, Aspire, and Aspire's attorneys, none of which amounted to bona fide clinical trial costs, while providing no benefit whatsoever to Hemostemix.

601.   Makofka and Jed Wood further engaged in fraud when they falsely represented that the full $1 million payment was made to the benefit of Hemostemix by paying Hemostemix's "creditors" thereby satisfying Condition Precedent 1 of the Amended License Agreement.   In reality, among other payments never made, Aspire never made a $273,000 payment to Jed Wood related to the 2019 Wood Debenture

and/or 2019 Wood Loan-to-Own.  It was not until the Canadian receivership court ordered the payment to be made in response to Jed Wood's receivership application demand was that payment made.   Accordingly, Jed Wood's and Makofka's contention that Aspire satisfied Condition Precedent 1 was and is false.

602.   Makofka and Jed Wood engaged in fraud when they directed Cooper and others to access, without authority, Hemostemix's computer network and server, hard-code program its emails to automatically forward from the Hemostemix email addresses to an Aspire email address, to use those email addresses to falsely hold themselves out as Hemostemix representatives and agents, to steal sensitive, proprietary trade secret and other information, and to steal Hemostemix's financial information and banking information.

603.   Makofka and Jed Wood engaged in fraud when they disseminated the false and misleading Trial Suspension Notice that Aspire was suspending the clinical trial of ACP-01 due to Hemostemix's conduct through no fault of Aspire.  In reality, the Trial Suspension Notice was not only false and misleading, as discussed above, but was issued without Aspire having any authority to do so.  The intent and design by Makofka and Jed Wood was to falsely disparage Hemostemix, disrupt and sabotage the clinical trial, and further impair Hemostemix financially.

604.   Makofka and Jed Wood engaged in fraud when they issued the improper, false and misleading Aspire Press Release.  In reality, no final analysis

was ever released, Aspire did not do so "under protest," the report was unsigned and of no verifiable authenticity, and despite its false representations, neither Aspire nor any of its agents or representatives had any ownership rights to ACP-01 clinical trial data, the Hemostemix IP, or the results of any midpoint analysis.  The Aspire Press Release further made false and fraudulent representations about the efficacy of ACP-01 and Aspire falsely held itself out as having authority to speak for or on behalf of Hemostemix or the clinical trial.  The intent and design by Makofka and Jed Wood of issuing the Aspire Press Release was to falsely and fraudulently impugn and disparage Hemostemix and its management, falsely call into question and undermine ACP-01 and the clinical trial, and to drive the Hemostemix stock price down so that Hemostemix would be left with no choice but to cede and surrender to Makofka's and Jed Wood's extortionate, repressive and exploitive demands .

605.   Hemostemix and its Board relied to the detriment of Hemostemix on Makofka's and Jed Wood's false and fraudulent representations above, all of which harmed Hemostemix by undermining and impeding its operations and ability to continue conducting the Clinical Trial.

606.  Makofka and Jed Wood intended that their false and fraudulent statements, representations and/or material omissions would induce Hemostemix's reliance thereon and take action to benefit Hemostemix to.

607.   Hemostemix reasonably relied upon Makofka's and Jed Wood's false and fraudulent representations or material omissions and had no reason to believe Makofka's representations were false.

608.   Hemostemix was entitled to rely on the false and fraudulent representations.

609.   As a direct and proximate result of Makofka's and Jed Wood's false and fraudulent representations or material omissions, Hemostemix has been injured.

610.   Hemostemix believed Makofka's and Jed Wood's false and fraudulent representations, and did not identify his material omissions, and in reasonable and justifiable reliance thereon, Hemostemix entered into various harmful and detrimental loan-to-own schemes, lopsided and damaging licensing and manufacturing agreements, contract services agreements, all designed to benefit Makofka and/or entities in which he had a financial interest, and harm Hemostemix.

611.   Makofka and Jed Wood showed willful, conscious, wanton, and reckless disregard for Hemostemix's right and for the deleterious consequences and unjust hardship placed upon Hemostemix as a result of the false and fraudulent representations of Makofka.

612.   Hemostemix is entitled to recover any and all damages available to it in an amount to be determined at trial.

175

WHEREFORE Plaintiff Hemostemix Inc. demands judgment be entered in its favor and against Makofka and Jed Wood for the full value of its damages suffered as a direct and proximate result of Makofka's and Jed Wood's fraud in an amount to be determined at trial, but in any event not less than $46 million in actual damages and not less than $300 million for Hemostemix's inability to take its ACP-01 therapy to market due to the foregoing conduct. Hemostemix further seeks an award to Hemostemix of its reasonable attorneys' fees and costs, and all other and such further relief as this Court deems just and proper under the circumstances.

## COUNT XV
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP
### (Against Defendants Makofka, Jed Wood, Jacobs, and Aspire)

613.   Hemostemix hereby realleges and incorporates as if fully set forth herein paragraphs 1 through 428 above.

614.   As alleged above, Hemostemix benefited from its actual and potential business relationship with third parties to this case. Such relationships include those between Hemostemix and the Clinical Trial sites, its relationship with Accudata Solutions, LLC, and its relationship with the FDA and its subsidiary parts.

615.   Aspire had actual knowledge of these and other relationships have provided services to Hemostemix the nature of which required them to communicate and work with them.

616.   Aspire intentionally and unjustly interfered with and disrupted the business relationships between Hemostemix and its Clinical Trial sites by calling or otherwise providing a site with negative and false information regarding pendency or status of the Clinical Trial.

617.   Aspire intentionally and unjustly interfered with and disrupted the business relationships between Hemostemix and Accudata to which it fraudulently and falsely claimed to be the owner of Hemostemix's property that Aspire knew at the time to be in Accudata's possession and claiming owners sites by calling or otherwise providing a site with negative and false information regarding pendency or status of the Clinical Trial.

618.   Aspire intentionally and unjustly interfered with and disrupted the business relationships between Hemostemix and the FDA as a direct result of its fraudulent and false claim to be the owner of Hemostemix's Clinical Trial data includes specific Phase II results in Accudata's possession and control and which Hemostemix wrongly has been precluded from exercising or asserting any of its legal rights as the true owner of its property.   Therefore, Aspire's conduct has interference with its business relationship between Hemostemix by indefinitely delaying its review of the Midpoint Analysis that threaten its ability to properly proceed.

WHEREFORE Plaintiff Hemostemix Inc., demands judgment be entered in its favor and against Makofka, Jed Wood, Jacobs and Aspire for the full value of its damages incurred as a result of their substantial and unjustified tortious interference with Hemostemix's business relationships with the clinical trial sites, contractors and consultants such as Accudata, and shareholders, in an amount to be determined at trial but in any event not less than $46 million in actual damages and not less than $300 million for Hemostemix's inability to take its ACP-01 therapy to market due to the foregoing conduct. Hemostemix further seeks an award to Hemostemix of its reasonable attorneys' fees and costs, and all other and such further relief as this Court deems just and proper under the circumstances.

**COUNT XVI**
**CONVERSION**
**(Against Defendants Makofka, Jed Wood, Jacobs, Cooper, KSM, and Aspire)**

619. Hemostemix hereby realleges and incorporates as if fully set forth herein paragraphs 1 through 428 above.

620. Hemostemix is the sole and rightful owner of all right, title and interest to its property described herein including but not limited to its IP and Clinical Trial data that it provided to Aspire.

621. Hemostemix has the right to immediate possession, access and use of all IP and other property described herein due to its status as the sole and rightful owner of all right, title and interest to same.

622.   Makofka, Jed Wood, Jacobs, Cooper, KSM and Aspire wrongfully deprived Hemostemix of its rights to immediate possession, access and use of its property as the sole and rightful owner of same by wrongfully retaining possession of same despite its full knowledge and aware of Hemostemix's status as the owner of same.

623.   Makofka, Jed Wood, Jacobs, Cooper, KSM and Aspire are not authorized to possess Hemostemix property as the sole and rightful owner of same. Makofka, Jed Wood, Jacobs, Cooper, KSM and Aspire were expressly obligated to return such property upon termination of their agreements, which obligation survived such termination and thereby remains in full force and effect.

624.   Hemostemix properly has submitted multiple demands to Aspire for the immediate return of its property.  To date, Makofka, Jed Wood, Jacobs, Cooper, KSM and Aspire have ignored Hemostemix's demands and thus remains in unauthorized possess of same, harming Hemostemix by depriving it of the use and benefit of its property.

625.   Additionally, at the direction of Makofka and Jed Wood, Aspire misappropriated Hemostemix's raw Clinical Trial statistics and data for sixty-five (65) patients, which Aspire then used to create ACT-20 purportedly to treat COVID-19 related pneumonia.

WHEREFORE Plaintiff Hemostemix Inc., demands judgment be entered in its favor and against Makofka, Jed Wood, Jacobs, Cooper, KSM and Aspire, for the full value of its property that Aspire has wrongfully converted by its continued and unauthorized possession of same even after Hemostemix properly demanded the immediate return of same, in an amount to be determined at trial but in any event not less than $46 million in actual damages and not less than $300 million for Hemostemix's inability to take its ACP-01 therapy to market due to the foregoing conduct.  Hemostemix further seeks an award to Hemostemix of its reasonable attorneys' fees and costs, and all other and such further relief as this Court deems just and proper under the circumstances.  Hemostemix further demands disgorgement and recovery of all revenues resulting from Aspire's development of ACT-20.

### COUNT XVII
### BREACH OF CONTRACT
### (Against Defendants Jacobs and AJIA)

626.  Hemostemix realleges and incorporates as if fully set forth herein paragraphs 1 through 428 above.

627.  During the period covered by this Complaint, Jacobs served as Hemostemix's President and CMO.  The terms and conditions of Jacob's position at Hemostemix are set forth in the Jacobs Agreement between Hemostemix, AJIA and its principal, Jacobs.

180

628.   The Jacobs Agreement was a valid and enforceable contract by and between Hemostemix and AJIA and its principal, Jacobs.

629.   The Jacobs Agreement contained a noncompete provision whereby Jacobs and AJIA covenanted to Hemostemix not to obtain employment with a competitor subject to the limitations set forth therein. This provision expressly provides that the benefits and obligation therein survive after termination of the Jacobs Agreement for a set period of time.

630.   Pursuant to the Jacobs Agreement, Jacobs and AJIA were obligated to protect and properly treat Hemostemix's confidential data, information, material or processes owned by Hemostemix and revealed or disclosed to him in the course of his employment.  This obligation survived termination or expiration of the Jacobs Agreement.

631.  Jacobs and AJIA breached the Jacobs Agreement by violating his covenant not to compete immediately upon his resignation.  By resigning his position to join Aspire, a direct competitor, Jacobs breached the noncompete provision in his contract as well his fiduciary duties.

632.   Jacobs and AJIA further breached his employment agreement by failing to protect and properly maintain the confidential information owned and belonging to Hemostemix by engaging in or allowing any or all of Makofka, Wood, KSM, and Aspire to misappropriate same.

633.   Jacobs' and AJIA's failures and refusals to uphold his obligations to Hemostemix under the Jacobs Agreement constitute material breaches of same.

634.   Hemostemix has suffered significant damages as a direct and proximate result of Jacobs' and AJIA's material breaches of the Jacobs Agreement.

WHEREFORE Plaintiff Hemostemix Inc. demands judgment be entered in its favor and against Jacobs for the full value of its damages incurred as a result of Jacobs' breaches of the Jacobs Agreement, in an amount to be determined at trial but in any event not less than $46 million in actual damages and not less than $300 million for Hemostemix's inability to take its ACP-01 therapy to market due to the foregoing conduct.   Hemostemix further seeks an award to Hemostemix of its reasonable attorneys' fees and costs pursuant to the indemnification provision of the Jacobs Agreement, and all other and such further relief as this Court deems just and proper under the circumstances.

## COUNT XVIII
## PETITION FOR REPLEVIN WITH NOTICE - § 78.067, FLORIDA STATUTES
### (Against Defendant Aspire)

635.   Hemostemix hereby incorporates and realleges as if fully set forth herein paragraphs 1 through 428 above.

636.   Hemostemix brings this petition for replevin with notice pursuant to Fla. Stat. §§ 78.01, 78.03-04, 78.055, 78.065-67 and Fed. R. Civ. P. 64.

637.   Consistent with and further to the factual allegations above, Hemostemix seeks to replevy from Aspire that Hemostemix property wrongfully retained by Aspire, as follows: all Clinical Trial Data and confidential information presently possessed and hereafter acquired by Aspire including, without limitation, all documents, records, physical materials, retains, samples, compilations and/or any other tangible property related to the Clinical Trial, all of which Aspire has and continues to wrongfully possess and control and refuses to return same to Hemostemix despite its repeated and proper demands that it do so.

638.   Hemostemix reasonably estimates that its property described herein has a commercial value of at least $300 million.

639.   According to Cooper's prior sworn testimony, Aspire wrongfully keeps and holds Hemostemix's property identified above at its warehouse facility located in Orlando, Florida.   To the best of Hemostemix's knowledge, information and belief, Aspire's Orlando facility is located at **2100 N. Alafaya Trail, Suite #600, Orlando, Florida 32826**.

640.   Hemostemix is the sole and rightful owner of its property described above and, as such, Hemostemix is entitled to immediate possession of its property that Aspire has and continues to wrongfully possess and control and refuses to return same to Hemostemix despite its repeated and proper demands that it do so. Hemostemix's ownership and possessory rights to its property described herein are

evidenced by the Original License Agreement and Manufacturing Agreement, as well as other agreements identified above, both of which expressly acknowledge and recognize Hemostemix's ownership and possessory rights to same. Hemostemix's right to immediate possession of its property described herein is evidenced by the Original License Agreement and the Manufacturing Agreement, both of which require Aspire to return Hemostemix's property upon their respective expiration or termination.

641.    The property Hemostemix seeks to be replevied is being wrongfully retained by Aspire. Aspire lost its right to use and possess Hemostemix's property upon termination or expiration of the Original License Agreement and the Manufacturing Agreement, after which Aspire was obligated to return all of Hemostemix's property to Hemostemix. Aspire has and continues to wrongfully possess and control Hemostemix's property described herein, which it refuses to return to Hemostemix despite its repeated and proper demands that it do so.

642.    The property Hemostemix seeks to be replevied was not and has not been taken for a tax, assessment or fine pursuant to applicable law.

643.    The property Hemostemix seeks to be replevied was not and has not been taken under execution or attachment against the property of Aspire.

WHEREFORE Plaintiff Hemostemix Inc. respectfully requests that this Court: (a) examine this Complaint on its face and, without consideration of further

or additional evidence, issue an Order to Show Cause to Defendant, Aspire Health Sciences, LLC, and schedule a hearing on the Order to Show Cause; (b) after the hearing, Hemostemix respectfully requests that this Court enter an Order authorizing and directing the Clerk of Court to issue a pre-judgment writ of replevin requiring the immediate return of Hemostemix's property described herein and precluding Aspire from taking any action to interfere with such Order, and further authorize and direct the United States Marshal to forthwith seize Hemostemix's property its seeks to be relieved and further authorize the United States Marshall to cause Aspire's house, building, warehouse, commercial facility or enclosure to be broken open and make replevin according the Writ, and, if necessary, further authorizing the United States Marshall to take to his or her assistance the power of the state and/or county; (c) after the seizure, and during the pendency of this action, Hemostemix respectfully requests that this court authorize Hemostemix to use and enjoy its possessory rights to the property described herein; and (d) that this Court enter a final judgment in Hemostemix's favor for its possession of the property sought to be replevied and described herein, award Hemostemix its attorneys' fees and costs incurred to obtain the replevin of its property, along with all other and such further relief as this Court deems just and appropriate.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Hemostemix Inc. respectfully requests that this Honorable Court grant relief in its favor and against Defendants as follows:

a. compensatory damages against Defendants jointly and severally exceeding $75,000.00, with interest at the maximum amount permitted by law but, in any event, not less than $46 million in actual damages and not less than $300 million for Hemostemix's inability to take its ACP-01 therapy to market due to the foregoing conduct;

b. statutory treble damages;

c. reasonable attorneys' fees, costs, and other expenses as permitted by law;

d. indemnification of attorneys' fees, costs and other expenses as against Jacobs pursuant to the Jacobs Agreement;

e. a preliminary and permanent injunction ordering the immediate return of all IP and other confidential information and assets of Hemostemix held by or at the direction Makofka, Jed Wood, Jacobs, Cooper, KSM and Aspire;

f. disgorgement and recovery of all revenues resulting from Aspire's development of ACT-20; and

g. such other and further relief as the Court may deem just and proper.

186

## JURY DEMAND

Hemostemix hereby demands trial by jury as to all issues and claims in this action triable by jury.

Dated: December 3, 2021

Respectfully submitted,

**DLA PIPER LLP (US)**

/s/ *Christopher Oprison*
Christopher Oprison, Esq.
Florida Bar No. 0122080
chris.oprison@dlapiper.com
sheila.hall@dlapiper.com
200 South Biscayne Blvd., Suite 2500
Miami, Florida 33131
Tel.: (305) 423-8522
Fax: (305) 675-6366

*Counsel for Plaintiff Hemostemix Inc.*